**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAMP MYSTIC, LLC,[1] | ) | Case No. 26-90621 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE**

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within 21 days from the date this Motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this Motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Camp Mystic, LLC (4064), Natural Fountains Properties, Inc. (1414), Mystic Camps Family Partnership, Ltd. (9861), and Mystic Camps Management, LLC (9688). The location of the Debtors' service address for purposes of these chapter 11 cases is: 2689 Highway 39, Hunt, TX 78024.

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..... **1**
**JURISDICTION AND VENUE** ..... **4**
**BACKGROUND** ..... **4**
I. The Debtors' Organizational Structure & Management. ..... 4
II. The July 4, 2025 Tragedy. ..... 6
A. The Eastland Family's Knowledge of Flooding at Camp Mystic. ..... 7
B. Timeline of Events July 3–4, 2025. ..... 8
C. Camp Mystic's Re-unification Efforts and Incident Management Were Chaotic ..... 10
D. Legislative Response to the July 4, 2025 Tragedy. ..... 10
III. July 2025–June 2026: The Eastlands' Efforts to Reopen the Camp, Consolidated State Court Litigation, Ongoing Criminal Investigation & Texas Legislature Report. ..... 11
A. The Consolidation of State Court Lawsuits in Travis County. ..... 11
B. Ongoing Texas Rangers Criminal Investigation. ..... 14
C. Conclusions of the Texas Legislature Report ..... 14
IV. The Chapter 11 Cases. ..... 16
A. Procedural Developments in the State Court Lawsuits ..... 17
B. Litigation Over the Scope of the Automatic Stay. ..... 18
C. Appointment of the Committee. ..... 19
D. The Filing of the Debtors' Schedules and Statements. ..... 19
E. The Debtors' Section 341 Meeting of Creditors. ..... 22
F. The Eastland Family's Continued Control & the Debtors' Insufficient Governance Reform Efforts. ..... 23
**ARGUMENT** ..... **25**
I. The Factual Record Clearly Demonstrates that "Cause" Exists to Appoint a Trustee Under Section 1104(a)(1) of the Bankruptcy Code. ..... 26
A. Current Management Has a Long Record of Incompetence and Gross Mismanagement of the Debtors' Affairs ..... 26
B. The Irreconcilable Conflicts of the Eastland Directors Constitute Cause. ..... 30
C. Acrimony Between the Debtors and Creditors Constitutes Cause ..... 32
II. Appointment of a Trustee Is in the Best Interests of the Estates Under Section 1104(a)(2) of the Bankruptcy Code. ..... 34

A. The Trustworthiness of the Debtors. ........ 34
B. The Debtors' Past and Present Performance and Prospects for Rehabilitation. ........ 35
C. Lack of Creditor Confidence. ........ 36
D. Benefits of a Trustee Outweigh the Costs. ........ 37
**CONCLUSION ........ 38**

# TABLE OF AUTHORITIES

**CASES**


*Alharbi v. Beck*,
62 F. Supp. 3d 202 (D. Mass. 2014) ---------- 7

*In re Adelphia Commc'ns Corp.*,
336 B.R. 610 (Bankr. S.D.N.Y. 2006) ---------- 36

*In re Cajun Elec. Power Coop., Inc.*,
74 F.3d 599 (5th Cir. 1996) ---------- 26, 30

*In re Eletson Holdings Inc.*,
659 B.R. 426 (Bankr. S.D.N.Y. 2024) ---------- 34

*In re Enron Corp.*,
No. 01-16034-AJG, 2005 WL 6237551 (Bankr. S.D. Tex. Dec. 9, 2005) ---------- 7

*In re Ford Steel, LLC*,
629 B.R. 871 (Bankr. S.D. Tex. 2021) ---------- 34

*In re Marvel Ent. Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998) ---------- 26, 32

*In re Patman Drilling Int'l, Inc.*,
No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D. Tex. Mar. 14, 2008) ---------- 30

*In re Poirier*,
346 B.R. 585 (Bankr. D. Mass. 2006) ---------- 7

*In re Russell*,
60 B.R. 42 (Bankr. W.D. Ark. 1985) ---------- 31

*In re Sharon Steel Corp.*,
871 F.2d 1217 (3d Cir. 1989) ---------- 26

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019) ---------- 26, 31, 34, 35

*In re Stream TV Networks, Inc.*,
No. 23-10763, 2024 WL 87639 (Bankr. E.D. Pa. Jan. 5, 2024) ---------- 32

*In re Taub*,
427 B.R. 208 (Bankr. E.D.N.Y. 2010) ---------- 34

*In re The 1031 Tax Grp., LLC*,
374 B.R. 78 (Bankr. S.D.N.Y. 2007) ---------- 35

*In re Westbank Holdings, LLC*,
2022 Bankr. LEXIS 2109 (Bankr. E.D. La. Aug. 1, 2022) ---------------------------------- 30, 34

*Ritchie Special Credit Invs., Ltd. v. U.S. Tr.*,
620 F.3d 847 (8th Cir. 2010) ----------------------------------------------------------------37

*United States v. Gluk*,
831 F.3d 608 (5th Cir. 2016) ---------------------------------------------------------------- 7

*Woodlawn Cmty. Dev. Corp. v. Official Comm. of Unsecured Creditors (In re Woodlawn Cmty. Dev. Corp.)*,
613 B.R. 671 (2020) ---------------------------------------------------------------------- 27, 28

**STATUTES**

11 U.S.C. § 105(a) ----------------------------------------------------------------------------36

11 U.S.C. § 1102 -------------------------------------------------------------------------------19

11 U.S.C. § 1104 -------------------------------------------------------------------------------- 1

11 U.S.C. § 1104(a)------------------------------------------------------------------------- passim

11 U.S.C. § 1107 -------------------------------------------------------------------------------17

11 U.S.C. § 1108 -------------------------------------------------------------------------------17

28 U.S.C. § 1334 -------------------------------------------------------------------------------- 4

28 U.S.C. § 1408 -------------------------------------------------------------------------------- 4

28 U.S.C. § 1409 -------------------------------------------------------------------------------- 4

28 U.S.C. § 157 --------------------------------------------------------------------------------- 4

28 U.S.C. § 157(b) ------------------------------------------------------------------------------ 4

**RULES**

Bankruptcy Local Rule 9013-1 ------------------------------------------------------------------ 4

Fed. R. Bank. P. 2009(c)(2) -------------------------------------------------------------------37

Fed. R. Bankr. P. 2007.1 ----------------------------------------------------------------------- 4

Fed. R. Bankr. P. 2009 -------------------------------------------------------------------------- 4

Fed. R. Bankr. P. 9014 -------------------------------------------------------------------------- 4

Fed. R. Evid. 803(8) ---------------------------------------------------------------------------------------- 7

The Official Committee of Unsecured Creditors (the "Committee") of Camp Mystic, LLC and its debtor affiliates in the above-captioned cases (collectively, the "Debtors"), hereby files this motion (the "Motion"), pursuant to section 1104 of title 11 of the United States Code (the "Bankruptcy Code"), requesting that the Court enter an order appointing a trustee for the Debtors. In support of the Motion, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Committee brings this Motion for a simple reason: these chapter 11 cases will not move forward so long as the Eastland Directors are deciding where they will go. Over seventy-five days into these cases, the Debtors have no reorganization strategy, no plan, and—by their own chief restructuring officer's testimony—have had no discussions about how to reorganize at all. This is not the ordinary pace of a functioning bankruptcy. It is the predictable result of a governance structure in which every decision that would advance these cases is a decision the Eastland Directors are unwilling to make. Investigating themselves. Selling the Camp Mystic property. Resolving the claims of twenty-six families whose daughters died at Camp Mystic on July 4, 2025 (the "Tragedy"). Confronted with these questions, the Eastland Directors have made the only decisions they were ever going to make—the ones that protect themselves. The Committee has concluded that the appointment of a trustee is necessary to break this logjam. So long as the Eastlands hold the keys there will be no bankruptcy solution in these cases. Not because one does not exist, but because the Eastlands are not able to reach for it.

2. For decades, the Eastland family owned and operated Camp Mystic, a summer camp for young girls located on a 725-acre ranch along the Guadalupe River. On July 4, 2025, 28 lives were needlessly lost at Camp Mystic, including twenty-five campers, two counselors, and Camp Mystic's director and co-owner, Richard "Dick" Eastland. Preventable tragedies often beget

litigation, and this case is no exception. In the months following the Tragedy, many of the victims' families filed wrongful death lawsuits against Camp Mystic and individual members of the Eastland family. After several months of litigation in Travis County—where all the wrongful death lawsuits were pending before a single judge—the Eastland Directors initiated these chapter 11 cases in late June, days shy of the Tragedy's one-year anniversary.

3. The Debtors have accomplished very little two and a half months into these chapter 11 cases. There is no reason to think this will change going forward. The reason so little progress has been made is simple: the Eastland Directors continue to control the Debtors. However, the interests of the Eastland Directors and the Debtors parted ways following the Tragedy. In fact, their interests are cross purposes in many contexts, including the five pending wrongful death lawsuits, future wrongful death lawsuits, the Texas Rangers' ongoing criminal investigation, the claims asserted against the estates by the Eastland family, and the various claims the estate is likely to hold against the Eastland Directors for their failures to prepare for and respond to the Tragedy.

4. Tellingly, the Debtors did nothing to address these obvious conflicts until the Committee and the victims' families began sounding the alarm several weeks ago. While the Debtors now acknowledge that they have a governance problem, their proposed solution—as set forth in the Independent Director Motion—falls well short. While the Committee intends to file an objection to the Independent Director Motion in due course, it can summarize its position now: the proposal is woefully inadequate and illustrates the Eastlands' continued unwillingness to give up control. If the Court is going to fix the Debtors' governance, it should do so once and soundly.

5. The Eastland Directors have made clear that they have no intention of doing the only appropriate thing under present circumstances: voluntarily remove themselves from the Debtors' decision-making authority and delegate that authority to independent, unconflicted

fiduciaries. Therefore, the Committee has concluded the best way to move these cases forward is to seek the appointment of a chapter 11 trustee. The record is replete with evidence of incompetence and gross mismanagement of the Debtors' affairs, as well as the Eastland Directors' conflicts of interest. Moreover, the acrimony between the Debtors, the Eastland family, and the victims' families runs deep—a byproduct of unfathomable and avoidable losses and the Eastlands' actions thereafter. Progress between the Debtors and the victims' families will not and cannot be made until the Debtors are represented by a truly independent fiduciary. For all these reasons, section 1104(a) of the Bankruptcy Code mandates the appointment of a trustee.

6. The Committee appreciates the weight of the relief it seeks. Appointing a trustee may involve additional costs, including the time and expense of getting a new fiduciary up to speed. However, the Committee knows all too well the context in which these cases were filed, the lack of progress to date, the lack of strategy going forward, and the Eastland Directors' ongoing inability to fulfill their roles as fiduciaries. Given the fundamental governance and trust issues holding these cases back, the Committee believes that any time or expense resulting from the appointment of a trustee will, in fact, move these cases forward more quickly and more efficiently in the long run. To be sure, the Committee does not want the value of the estates to erode as these cases languish in bankruptcy. To that end, the Committee has already begun working to identify potential chapter 11 trustees and replacement counsel willing to work on these cases on a low or no-cost basis. Moreover, upon appointment, the Committee would be prepared to immediately begin working with a trustee on plan structures and asset monetization strategies. For the reasons set forth below, the Committee urges the Court to approve the Motion and order the appointment of a trustee.

## JURISDICTION AND VENUE

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, entered May 24, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested herein are section 1104(a) of the Bankruptcy Code, Rules 2007.1, 2009, and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas.

## BACKGROUND

### I. The Debtors' Organizational Structure & Management.

10. There are four debtor entities in these jointly administered chapter 11 cases: (i) Camp Mystic, LLC ("Camp Mystic LLC"), (ii) Natural Fountains Properties, Inc. ("NFP"), (iii) Mystic Camps Family Partnership, Ltd. ("MC Family Partnership"), and (iv) Mystic Camps Management, LLC ("MC Management"). **Graphic 1** below shows the Debtors' organizational structure as well as (i) NFP's ownership of the 725-acre ranch on which Camp Mystic operated (the "Property") and (ii) the Eastland family's financial interests in the Camp's operation.[2]

[2] *See Declaration of Karen Nicolaou, Debtors' Proposed Chief Restructuring Officer, in Support of Chapter 11 Petitions and Second Day Motions* [Docket No. 45], Exhibit A (the "Second Day Declaration").

**<u>Graphic 1</u>**




11. Before the Tragedy, Richard "Dick" Eastland, his wife Willetta "Tweety" Eastland and their three adult sons—Richard Eastland Jr., Britt Eastland, and Edward Eastland—operated Camp Mystic. Following Dick's passing in the Tragedy, his wife and sons (collectively, the "<u>Eastland Directors</u>") continued to operate and govern the Debtors. The table below summarizes the operational and governance roles of the Eastland Directors:

| Family Member | Spouse | Governance Roles | Operational Roles[3] |
|---|---|---|---|
| Tweety Eastland | Dick Eastland (Deceased) | • Director of NFP<br>• Manager of Camp Mystic LLC<br>• Manager of MC Management<br>• Sole Member of MC Management | • Owner & Executive Director |
| Richard Eastland Jr. | Leslie Eastland | • Director of NFP<br>• Manager of Camp Mystic LLC<br>• Manager of MC Management | • Head Chef and Kitchen Supervisor |
| George "Britt" Eastland | Catie Eastland | • Director of NFP<br>• Manager of Camp Mystic LLC<br>• Manager of MC Management | • Co-Director of Camp Mystic Cypress Lake |
| Edward Eastland | Mary Liz Eastland | • Director of NFP<br>• Manager of Camp Mystic LLC<br>• Manager of MC Management | • Co-Director of Camp Mystic Guadalupe River<br>• CFO of Camp Mystic Cypress Lake and Guadalupe River |

*See Second Day Declaration*, Exhibit B; *see also Directors & Staff*, CAMP MYSTIC, https://campmystic.com/directors-staff (last visited Sep. 5, 2026); Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 52:15–25.

12. Campers stayed on one of two campuses located on the Property: (i) the original Guadalupe River campus or (ii) the Cypress Lake campus, which opened in 2020. All those that died in the Tragedy were staying on the lower-elevation Guadalupe River campus.

## II. The July 4, 2025 Tragedy.

13. Twenty-eight individuals died at Camp Mystic on July 4, 2025. Shortly thereafter, the Texas Senate and House General Investigating Committees launched an investigation into the

[3] The testimony of the Debtors' Chief Restructuring Officer Ms. Karen Nicolaou ("CRO") at the Section 341 Meeting of creditors demonstrated that each of the Eastland Directors supported the Camp's operations in different ways. For example, in addition to handling the kitchen, Richard Eastland Jr. would also do "day-to-day office work" and worked on a failed effort to reopen the Camp following the Tragedy. Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 33:15–33:24. Britt Eastland is knowledgeable about insurance issues. *Id.* at 49:16–18, 64:7–9. Edward Eastland has served as the most direct point of contact for Ms. Nicolaou. *Id.* at 49:6–8, 64:5–7. A copy of the 341 Meeting Transcript is attached hereto as **Exhibit A**.

tragedy. On June 18, 2026, following hearings, evidentiary review, and more than 140 witness interviews, they released the "*Report on the Camp Mystic Flood Disaster of July 4, 2025*" (the "Texas Legislature Report"), which is attached hereto as **Exhibit B**.[4] [5]

**A. The Eastland Family's Knowledge of Flooding at Camp Mystic.**

14. Camp Mystic sits in the heart of what is known as "Flash Flood Alley." Texas Legislature Report at 40. The region's history of catastrophic flooding is well-documented, as is Camp Mystic's. Before 2025, the most significant recorded floods at Camp Mystic occurred in 1932, 1978, and 1987. *Id.* at 42. In both 1978 and 1987, the Eastland family's patriarch (Dick Eastland) helped evacuate campers from the floods. *Id.* at 91.

15. In the aftermath of the 1987 flood—which killed ten campers at a different camp on the same Guadalupe River—Dick Eastland became active in Guadalupe River flash flood preparedness efforts. Specifically, Dick advocated for and helped establish an automatic flood alert and rain gauge system for the region. *Id*. at 58. Dick also served multiple terms on the board of the Upper Guadalupe River Authority, including at the time of his death. *Id.* at 58. A few years after the deadly 1987 flood along the Guadalupe River, the Texas Legislature enacted the Texas Youth Camp Safety and Health Act. *Id.* at 43. Under the regulations applicable at the time of the Tragedy, camps like Camp Mystic were required to maintain written emergency plans, review those plans with staff, and assign personnel responsibilities in the event of emergencies. *Id.* at 44.

---

[4] Senate General Investigating Committee on the July 2025 Flooding Events & House General Investigating Committee on July 2025 Flooding Events, Report on the Camp Mystic Flood Disaster of July 4, 2025 (June 18, 2026), https://senate.texas.gov/_assets/pdf/2026.06.26-FINAL-report-corrected.pdf. The Court may take judicial notice of the Texas Legislature Report. *See, e.g., Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014); *In re Poirier*, 346 B.R. 585, 588 (Bankr. D. Mass. 2006) (collecting cases). In turn, the Texas Legislature Report's factual findings are admissible for their truth under the Rule 803(8) hearsay exception for "legally authorized investigation[s]." FED. R. EVID. 803(8); *United States v. Gluk*, 831 F.3d 608, 613–14 (5th Cir. 2016); *see also In re Enron Corp.*, No. 01-16034-AJG, 2005 WL 6237551, at *27 (Bankr. S.D. Tex. Dec. 9, 2005) (applying the public records hearsay exclusion to congressional reports).

[5] The Texas Legislature Report is the single-best public resource for understanding the Tragedy. To that end, the Committee relied heavily on the Texas Legislature Report when drafting the following sections.

As a camp director, Dick understood better than most the region's capacity for sudden destruction and the need for proper emergency preparation. In 2017, he forwarded an educational video published by the Upper Guadalupe River Authority called "Be Flood Aware" to members of the Eastland family—including his wife and three sons—urging them to watch. *Id.* at 58, n.96.

**B. Timeline of Events July 3–4, 2025.**

16. The Texas Legislature Report includes a comprehensive timeline of the events that took place early on the morning of July 4. At 1:14 a.m., the National Weather Service upgraded the previous day's "flood watch" to a ***flash flood warning*** and pushed those alerts automatically to all cell phones within the affected region that have not disabled such warnings. *Id.* at 76–78. The warning cautioned of "life threatening flash flooding of creeks and streams," specifically identified the community of Hunt—the location of Camp Mystic—as a location that would experience flash flooding, and reminded that "[m]ost flood deaths occur in vehicles." *Id.* at 77. Despite multiple members of the Eastland family receiving the National Weather Service's warnings, no effort took place to evacuate campers until 3:00 a.m. *Id.* at 37–38; 81. To the contrary, Dick Eastland and his son Edward Eastland had instructed counselors to remain in their cabins, despite these cabins being in a floodplain of the Guadalupe River. *Id.* at 80–81. Less than two hours later, Dick, along with twenty-seven campers and counselors, would be dead. The Texas Legislature Report timeline is provided below as **Graphic 2**.

**Graphic 2**

| JULY 4, 2025 | *All times Central* |
|---|---|
| **1:14 a.m.** | **NWS issues Flash Flood Warning.** |
| **1:45 a.m.** | Dick Eastland radios son Edward and the grounds crew to move equipment. |
| **2:11 a.m.** | Night watchman reports flooding to retired fire chief. |
| **2:14 a.m.** | Edmundson/Bubble Gum Creek becomes impassable. |
| **2:30 a.m.** | Bug House and Look Inn counselors run to the office to report water in the cabins. |
| **2:33 a.m.** | Dick texts wife Tweety reporting over four inches of rain. |
| **2:37 a.m.** | Dick and Edward drive Bug House / Look Inn counselors back to the cabins. |
| **2:55 a.m.** | Gate guard radios for help and reports flooding inside the guard house. |
| **3:00 a.m.** | **Dick decides to evacuate Bug House and Look Inn.** |
| **3:11–3:19** | Bug House, Look Inn, and Hang Out evacuated to Rec Hall by vehicle. |
| **3:20–3:30** | Tumble Inn I & II evacuated by vehicle; Jumble House directed to walk to Rec Hall. |
| **3:30–3:40** | Nut Hut and Chatterbox self-evacuate up the hill; Dick drives to Bubble Inn. |
| | Edward assists at Twins I & II; the night watchman assists at Giggle Box and Wiggle Inn. |
| | Dick radios for help with Bubble Inn. |
| **3:51 a.m.** | Dick is submerged. |
| **4:09 a.m.** | Edward is submerged and swept to the Bug House tree with campers and counselors. |
| **4:19 a.m.** | 911 call reports rescue of two Twins campers downriver. |
| **5:00–7:00** | Other adults help survivors descend from trees and roofs. |

*Id.* at 68.

### C. Camp Mystic's Re-unification Efforts and Incident Management Were Chaotic.

17. In the immediate aftermath of the Tragedy, Camp Mystic's response inflicted additional trauma on the families of the victims. For example, at 11:28 a.m. on the morning of July 4, Camp Mystic sent out an email to parents that stated:

> We have sustained catastrophic level floods. We have no power, water, or wifi. All Cypress Lake campers are accounted for. All campers on senor [sic] hill are accounted for. If your daughter is not accounted for you have been notified. **If you have not been personally contacted then your daughter is accounted for.** We are working with search and rescue currently. The highway has washed away so we are struggling to get more help. Please continue to pray and send any help if you have contacts to do so.

*Id.* at 101. The Texas Legislature Report goes on to note that "This email provided false hope to families who had not yet been called, only to be told later that their daughter was missing." *Id.*

18. Another example took place that same afternoon. Around 2:45 p.m., Camp Mystic sent additional emails to parents letting them know that rescue helicopters were evacuating campers in small groups to Ingram Elementary, and that parents should pick up their daughters there. *Id.* The Texas Legislature Report goes on to note: "Although there were well-meaning volunteers and public officials at Ingram Elementary, no one person or agency took control there. The anxious parents of missing campers waited in the same area with parents who were joyfully reuniting with their children." *Id.*

### D. Legislative Response to the July 4, 2025 Tragedy.

19. Following the Tragedy, the Texas Legislature took steps to address deficiencies exposed by the tragedy at Camp Mystic. Specifically, it enacted three statutes directed at youth-camp safety and Texas' flood-warning capacity: (i) the Youth CAMPER Act—establishing requirements for emergency planning, training, and oversight; (ii) Heaven's 27 Camp Safety Act—imposing additional requirements for camps located in floodplains, including communication and

alert systems and licensing oversight; and (iii) Senate Bill 3—amending the Texas Water Code and Government Code to mandate flood-warning sirens in flash flood-prone areas. *Id.* at 107–110. Governor Greg Abbott signed these bills into law on September 5, 2025. *Id.* at 107.

## III. July 2025–June 2026: The Eastlands' Efforts to Reopen the Camp, Consolidated State Court Litigation, Ongoing Criminal Investigation & Texas Legislature Report.

20. Less than three months after the Tragedy, the Eastland family began recruiting efforts for the 2026 season. *See* Pls.' Appl. for TRO & Temp. Inj. ¶¶ 106–108, Docket No. 2, *Steward*, attached hereto as **Exhibit C**. At least one email sent to prospective families referenced the construction of a memorial for the campers and counselors that died in the Tragedy. *Id.* at ¶ 311. Prior to sending this communication, the Debtors had not contacted any of the victims' families about this project. The email was signed by seven members of the Eastland family—Tweety Eastland, Richard Jr. and Leslie Eastland, Britt and Catie Eastland, Edward and Mary Liz Eastland. *Id.* at ¶ 322.

### A. The Consolidation of State Court Lawsuits in Travis County.

21. By November 2025, families of the deceased began initiating civil lawsuits in Travis County against both the Debtors and individual defendants, including members of the Eastland family (respectively, the "State Court Lawsuits" and "Individual Defendants").[6] [7] The

[6] The twenty-seven (27) campers and counselors that died at Camp Mystic on July 4, 2025 come from twenty-six (26) separate families (the Lawrence family lost two daughters). As of the Petition Date, twenty-two (22) of those families were plaintiffs in one the five (5) State Court Lawsuits. The original captions of the five State Court Lawsuits are: *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (200th Dist. Ct., Travis Cnty., Tex.) (the "Steward Lawsuit"); *Getten v. Nat. Fountains Props., Inc.*, No. D-1-GN-25-009976 (459th Dist. Ct., Travis Cnty., Tex.) (the "Getten Lawsuit"); *Bellows v. Camp Mystic, LLC*, No. D-1-GN-25-009963 (455th Dist. Ct., Travis Cnty., Tex.) (the "Bellows Lawsuit"); *Naylor v. Camp Mystic, LLC*, No. D-1-GN-25-010016 (200th Dist. Ct., Travis Cnty., Tex.) (the "Naylor Lawsuit"); and *Peck v. Camp Mystic, LLC*, No. D-1-GN-25-009983 (261st Dist. Ct., Travis Cnty., Tex.) (the "Peck Lawsuit"). As of the Petition Date, only the Marsh family, the Lawrence family, the Baker family, and the Smajstrla family have not initiated wrongful death lawsuits against the Debtors and Individual Defendants.

[7] The Individual Defendants are Willetta "Tweety" Eastland, George Albritton "Britt" Eastland as representative of Richard G. "Dick" Eastland's estate, Edward S. Eastland, Mary Liz Eastland, and William Neely Bonner III.

Plaintiffs in those actions assert numerous claims based on the conduct of the Debtors and the Individual Defendants, both prior to and in response to the Tragedy, including failing to maintain safe premises, implement adequate flood emergency and evacuation plans, and train staff on emergency procedures. *See, e.g.*, Pls.' Original Pet. ¶¶ 115–19, Docket No. 1, *Bellows*; Pls.' Original Pet. ¶¶ 54–55, Docket No. 1, *Peck*. Specifically, the claims asserted in the State Court Lawsuits include negligence, gross negligence, premises liability, wrongful death, and intentional infliction of emotional distress. *See* Pls.' Original Pet. ¶¶ 329–374, Docket No. 1, *Steward* (*see* Exhibit 2 to **Exhibit C** hereto); Pls.' Original Pet. ¶¶ 95–131, Docket No. 1, *Bellows*; Pls.' Original Pet. ¶¶ 60–77, Docket No. 1, *Peck*; Pls.' Original Pet. ¶¶ 64–104, Docket No. 1, *Getten*; Pls.' Original Pet. ¶¶ 25–64, Docket No. 1, *Naylor*.

22. On March 4, 2026, a local administrative judge consolidated the five outstanding State Court Lawsuits for pretrial purposes—the Bellows Lawsuit, the Getten Lawsuit, the Naylor Lawsuit, the Peck Lawsuit, and the Steward Lawsuit—and assigned them to Judge Maya Guerra Gamble of the 459th District Court, Travis County, Texas. *See, e.g.,* Assignment Letter from Loc. Admin. J. Amy Clark Meachum to Counsel (Mar. 4, 2026), Docket No. 32, *Getten*.

23. A brief timeline of the procedural history of the State Court Lawsuits is provided below:

- **February 6, 2026**: Plaintiffs in the Steward Lawsuit move for a temporary injunction designed to enjoin the Debtors from making repairs at Camp Mystic's Guadalupe River campus in advance of the 2026 camp season. Pls.' Appl. for TRO & Temp. Inj. ¶ 46, Docket No. 2, *Steward*. The plaintiffs in the Steward Lawsuit are uniquely positioned to seek this relief as the body of their daughter has not been located or identified.[8] In short, the temporary injunction is designed to preserve evidence.

- **March 5, 2026**: Judge Guerra Gamble enters a written order granting the temporary injunction sought in the Steward Lawsuit.

[8] As of the filing of this Motion, the body of C.S. is still missing.

- **March 24, 2026**: Defendants move to compel arbitration and stay the State Court Lawsuits (the "Arbitration Motion"). A hearing on the Arbitration Motion is scheduled for May 13, 2026.

- **April 15, 2026**: Following a three-day evidentiary hearing, Judge Guerra Gamble enters a revised written order granting the temporary injunction sought in the Steward Lawsuit, which is attached hereto as **Exhibit D** (the "Prepetition TRO"). The Prepetition TRO's factual findings, based on the days of testimony, include (i) "that Plaintiffs have demonstrated a probable right to relief sought in their claims for negligence, gross negligence, and premises liability . . . , supported by facts tending to show that Defendants breached [their duty of care to the minor campers] by operating Camp Mystic in a high-risk flood zone without adequate flood protections," and (ii) "that Defendants potentially violated Texas Administrative Code § 265.15(k) by failing to maintain a written evacuation plan or provide documented safety training which supports a finding of negligence *per se*."[9]

- **May 12, 2026**: On the evening before oral argument, the Defendants withdraw the Arbitration Motion and move to compel arbitration and stay the State Court Lawsuits (the "Amended Arbitration Motion").

- **May 27, 2026**: Plaintiffs in the Steward Lawsuit move for sanctions against (i) Camp Mystic LLC; (ii) NFP; (iii) MC Family Partnership; (iv) MC Management; (v) Britt Eastland, as Representative of the Estate of Dick Eastland; (vi) Tweety Eastland; (vii) Edward Eastland; (viii) Mary E. Eastland; and (ix) William Neely Bonner, III as a result of the withdrawal of the Arbitration Motion and other alleged bad faith conduct that occurred in the State Court Lawsuits. In that motion, which is attached hereto as **Exhibit F**, the plaintiffs alleged that the Individual Defendants and their counsel engaged in a pattern of bad-faith litigation conduct, including (i) making misrepresentations to the state court and the Texas Third Court of Appeals, (ii) willful noncompliance with the state court's directives regarding hearing attendance and docket settings, (iii) spoliation of evidence at the Camp Mystic site in violation of the temporary injunction, and (iv) exhibiting indecorous and personally targeted conduct toward Plaintiffs and their counsel, including telling Plaintiffs' counsel in open court that they were "going to burn in hell." Pls.' Mot. for Sanctions, Docket No. 82, *Steward*. In the next two weeks, certain plaintiffs in the other State Court Lawsuits separately move for sanctions and to strike the filing of the Amended Arbitration Motion (collectively, the "Motions to Strike and Sanction").

- **June 10, 2026**: Judge Guerra Gamble holds a hearing on the Amended Arbitration Motion and the Motions to Strike and Sanction. All motions presented are taken under advisement.

---

[9] On April 30, 2026, following the testimony, Judge Guerra Gamble's order establishing the Prepetition TRO, and the announcement of a criminal investigation discussed below, Camp Mystic issued a statement that it will not be operating during the 2026 season and that it withdrew its 2026 license application from the Texas Department of State Health Services ("Texas DSHS"). That statement is attached hereto as **Exhibit E**.

- **June 24, 2026**: The Debtors initiate these chapter 11 cases (the "Chapter 11 Cases") before Judge Guerra Gamble can issue decisions on the Amended Arbitration Motion and the Motions to Strike and Sanction.

### B. Ongoing Texas Rangers Criminal Investigation.

24. On April 7, 2026, Texas Lieutenant Governor Dan Patrick announced that the Texas Rangers would begin a criminal investigation into Camp Mystic and urged the commissioner of the Texas DSHS not to approve or renew Camp Mystic's camp license until "all criminal and legislative investigations are complete and necessary corrective actions are taken." That statement is attached hereto as **Exhibit G**. That investigation remains ongoing.

### C. Conclusions of the Texas Legislature Report

25. On June 18, 2026, the Texas Senate and House General Investigating Committees issued the Texas Legislature Report. The report includes twenty separate conclusions which have been provided below:[10]

**Camp Mystic did not have written emergency plans that complied with state requirements.**

- C-1. Camp Mystic **did not** have written emergency plans that specified how each occupied building would be evacuated in the event of the need to evacuate in response to a flood, as occurred on July 4, 2025.

- C-2. Instead, the Camp's written emergency plan instructed campers to **shelter in place and to await further instruction**.

- C-3. Procedures for actual evacuation of cabins in response to a flood **were not reviewed** with camp staff and counselors; specific assignments of responsibilities **were not made** to each staff member and counselor.

- C-4. Campers **were not instructed** about how a flood evacuation would occur.

- C-5. To the extent Camp Mystic had an evacuation plan for its Guadalupe Camp cabins based on the actual experience of past floods, that plan **was not documented in writing,** and it **was not communicated** to staff, counselors, or campers.

[10] The conclusions have been copied here verbatim, including any original emphasis.

- C-6. If there was any threshold of flooding at which sheltering in place would be abandoned and campers would be instructed how and where to evacuate to higher ground, that plan only would have been known to the camp's co-executive director, Dick Eastland.

**Camp Mystic did not adequately prepare for the July 3–4, 2025 storm.**

- C-7. Camp Mystic staff had access to weather updates available to the general public. The National Weather Service issued a **series of weather alerts** of increasing severity on July 3 and into the morning of July 4.

- C-8. In the early afternoon of July 3, a **Flood Watch** was in effect through the morning of July 4, which **specifically included Kerr County**, and warned of the possibility of "[l]ocally heavy rainfall" which "could cause flash flooding." Thus the general public—including Camp Mystic, which had assumed responsibility for the safety of 557 girls—was on notice on the evening of July 3 of the risk of flash flooding in the area overnight.

- C-9. Many of Camp Mystic's senior leaders went to bed on July 3 with **no awareness of the potential for extreme weather**. Only Dick Eastland and a security guard stayed awake at Camp Mystic to monitor the weather.

- C-10. At 1:14 a.m. on July 4, the National Weather Service significantly upgraded its alert to a **Flash Flood Warning**, through 4:15 a.m. Flash flooding in the area was "ongoing or expected to begin shortly." The potential impact was identified to include "[l]ife threatening flash flooding of creeks and streams," and Hunt was specifically identified as a location "that will experience flash flooding." The 1:14 a.m. warning also stated: "Most flood deaths occur in vehicles."

- C-11. As flooding events unfolded, adult camp staff in their residences became aware of rising water and the severity of the storm, and some eventually evacuated themselves to higher ground, but they had been **assigned no responsibility** to assist with evacuating the Guadalupe River Camp cabins, and they generally were unaware of the horrors experienced by the campers.

**Camp Mystic did not timely evacuate in advance of the July 3–4, 2025 storm, despite ample opportunity to do so.**

- C-12. Shortly after 3:00 a.m., Dick Eastland summoned Edward Eastland and the security guard to meet him at the Bug House cabin to begin evacuating campers. At this time approximately one inch of water covered the road near the cabins, and water was beginning to enter Bug House. **If all campers had been instructed to evacuate their cabins by foot at this time or earlier, there was ample time and opportunity for them all to safely reach higher ground.**

- C-13. Instead of using a PA system or going cabin-to-cabin to provide instruction to campers and to order immediate evacuation, Dick Eastland instructed the two other men to help evacuate the three cabins closest to the river by driving them in vehicles. At no time during the flood was the PA system used.

- C-14. The same three adult staff then returned with their vehicles to evacuate the next cabins in sequence. By then water on the road covered their ankles, and **all campers still had the opportunity to evacuate by foot.**

- C-15. Dozens of other adult staff members in close proximity to the Guadalupe Camp cabins never were tasked to assist with the evacuation of cabins.

- C-16. Some self-evacuating counselors separated from their campers, who were directed to Rec Hall; as a result **some campers became separated from their counselors without adequate supervision for the remainder of the flood event.**

- C-17. Counselors and campers sheltered in place in the Bubble Inn, Twins I, Twins II, and Wiggle Inn cabins, **as they were told**, awaiting further instruction.

  - C-17A. In all likelihood, Dick Eastland loaded all campers and both counselors from Bubble Inn into his vehicle. It was swept into the Guadalupe River, and **all 13 campers and both counselors perished.**

  - C-17B. Edward Eastland helped campers in the connected cabins Twins I and Twins II until the water rose too high for them to remain there. **One camper perished in her cabin. The others all were swept away in the flood.** Some, including Edward, survived, but **11 Twins campers did not survive.**

  - C-17C. Of the large number of inadequately supervised campers who had evacuated to Rec Hall, one decided to return to her cabin to retrieve an item. **That camper also was lost in the flood.**

- C-18. Camp leadership did not attempt to call 911 during the flood or immediately afterward.

**Re-unification efforts and incident management were chaotic, with traumatic effects for families.**

- C-19. Parents of campers were unnecessarily traumatized by the delivery of incomplete and conflicting information while they waited to learn whether their loved ones had survived.

- C-20. In addition to concerns about Camp Mystic's emergency planning and response, parents were frustrated by the lack of meaningful communication and effective coordination in the flood's aftermath.

Texas Legislature Report at 104–06.

## IV. The Chapter 11 Cases.

26. On June 24, 2026 (the "Petition Date"), Camp Mystic LLC, NFP, MC Family Partnership, and MC Management filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The major events in the Chapter 11 Cases are briefly summarized below.

**A. Procedural Developments in the State Court Lawsuits.**

27. On July 13, the Debtors removed the State Court Lawsuits before Judge Guerra Gamble in Travis County to the United States District Court for the Western District of Texas, Austin Division. *See, e.g.*, *Notice of Removal Pursuant to 28 U.S.C. §§ 1334(b), 1367(a), and 1452, Federal Rule of Bankruptcy Procedure 9027 and W.D. Tex. L. Rule 9027-1* [Docket No. 1] (the "Notice of Removal"), *Bellows, et al. v. Camp Mystic, LLC, et al.,* No. 1:26-cv-01916-RP (W.D. Tex. July 13, 2026). The State Court Lawsuits were assigned to Judge Pitman. On August 5, 2026, Plaintiffs in the State Court Lawsuits filed a motion to remand the cases back to Judge Guerra Gamble. *See Plaintiffs' Motion for Abstention and Remand* [Docket No. 22], *Bellows, et al. v. Camp Mystic, LLC, et al.,* No. 1:26-cv-01916-RP (W.D. Tex. Aug. 5, 2026) (the "Remand Motion"). As of the filing of this Motion, briefing on the Remand Motion has been completed and no hearing date has been set.

28. In the Notice of Removal, the Debtors stated their intention to file a separate motion to transfer venue of the removed actions to the Southern District of Texas, where the Chapter 11 Cases were filed. On July 15, 2026, the Debtors filed such a motion in the Southern District of Texas. *See, e.g.*, *Motion to Transfer Venue Pursuant to 28 U.S.C. § 157(b)(5)* (the "Venue Transfer Motion"), *In re Camp Mystic, LLC*, No. 4:26-mc-01321 (S.D. Tex. July 15, 2026). The Venue Transfer Motion is currently before Judge Ganjei. As of the filing of this Motion, briefing has been completed on the Venue Transfer Motion and no hearing date has been set.

**B. Litigation Over the Scope of the Automatic Stay.**

29. On July 13, 2026, an ad hoc group comprising twenty-four of the twenty-six Heaven's 27 families represented by Gray Reed (collectively, "Certain Heaven's 27 Families") filed a motion seeking confirmation that the automatic stay does not apply to the Individual Defendants in the State Court Lawsuits. *Ad Hoc Group of Certain Heaven's 27 Families' Motion for Entry of Order Confirming that the Automatic Stay Does Not Apply to Direct Claims Against Non-Debtor Individual Defendants* [Docket No. 77] (the "Automatic Stay Non-Applicability Motion"). On August 2, the Certain Heaven's 27 Families renewed the Automatic Stay Non-Applicability Motion. *Substituted Motion for Entry of Order Confirming that the Automatic Stay Does Not Apply to Direct Claims Against Non-Debtor Individual Defendants* [Docket No. 132].

30. Three days later, on August 5, the Debtors filed an adversary proceeding and motion for a preliminary injunction seeking to extend the automatic stay to the Individual Defendants. *See Complaint for Declaratory and Injunctive Relief (I) Declaring That the Automatic Stay Prohibits Certain Actions Against Non-Debtors, and (II) Preliminarily Enjoining Such Actions*; *Debtors' Motion for Entry of an Order (A) Declaring that the Automatic Stay Prohibits Certain Actions Against Non-Debtors or (B) Preliminarily Enjoining Such Actions* [Adv. Pro. No. 26-03604, Docket Nos. 1, 2] (the "Preliminary Injunction Motion").

31. On August 28, the Debtors, Certain Heaven's 27 Families and Committee agreed to a scheduling order setting the Automatic Stay Non-Applicability Motion and Preliminary Injunction Motion for a hearing on October 9, 2026. *Stipulation and Agreed Scheduling Order on Pending Stay Motions and Adversary Proceedings* [Docket No. 201].

32. On August 31, 2026, the Certain Heaven's 27 Families filed their *Motion for Relief from the Automatic Stay* [Docket No. 204] (the "Stay Relief Motion"), seeking to modify the

automatic stay to allow the State Court Lawsuits to proceed to final judgment. At the September 1 status conference, the Court set the Automatic Stay Non-Applicability Motion, the Preliminary Injunction Motion, the Stay Relief Motion, and the Independent Director Motion for hearing on October 9, 2026. *See* Transcript of Status Conference held on Sep. 1, 2026 at 41:24–42:7.

**C. Appointment of the Committee.**

33. On July 22, 2026, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code and filed a notice of appointment [Docket No. 94]. Each of the Committee's members lost at least one daughter in the Tragedy.

34. On July 28, the Committee selected Willkie Farr & Gallagher LLP ("Willkie") to serve as lead counsel in these Chapter 11 Cases. Shortly thereafter, the Committee selected Lawson & Moshenberg PPLC ("L&M") as Texas and conflicts counsel, and FTI Consulting, Inc. ("FTI") as financial advisor. Willkie, L&M and FTI have agreed to represent the Committee *pro bono* as set forth in their respective retention applications. *See* Dockets Nos. 218–220.

35. On August 5, 2026, the Committee served informal discovery on the Debtors. The Committee then served Rule 2004 discovery on the Debtors on August 24, 2026. To date, the Debtors have made minimal responsive productions: fewer than 500 documents, of which more than half are publicly available.

**D. The Filing of the Debtors' Schedules and Statements.**

36. On August 7, 2026, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"). *See* Docket Nos. 152–159. The Schedules and Statements value the Debtors' collective assets at approximately $20 million, which mostly consists of the value of the Property and cash on hand. *See* Docket Nos. 152 at 13; 153 at

10–11; 154 at 10; and 155 at 10. In addition, the Debtors disclose six insurance policies, including a general liability insurance policy and an excess insurance policy with a $5 million limit. *See Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Obtained Prepetition and Pay Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Modify, Extend, Purchase, Cancel, and Enter Into New Insurance Policies, and (C) Continue to Pay Brokerage Fees; and (II) Granting Related Relief* [Docket No. 38]; Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 94:16–95:10.

37. The Schedules and Statements show that the Debtors made numerous transfers to the Eastland family in the one year prior to the Petition Date. The table below summarizes the compensation received by the various members of the Eastland Family.

| Eastland Family Member | Transfers Received |
| --- | --- |
| Edward S. Eastland | $195,755.81 |
| George A. "Britt" Eastland | $61,333.26 |
| Richard G. Eastland | $59,153.75 |
| Mary H. Eastland | $44,480.55 |
| Cathryn L. Eastland | $43,864.29 |
| Leslie D. Eastland | $12,260.15 |
| Frank G. Albritton | $8,865.60 |

38. The Global Notes to Schedules and Statements make clear that the Eastland family received additional value from the Debtors in the year prior to the Petition Date. Specifically, the Global Notes disclose that members of the Eastland family are living on properties owned by the Debtors, have utilized Debtor property including vehicles, and that the Debtors historically paid basic living expenses of the Eastlands.

> Certain insiders occupied temporary housing on affiliate debtor Natural Fountains Properties, Inc.'s property or utilized the Debtor's leased property ("Camp Mystic") and company vehicles, and utilized services paid for by the Debtor, including but not limited to its utilities, gasoline, cable, and internet, within the year prior to filing these chapter 11 cases. Specifically, (i) George Eastland and his family have occupied a house at Camp Mystic since 2015; (ii) Edward Eastland and his family have occupied a manufactured house at Camp Mystic since June 2026 after their

> home was damaged in the July 2025 flood; and (iii) Willetta Eastland, after her home at Camp Mystic was damaged in the July 2025 flood, has occupied temporary housing in the Camp Mystic infirmary since Fall 2025. For purposes of the Statements, the Debtor has marked the value attributed to such use as undetermined.

*See* Schedule E/F at 11–12, Camp Mystic, LLC's Schedules of Assets and Liabilities [Docket No. 152].[11]

39. In addition, the Schedules and Statements show that various Eastland-affiliated entities will have claims against the Debtors. For example, the 1990 Richard G. Eastland Generation-Skipping Trust holds a nonpriority unsecured claim against NFP in the amount of $1,376,789.04 on account of a promissory note. *See* Schedule E/F at 29, Natural Fountains Properties, Inc.'s Schedules of Assets and Liabilities [Docket No. 153]. The Richard G. Eastland Appointment Trust also holds a nonpriority unsecured claim against NFP for $423,627.40 also on account of a promissory note. *See id.* at 36.

40. Finally, the Schedules and Statements indicate that various members of the Eastland family have undisputed indemnification claims against the Debtors. The Estate of Dick Eastland and each of the Eastland Directors are listed as having undisputed indemnification claims against Camp Mystic LLC, NFP, and MC Management, while the Estate of Dick Eastland and

---

[11] Based on the Monthly Operating Reports filed in the case to date, although members of the Eastland family are reimbursing the Debtors' estates for electricity costs, it does not appear that they are doing the same for rent, the use of vehicles, or any other living expenses. See Monthly Operating Report of Camp Mystic, LLC [Docket No. 185] (reporting $27,222 in total receipts for the period ending July 31, 2026, of which $2,305 constitutes family expense reimbursements). As the Court may recall, the Debtors' Utilities Motion did not disclose that members of the Eastland family residing on the Property would receive utilities at the Debtors' expense and offered no reason why that information had not been addressed through a supplemental declaration or otherwise disclosed to the Court. Transcript of July 9, 2026 Hearing. at 58:11–25 (attached hereto as **Exhibit H**). That omission surfaced only after inquiry by the families, as a result of which the Debtors agreed that the Eastlands would pay for their own utility usage. *Id.* at 25:18–27:14. Any failure by members of the Eastland family to reimburse the Debtors for basic living costs is problematic given the Debtors held less than $5 million in aggregate cash as of July 31, 2026. *See* Operating Report of Camp Mystic, LLC [Docket No. 185] (reporting a month-end cash balance of $1,440,860); Monthly Operating Report of Natural Fountains Properties, Inc. [Docket No. 186] (reporting a month-end cash balance of $3,158,256); Monthly Operating Report of Mystic Camps Management, LLC [Docket No. 187] (reporting a month-end cash balance of $0); Monthly Operating Report of Mystic Camps Family Partnership, Ltd. [Docket No. 188] (reporting a month-end cash balance of $237,576).

Tweety Eastland are also listed as having undisputed indemnification claims against MC Family Partnership. *See* Schedule E/F at 739, 742–744, Camp Mystic, LLC's Schedules of Assets and Liabilities [Docket No. 152]; *see also* Schedule E/F at 32–33, 36, 38, Natural Fountains Properties, Inc.'s Schedules of Assets and Liabilities [Docket No. 153]; Schedule E/F at Pages 26, 29, 31, Mystic Camps Management, LLC's Schedules of Assets and Liabilities [Docket No. 154]; Schedule E/F at Pages 26, 30, Mystic Camps Family Partnership, Ltd.'s Schedules of Assets and Liabilities [Docket No. 155].

**E. The Debtors' Section 341 Meeting of Creditors.**

41. On August 26, 2026, the U.S. Trustee held the section 341 meeting of creditors (the "341 Meeting"). The CRO served as the Debtors' representative, testifying that she does not have independent decision-making authority. Instead, she consults with Debtors' counsel, who, in turn, takes direction from the board of managers for each entity, which is comprised solely of Eastland Directors. Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 48:18–24, 60:9–13. Moreover, when asked whether she had authority to make decisions on behalf of the Debtors over the objection of the board, the CRO testified that she did not because "[t]hey're the board." *Id.* at 58:12–17.

42. Ms. Nicolaou's testimony at 341 Meeting included the following key points:

- **Receipt of Previously Unidentified Flood Insurance Proceeds**. The Debtors received a $400,000 payment on account of a flood insurance policy. The CRO testified that she does not have a copy of the underlying policy, nor do the Debtors understand "the circumstances of it." *Id.* at 19:22–20:21, 65:21–66:1.

- **Unclear Extent of Eastland Costs Being Paid for By the Debtors**. Certain members of the Eastland family are, and have been, living on the Debtors' property without paying rent. *Id.* at 74:17–76:6.[12] Additionally, the CRO has had to proactively seek out and identify

[12] On August 28, 2026, the Committee requested additional information to determine which members of the Eastland family are living on the Debtors' property to confirm compliance with the Prepetition TRO. As of the filing of this Motion, the Committee has received no response to its request.

benefits that members of the Eastland family have received at the Debtors' expense. *Id.* at 77:8–81:24.

- **Ongoing Employment of Nine Individuals**. The Debtors currently employ nine individuals, whose roles vary from camp maintenance (four employees), horse training and breeding (one employee), and groundskeeping (one employee) to office administration (two employees) and media consulting (one employee). *Id.* at 70:13–72:9. The Debtors employ these individuals notwithstanding that they have no current operations nor any plans to reopen in the foreseeable future. *Id.* at 9:7–10:16, 11:16–20, 39:3–6.

- **No Discussions Regarding Reorganization Strategy**. The Debtors have had no conversations with the CRO regarding a plan to reorganize. *Id.* at 11:16–20, 39:7–40:6. Nor has the CRO discussed with the Eastland Directors whether the Debtors intend to seek a future operating license. Indeed, the CRO testified that, to her knowledge, there are no plans to apply for one. *Id.* at 11:16–20, 39:3–6. When the CRO was asked what the Debtors' path forward would look like, Debtors' counsel stepped in and acknowledged that "at this point, it's difficult to articulate." *Id.* at 39:7–40:6.

- **Unclear Efforts to Secure Property.** Although the CRO testified that the Debtors' property is secure, she made clear that there is no process for tracking who enters or visits the Debtors' property, there are no signs clarifying not to go on the part of the property subject to the Prepetition TRO, and sixty-four horses currently roam and graze on the property. *Id.* at 70:19–20, 72:7–73:14, 105:24–106:15, 110:4–14, 112:20–113:1. Members of the Eastland family and the employees control access to the property. *Id.* at 111:19–112:15.

- **No Knowledge of Document Preservation Measures.** Despite the pending wrongful death litigation, allegations of spoliation, and ongoing criminal investigations arising from the Tragedy, the CRO could not identify what steps, if any, the Debtors have taken to preserve documents and evidence relating to the Tragedy. *Id.* at 97:21–24.

- **Meeting with the Eastland Directors Before Filing Schedules and Statements.** Prior to filing the Schedules and Statements, each of the Eastland Directors joined a call with the Debtors' professionals in which they closely reviewed and signed off on the Schedules and Statements. *Id.* at 49:12–15, 65:10–17.

### F. The Eastland Family's Continued Control & the Debtors' Insufficient Governance Reform Efforts.

43. On August 14, 2026, the Committee filed a statement and omnibus reservation of rights regarding the Debtors' application to retain professionals, wherein the Committee raised several concerns regarding the Debtors' governance structure and outsized control the Eastland Directors exercise over these Chapter 11 Cases, despite their numerous obvious conflicts of

interest. *Statement and Omnibus Reservation of Rights by the Official Committee of Unsecured Creditors Regarding (I) the Debtors' Applications to Retain Professionals and (II) Ordinary Course Professionals Motion* [Docket No. 164].

44. At a status conference on August 26—sixty-three days after the Petition Date—the Debtors publicly conceded the need for corporate governance reforms. The Debtors previewed that they would be filing a motion that would seek authority to appoint two independent directors, one at Camp Mystic LLC and one at NFP. Notably, the Debtors explained that their governance proposal would not fully eliminate the Eastland Directors from decision-making in the Chapter 11 Cases. Specifically, Debtors' counsel previewed that the Eastland Directors (i) would still have complete decision-making authority over MC Family Partnership and MC Management, and (ii) would still have decision making authority over any sale of the Property and the final form of the Chapter 11 Plan.

45. Thereafter, on September 1, the Debtors filed their motion seeking the appointment of two independent directors (together, the "Independent Directors"), one at each of the operational Debtor entities, Camp Mystic LLC and NFP. *Debtors' Motion for Entry of an Order (I) Authorizing the Appointment of an Independent Director and an Independent Manager, (II) Establishing Special Committees, (III) Approving Governance Amendments, and (IV) Granting Related Relief* [Docket No. 205] (the "Independent Director Motion"). Each appointee would constitute a one-person special committee for the relevant entity, and would control certain day-to-day chapter 11 administration issues, such as oversight of the CRO, claims reconciliation, and investigating claims against insiders. *Id.* ¶¶ 12, 22. However, the full boards and managers at Camp Mystic LLC and NFP would retain approval authority over the central reorganization decisions, specifically: (i) any sale of all or substantially all assets; (ii) settlements of

personal-injury or wrongful-death claims; and (iii) the filing of a chapter 11 plan. *Id.* ¶ 22. The Independent Director Motion does not contemplate independent directors at MC Family Partnership or MC Management.

**ARGUMENT**

46. Section 1104(a) of the Bankruptcy Code governs the appointment of chapter 11 trustees and provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

As such, section 1104(a) mandates the appointment of a trustee upon a showing (1) of "cause" or (2) that such an appointment would be in the interests of the estates. Here, current management (*i.e.*, the Eastland Directors) has demonstrated repeatedly many of the grounds recognized as constituting "cause" under section 1104(a)(1), including incompetence, gross mismanagement of the Debtors' affairs, and laboring under conflicts of interest. Moreover, the appointment of a chapter 11 trustee is separately justified under section 1104(a)(2) where courts apply a multi-factor test to help determine a basic question: whether the appointment of a trustee is in the best interests of the estates. That test is also easily satisfied under the circumstances here, particularly given the lack of progress in these Chapter 11 Cases to date and the acrimonious relationship between the

families, the Debtors, and the Eastlands. Accordingly, and as discussed below, the Court should find that appointment of a trustee is mandated under both sections 1104(a)(1) and (a)(2).

## I. The Factual Record Clearly Demonstrates that "Cause" Exists to Appoint a Trustee Under Section 1104(a)(1) of the Bankruptcy Code.

47. Section 1104(a)(1) contains a list of examples of "cause" that mandate the appointment of a chapter 11 trustee, including "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." Section 1104(a)(1)'s statutory examples of "cause" are not exhaustive. *See In re Sillerman*, 605 B.R. 631, 641 (Bankr. S.D.N.Y. 2019). For example, courts have found "cause" where the debtor's management is subject to irreconcilable conflicts of interest. *See, e.g.*, *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996). Moreover, courts have found "cause" where the chapter 11 cases are unable to advance because of intense acrimony between the debtors and the creditor base that creates conflict beyond that which regularly exists in chapter 11 cases. *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) (affirming trustee appointment where there was "no reasonable likelihood of any cooperation" between debtors and creditors). Here, the actions of the Debtors' current management (*i.e.*, the Eastland Directors), from before the Tragedy and continuing through the present day, unquestionably constitute cause.

### A. Current Management Has a Long Record of Incompetence and Gross Mismanagement of the Debtors' Affairs.

48. The Debtors' failures in connection with the Tragedy can be laid at the feet of current management: Tweety Eastland, and her three sons, Richard, Britt, and Edward. When assessing if incompetence and gross mismanagement constitute cause, courts evaluate a debtor's current management, which should be free from the taint of previous management. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1227 (3d Cir. 1989); *see also Woodlawn Cmty. Dev. Corp. v. Official*

*Comm. of Unsecured Creditors (In re Woodlawn Cmty. Dev. Corp.)*, 613 B.R. 671, 685 (2020) (finding that the bankruptcy court did not err in determining that management was essentially the same when current management was not free from the taint of prior management) Here, except for Dick Eastland, the same senior members of the Eastland family who ran the Debtors prior to the Tragedy continue to run the Debtors today. Prior to the Tragedy, Tweety Eastland and her sons each held senior operational positions at Camp Mystic, including executive director of Camp Mystic (Tweety), chief financial officer (Edward), and co-directors of Camp Mystic Cypress Lake and Guadalupe River (Britt and Edward). *See* Second Day Declaration, Exhibit B; *see also, Directors & Staff*, CAMP MYSTIC, https://campmystic.com/directors-staff/ (last visited Sep. 5, 2026); Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 52:15–25. Following the Tragedy, Tweety and her sons worked to open Camp Mystic for the 2026 Season, including contacting the families of potential campers. *See* Pls.' Original Pet. ¶¶ 106–107, Docket No. 1, *Steward*. Indeed, they remain operationally involved, as demonstrated by the Eastland Directors' collective sign off on the Schedules and Statements. Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 49:12–15, 65:10–17. Of course, such operational efforts are in addition to the Eastland Directors holding all of the Debtors' formal governance positions. Second Day Declaration, Exhibit B. Put simply, the collective incompetence and gross mismanagement of the Debtors' management leading up to and during the Tragedy is central to the question presented by this Motion, as those individuals continue to oversee the Debtors.

49. Tragically, the Debtors' lack of preparedness and response to the Tragedy go well beyond incompetence and gross mismanagement. Under the Eastland family's stewardship, twenty-five campers and two counselors died. The conclusions of the Texas Legislature Report speak for themselves: (i) Camp Mystic did not have written emergency plans that complied with

state requirements; (ii) Camp Mystic did not adequately prepare for the July 3–4, 2025 storm; (iii) Camp Mystic did not timely evacuate in advance of the July 3–4, 2025, despite ample opportunity to do so; and (iv) re-unification efforts and incident management were chaotic, with traumatic effects for families. These conclusions go well beyond "incompetence" and "gross mismanagement." In light of the Tragedy, there is no question that current management engaged in incompetence and gross mismanagement of the Debtors' affairs.

50. The Debtors' post-petition actions similarly demonstrate current management's continued incompetence and gross mismanagement of the Debtors' affairs. Indeed, the CRO's testimony during hearings and the 341 Meeting underscore the extent of these failures:

- *First*, current management is self-dealing by, among other things, allowing numerous members of the Eastland family (*i.e.*, themselves) to live on the Property rent-free.[13] Schedule E/F at 11–12, Camp Mystic, LLC's Schedules of Assets and Liabilities [Docket No. 152]; *see also* Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 75:22–76:3. In fact, not paying rent appears to be just the tip of the iceberg: members of the Eastland family are using the Debtors' assets, and it does not appear that they are reimbursing the Debtors for that use. *Id.* at 78:4–24. Based on the Monthly Operating Reports filed to date, various members of the Eastland family are not reimbursing the Debtors for these expenses, except for utility payments. *See generally* Debtors' Monthly Operating Reports filed to date, Dkt. Nos. 104, 113, 114, 115, 185, 186, 187, and 188 (only reflecting reimbursement by the Eastlands for utilities). If anything, the CRO's testimony at the 341 Meeting suggests members of the Eastland family have not been fully cooperative in reimbursing the Debtors for these expenses. *See* Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 81:19–24.

- *Second,* current management is not taking reasonable steps to protect the value of the estates' property. The Committee is particularly focused on securing the Property and minimizing the risk of injury and post-petition tort claims that could arise in any number of ways (*e.g.*, accidental falls, additional weather events, the sixty-four horses roaming the property). By stark contrast to these concerns, the CRO testified that (i) the Debtors have no system to track visitors, (ii) members of the Eastland family and their children are living on the property, and (iii) additional signage would likely be prudent to comply with the

[13] Failure to collect rent can support a finding of incompetence. *In re Woodlawn Cmty. Dev. Corp.*, 613 B.R. at 685. It also can support a finding of self-dealing, which is a breach of fiduciary duty, and itself a separate ground constituting cause under 1104(a). *Id.* at 684.

Prepetition TRO. *See id.* at 111:7–10, 75:22–76:3, 105:21–106:2. The failure by the Debtors to address these obvious concerns two and a half months into the Chapter 11 Cases supports a finding of self-dealing, incompetence, and/or gross negligence.

- *Third,* the CRO testified that the Debtors are unaware of the circumstances surrounding the $400,000 in flood insurance proceeds received by the Debtors. *See id.* at 20:6–20:21, 65:21–66:3. The Eastland Directors' lack of knowledge over a major estate asset is telling. The lack of familiarity with these insurance proceeds raises additional questions, including whether current management explored all avenues for financial relief in the wake of the Tragedy. *See id.* at 85:6–87:1; 20:6–21.

- *Fourth*, the CRO admitted that the Debtors have not had any meaningful discussion about how to reorganize the Debtors. *See id.* at 11:16–12:11, 39:3–40:6. That admission, alone, is sufficient evidence of estate fiduciaries abdicating their most basic strategic decision-making obligations.

- *Fifth*, the Debtors are a non-operational summer camp, yet still employ nine individuals, including a "media consultant" and two people to do office work. *See id.* at 9:14–10:4, 70:23–72:4. The Committee's concerns regarding these positions are heightened by testimony that at least one employee's duties include performing administrative work for Edward Eastland—yet another fact that was not disclosed in Ms. Nicolaou's declaration, but that was uncovered only on cross-examination. *See* Transcript of July 9, 2026 Hearing at 56:14–22. This continued employment of so many individuals is not in the estates' best interests, and is instead indicative of the Eastland Directors treating the Debtors' assets like *their* property instead of *estate* property.[14]

51. The Eastland Directors' management of the Debtors from the lead up to the Tragedy through the present day has been defined by incompetence and gross mismanagement. There can be no doubt that cause has been established here. Indeed, rarely are the actions of a debtor's management so egregious that they spur multiple legislative reforms, a state bicameral legislature investigation, and a criminal investigation. But these are not ordinary cases. Moreover, the CRO's testimony demonstrated that the Eastland Directors' shortcomings were not an epically tragic

[14] To the extent the Debtors contend these employees are necessary to collect documents and information to respond to the Committee's (and other parties') formal and informal discovery requests, the Debtors have yet to produce anything of significance to justify the expense of these employees.

one-off failure, but part of a consistent pattern that continues to this day. These facts clearly support the appointment of a trustee.

**B. The Irreconcilable Conflicts of the Eastland Directors Constitute Cause.**

52. Courts have held that serious management conflicts of interest can separately constitute cause under section 1104(a)(1). *See In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996); *see also In re Westbank Holdings, LLC*, 2022 Bankr. LEXIS 2109, at *39 (Bankr. E.D. La. Aug. 1, 2022) ("[A] finding that the principals or managers of a debtor possess irremediable conflicts of interest can also serve as 'cause' to appoint a trustee under § 1104(a)(1)."); *In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008). Here, there is no shortage of examples where the interests of the individual Eastland Directors and the Debtors are not aligned:

- *First*, the Eastland Directors are co-defendants with the Debtors in the State Court Lawsuits. As a result, there is significant risk that the interests of the Eastland Directors and Debtors will be at cross-purposes. It is not hard to imagine the Eastland Directors concluding that they should pursue a litigation strategy that minimizes personal liability for them and their families, while maximizing the Debtors' liabilities.

- *Second*, the Schedules and Statements present numerous examples where the Eastland Directors' and Debtors' interests are not aligned, including the Eastland Directors' asserted indemnification claims, claims of Eastland family trusts against the Debtors, and the numerous transfers made to the Eastland Directors in the year prior to the Petition Date.[15] If anything, the Schedules and Statements understate the estates' causes of action against the Eastland Directors, who also may have received numerous dividends in the years prior to the Petition Date.

- *Third*, the Eastland Directors have strong financial and personal-housing interests in retaining ownership in the Debtors' crown jewel asset: the 725-acre property on which

[15] The conclusion that these indemnification claims are undisputed—despite the Debtors' acknowledgment in other pleadings that these claims are subject to the "standard exclusions for gross negligence and willful misconduct, as well as an exclusion for claims based on a breach of the operating agreement"—is particularly puzzling to the Committee. *See Adversary Complaint* at 6, n.2. This appears to be just another example of the Eastland Directors forcing the Debtors to take harmful positions for their personal benefit.

Camp Mystic operated. To protect their financial interests, the Eastland Directors are likely to adopt a litigation strategy designed to avoid having to sell or give up possession of the Property. To protect their personal-housing interests, they may have to decide whether to approve a sale of the Property on which they reside for free. Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 74:19–76:6. Moreover, given their attachment to the property and Camp Mystic, the Eastland Directors could not credibly preside over a sale process for the Property that would need to determine the highest or otherwise best bid.

- *Fourth,* Debtor Camp Mystic, LLC is subject to an ongoing criminal investigation led by the Texas Rangers. *See* Part 3, Statement of Financial Affairs for Camp Mystic, LLC [Docket No. 156]. If that investigation expands to include the Eastland Directors—which cannot be ruled out, especially in light of the Texas Legislature Report—that is yet another area where the Eastland Directors' personal interests (or those of their families) could conflict directly with the Debtors' interests.

- *Fifth*, the Committee believes that the Debtors are likely to hold actionable claims against the Eastland Directors, including claims for breaches of fiduciary duty. As noted above, during the 341 Meeting, the CRO testified that she has not evaluated any potential estate claims against the Debtors' fiduciaries. *See* Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 94:4–7. Indeed, the Eastland Directors' failure to address the known, mission-critical risk of flooding and to comply with state laws designed to mitigate that risk is a hallmark breach of fiduciary duty. This fact pattern—where management's fiduciary duties require an investigation into their own actions or transfers involving family members—supports a finding of cause. *See In re Sillerman*, 605 B.R. at 647 ("Tasking the . . . debtor with the responsibility of bringing avoidance actions against a family member or an entity in which the debtor has a substantial interest may be daunting."); *see also In re Russell*, 60 B.R. 42, 48 (Bankr. W.D. Ark. 1985) ("It is unreasonable to suppose that the debtor-in-possession would choose to sue himself.").

53. The Debtors' actions to date confirm the Committee's concerns that these cases are being run for the benefit of the Eastlands. Since the Petition Date, the Debtors have focused almost exclusively on litigation management strategies that are wholly consistent with a strategy of protecting the Individual Defendants: the Stay Extension Motion, the Motion to Transfer Venue before Judge Ganjei, and the opposition to the Motion to Remand the cases back to Judge Guerra Gamble. In the Schedules and Statements, the Debtors listed the Eastland Directors as having

numerous undisputed claims, including (highly questionable) indemnification claims.[16] On issues of governance, the Eastland Directors have dragged their feet for months despite the obvious conflicts plaguing them. The Independent Director Motion—at best a half-measure that leaves untouched the Eastland Directors' control over the most central questions in these cases—further shows that the Eastland Directors are looking to retain control for their own benefit. Collectively, these conflicts unquestionably establish another basis for concluding that "cause" exists to appoint a chapter 11 trustee.

### C. Acrimony Between the Debtors and Creditors Constitutes Cause

54. Numerous courts have found that irreconcilable acrimony between debtors and creditors can separately constitute cause under Section 1104(a)(1). *See, e.g.*, *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 472–74 (affirming appointment of chapter 11 trustee under where "deep-seeded [sic] conflict and animosity" between debtor-in-possession and creditors supported a finding of cause); *In re Stream TV Networks, Inc.*, No. 23-10763, 2024 WL 87639, at *33–34 (Bankr. E.D. Pa. Jan. 5, 2024) (appointing trustee where entrenched acrimony, delay, mistrust, conflicts, and lack of candor left the court without confidence that existing management could administer the estates consistent with fiduciary duties).

55. Over the past several weeks, the Committee's professionals have had numerous conversations with the victims' families and their counsel on a wide range of topics, including the Tragedy, the Debtors' efforts to reopen for the 2026 season, the State Court Lawsuits, and the Eastland Directors. The Committee has concluded that if nothing changes, the level of acrimony between the Debtors (*i.e.*, the Eastland Directors) and the victims' families will make moving these

[16] To the extent there was any legal analysis done on those claims, it is telling that the Debtors used their limited estate resources *for this purpose* as opposed to focusing on maximizing the value of the estates (*e.g.*, forcing Tweety Eastland, Britt Eastland, and Edward Eastland to start paying rent).

Chapter 11 Cases forward all but impossible. To be clear, there are multiple contributing factors to the acrimony between Debtors and creditor body that go well beyond the Tragedy. These include the Debtors' efforts to reopen Camp Mystic for the 2026 season less than three months after the Tragedy, their fighting the Prepetition TRO, their refusal to provide basic information and discovery about the Tragedy, and their lawyers' actions in the State Court Lawsuits. *See* Pls.' Mot. for Sanctions at 2–3, Docket No. 82, *Steward* (alleging Defendants and their counsel engaged in a pattern of bad-faith litigation conduct, including launching targeted public attacks on plaintiffs, and counsel's statement in open court that Plaintiffs' counsel were "going to burn in hell").

56. The Debtors' actions in the Chapter 11 Cases have further crystallized creditors' views about the Debtors. As discussed above, the Debtors—through the Eastland Directors—have accomplished very little in the first two and a half months of the case.[17] The Debtors have not put forth a plan to advance these cases. Instead, the Debtors, at the behest of the Eastland Directors, have pursued a multi-pronged strategy to stop the State Court Lawsuits from proceeding against the Individual Defendants. The Independent Director Motion is a thinly-veiled attempt to avoid the very relief this Motion seeks; ultimately, the Debtors' proposed governance reforms do little and just show Eastland Directors' unwillingness to give up control. All the while, the Eastland Directors continue to treat the Debtors' assets like a birthright, living rent-free on property that belongs to the Debtors' estates and creditors. The Committee has given the Debtors more than enough time to get their house in order. The time has come to replace the hopelessly conflicted

[17] While the Debtors' professionals, on several occasions, have suggested that mediation might provide a viable path to exit these chapter 11 cases, it is inconceivable for the Committee to support a mediation process where: (i) the Debtors have not meaningfully responded to the Committee's discovery requests; and (ii) the Eastland Directors continue to maintain effective control over the Debtors' three key decisions—selling property, settling claims, and proposing a plan.

Debtors and their owners with an independent decision-maker who can actually push these cases towards the conclusion that the families deserve.

## II. Appointment of a Trustee Is in the Best Interests of the Estates Under Section 1104(a)(2) of the Bankruptcy Code.

57. Section 1104(a)(2) provides an independent basis for appointment where a trustee is in the interests of the estates. *See* 11 U.S.C. § 1104(a)(2). When analyzing relief requested under section 1104(a)(2), courts apply a flexible, fact-driven inquiry that looks to the practical realities and necessities of the record. *See In re Sillerman*, 605 B.R. at 652; *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) ("Courts construing this subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interests of the estate.") (internal citation omitted). In analyzing this question, courts commonly apply a multi-pronged balancing analysis that looks at (i) the debtor's trustworthiness, (ii) the debtor-in-possession's past and present performance and prospects for rehabilitation, (iii) creditor confidence in current management, and (iv) the benefits of appointment balanced against its costs. *See In re Ford Steel, LLC*, 629 B.R. 871, 889–90 (Bankr. S.D. Tex. 2021); *In re Westbank Holdings, LLC*, 2022 Bankr. LEXIS 2109, at *41 (Bankr. E.D. La. Aug. 1, 2022); *In re Eletson Holdings Inc.*, 659 B.R. 426, 453–54 (Bankr. S.D.N.Y. 2024). As demonstrated below, each factor of this balancing test cuts strongly in favor of appointing a trustee.

### A. The Trustworthiness of the Debtors.

58. A debtor-in-possession must be trusted to discharge its fiduciary duties to the estate, which include a duty of care to protect the assets, a duty of loyalty, and a duty of impartiality. *In re Ford Steel, LLC*, 629 B.R. at 889. To that end, "a debtor-in-possession must avoid self-dealing, conflicts of interest, and the appearance of impropriety." *Id.* A debtor's trustworthiness must be evaluated in light of who controls the estates and what those individuals

are being asked to decide. *In re Sillerman*, 605 B.R. at 647–49, 652–53 (finding the debtor's trustworthiness in doubt where conflicts and self-interest prevented impartial investigation and pursuit of claims against insiders and affiliates). Here, there can be little dispute that the Debtors are not trustworthy based on the actions of the Eastland Directors in the Chapter 11 cases, without even looking to their prior conduct in connection with the Tragedy. Specifically, the Eastland Directors have taken numerous positions that serve their own self-interest, rather than the interests of the Debtors' estate and creditors (*e.g.*, filing the Preliminary Injunction Motion and listing indemnification claims as undisputed). Perhaps the most obvious example is the Eastland Directors using the Debtors' assets to inappropriately enrich themselves during these cases (*e.g.*, living on land rent free and not fully reimbursing the Debtors for basic living expenses). Moreover, the Eastland Directors are taking these actions against the backdrop of their numerous, significant conflicts (*e.g.*, the State Court Lawsuits, claims being asserted in these cases, and the ongoing criminal investigation).

### B. The Debtors' Past and Present Performance and Prospects for Rehabilitation.

59. The Debtors' past and present performance also weighs in favor of appointing a chapter 11 trustee. "To determine past and present performance, the Court can examine both pre-and post-petition conduct of a debtor." *In re Sillerman*, 605 B.R. at 654 (quoting *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007)). Regardless of Camp Mystic's many years of financial success, the Debtors are now a non-operational business that is defined by the Tragedy. The prospects for the Debtors' rehabilitation are low: (i) at the 341 Meeting, the CRO testified that the Debtors have no plans to rehabilitate; (ii) the Debtors may burn through their *de minimis* cash on hand to pay chapter 11 professional fees; (iii) the Debtors have not presented a clear strategy to advance these cases; (iv) in light of the Texas Legislature Report's

findings, it is hard to imagine the State of Texas ever credentialing the Eastland family to run a camp again; and (v) the creditor body does not trust the Debtors' management. *See* Transcript of § 341 Meeting of Creditors held Aug. 26, 2026, at 11:16–20, 39:3–40:6; 35:24–36:1. Again, this factor weighs heavily in favor of appointing a chapter 11 trustee.

**C. Lack of Creditor Confidence.**

60. Creditors' overwhelming lack of confidence in the Debtors cuts in favor of appointing a trustee. Here, the creditor body overwhelmingly comprises families who lost their daughters in the Tragedy. The Committee has been in regular conversation with Gray Reed, which represents twenty-four of the twenty-six families, and Akin Gump Strauss Hauer & Feld LLP, which represents the Lawrence family. These families are all aligned in their support for the appointment of a trustee. Indeed, the Committee understands that the Certain Heaven's 27 Families and the Lawrence family each intend to file joinders in support of this Motion.

61. The lack of creditor confidence arises from the facts that underlie the Committee's other arguments herein: namely, the Debtors' handling of Tragedy; the Eastland Directors' tone-deaf rush to reopen Camp Mystic; the conduct of the defendants and their lawyers in the State Court Lawsuits; the Eastland family's conflicts of interest; the self-serving conduct and efforts to retain control in the Chapter 11 Cases; the self-dealing; and the lack of any viable path forward.[18] Against this backdrop, there can be no dispute that the creditors support—and deserve—the appointment of a truly independent fiduciary to bring these cases to conclusion.

[18] The Debtors admit, through the Independent Director Motion, that creditors have lost confidence in the Eastland Directors' management. They ask the Court to exercise equitable powers under § 105(a) to appoint independent, "trustee-like" fiduciaries. Such relief is not supported by the Bankruptcy Code, however. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y. 2006) ("Using section 105(a) to appoint a fiduciary to act as a trustee shorn of the name, but with few other substantive differences, would be the exact kind of wrongful judicial action that the Second Circuit has forbidden. Section 1104 already provides for two kinds of fiduciaries, trustees and examiners.") (citations omitted).

### D. Benefits of a Trustee Outweigh the Costs.

62. The benefits of a chapter 11 trustee here are clear. Indeed, a trustee could step in immediately as a truly independent fiduciary to take control of the Debtors' estates, reverse course on any decisions that they determined not to be in the best interests of the Debtors' estates and creditors (*e.g.*, continuing to prosecute the Preliminary Injunction Motion or letting certain members of the Eastland family continue living on the Debtors' property rent-free), and work with the Committee and the Debtors' creditors to chart a path out of these Chapter 11 Cases that maximizes recoveries for all. But perhaps most importantly, a trustee could—for the first time since before the Tragedy at Camp Mystic—establish a strong communication between the Debtors and the victims' families to ensure the families have a meaningful voice in determining how these cases resolve and what the Debtors' future will entail. The Committee believes establishing such communication is a prerequisite to more efficient resolutions of these cases.

63. To be sure, the Committee also understands that the appointment of a chapter 11 trustee carries certain inevitable costs, including the time and expense needed to get a new professional familiar with the cases.[19] The Committee does not dismiss these costs, especially here where the Debtors have limited cash, are non-operational, and are not generating money. However, these concerns are offset by several factors. *First,* the Debtors' lack of progress means there is less for a trustee to get their arms around. *Second*, a trustee could further cut down on the time needed to get up to speed by continuing to work with the Debtors' financial advisor. *Third*, the Committee has already reached out to several potential chapter 11 trustee candidates and

[19] A common trustee may be appointed for jointly administered estates. FED. R. BANK. P. 2009(c)(2). Only one trustee is needed here. *See Ritchie Special Credit Invs., Ltd. v. U.S. Tr.*, 620 F.3d 847, 854–55 (8th Cir. 2010) (holding that the bankruptcy court did not abuse its discretion in appointing a single trustee after finding no disqualifying prejudice existed between creditors or security holders of different estates).

replacement counsel, many of whom have expressed willingness to undertake the role on a *pro bono* basis. *Fourth*, the Committee's own professionals are working *pro bono*, thereby limiting the accrual of administrative costs. Finally, the Committee has already started developing potential constructs to resolve these cases effectively and efficiently and can work closely with the chapter 11 trustee to determine and implement the best path forward on an expedited basis.[20] Under these circumstances, the cost-benefit analysis weighs strongly in favor of appointing a trustee.

## CONCLUSION

64. These cases will not move forward until the Debtors' significant governance issues are addressed. The Committee believes that the appointment of a trustee—whether under Section 1104(a)(1) or (a)(2)—is the best way to address these issues. Adopting half measures to remedy the Debtors' governance shortcomings—such as those proposed in the Independent Director Motion—will ultimately lead to a longer, more litigious case. The time has come for the Debtors' decisions to be made by a truly independent fiduciary.

65. WHEREFORE, the Committee requests that the Court enter an order (i) granting the relief requested here and (ii) granting such other and further relief as may be just and proper.

---

[20] Currently, the Debtors' exclusivity period terminates on October 22, 2026.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Jennifer J. Hardy*

**WILLKIE FARR & GALLAGHER LLP**

Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone: 713-510-1700
Facsimile: 713-510-1799
Email: jhardy2@willkie.com

**AND**

Brett H. Miller (admitted *pro hac vice*)
Hon. Shelley C. Chapman (Ret.) (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: bmiller@willkie.com
schapman@willkie.com
jburbage@willkie.com

**AND**

Christopher DiPompeo (admitted *pro hac vice*)
1875 K St., N.W.
Washington, D.C. 20006
Telephone: (202) 303-1016
Facsimile: (202) 303-2000
Email: cdipompeo@willkie.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

**LAWSON & MOSHENBERG PLLC**

Nicholas R. Lawson (Texas Bar No. 24083367)
Avishay Moshenberg (Texas Bar No. 24083532)
2301 Commerce St., Suite 200
Houston, TX 77002
Telephone: 903-316-9155
Email: nick.lawson@lmbusinesslaw.com
avi.moshenberg@lmbusinesslaw.com

*Proposed Conflicts and Texas Counsel to the Official Committee of Unsecured Creditors*

**Certificate of Service**

I certify that on September 8, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*Jennifer J. Hardy*
Jennifer J. Hardy