**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CAMP MYSTIC, LLC, *et al.*,[1] | Case No. 26-90621 (CML) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE JOINT**
**CHAPTER 11 PLAN OF CAMP MYSTIC, LLC AND ITS AFFILIATED DEBTORS**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. IT IS BEING FILED WITH THE BANKRUPTCY COURT IN CONNECTION WITH THE DEBTORS' MOTION FOR AN ORDER APPROVING THIS DISCLOSURE STATEMENT AND THE PROCEDURES FOR SOLICITING VOTES ON THE PLAN. IT IS SUBJECT TO REVISION BEFORE THAT APPROVAL, AND IT IS NOT YET A SOLICITATION OF VOTES. NO HOLDER OF A CLAIM OR INTEREST SHOULD RELY ON THIS DISCLOSURE STATEMENT, OR VOTE ON THE PLAN, UNTIL THE BANKRUPTCY COURT HAS APPROVED IT AND THE DEBTORS HAVE DISTRIBUTED THE APPROVED VERSION TOGETHER WITH A BALLOT.**

**VARTABEDIAN KATZ HESTER & HAYNES LLP**
Martin Sosland (State Bar No. 18855645)
Candice M. Carson (State Bar No. 24074006)
2200 Ross Avenue, Suite 5000
Dallas, Texas 75201
Telephone: (469) 654-1340

Deirdre Carey Brown (State Bar No. 24094116)
2019 Washington, Suite 105
Houston, Texas 77007
Telephone: 832-367-6722

Jeff P. Prostok (State Bar No. 16352500)
Emily S. Chou (State Bar No. 24006997)
Suzanne K. Rosen (State Bar No. 00798518)
Lynda L. Lankford (State Bar No. 11935020)
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Telephone: (817) 214-4990

*Counsel to the Debtors and Debtors-in-Possession*

Dated: September 25, 2026

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Camp Mystic, LLC (4064), Natural Fountains Properties, Inc. (1414), Mystic Camps Family Partnership, Ltd. (9861), and Mystic Camps Management, LLC (9688). The location of the Debtors' service address for purposes of these chapter 11 cases is: 2689 Highway 39, Hunt, TX 78024.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF CAMP MYSTIC, LLC AND ITS AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* (AS IT MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED, THE "PLAN"). A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY PERSON FOR ANY OTHER PURPOSE.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF, AND PROVIDES THE HIGHEST AND MOST CERTAIN RECOVERIES TO, HOLDERS OF CLAIMS AGAINST EACH OF THE FOUR DEBTORS. THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF THE PLAN, OF CERTAIN STATUTORY PROVISIONS, OF DOCUMENTS RELATED TO THE PLAN, AND OF THE EVENTS THAT LED TO THESE CHAPTER 11 CASES. THOSE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, THE PLAN SUPPLEMENT, AND THE DOCUMENTS ON FILE WITH THE BANKRUPTCY COURT. IF THERE IS ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN. THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE SHOWN ON THE COVER UNLESS ANOTHER DATE IS SPECIFIED, AND THE DEBTORS HAVE NO DUTY TO UPDATE THEM EXCEPT AS REQUIRED BY THE BANKRUPTCY CODE, THE BANKRUPTCY RULES, OR AN ORDER OF THE BANKRUPTCY COURT.**

**THIS DISCLOSURE STATEMENT DESCRIBES LITIGATION, INVESTIGATIONS, AND ALLEGATIONS MADE AGAINST THE DEBTORS AND OTHERS. THE DEBTORS HAVE TRIED TO DESCRIBE THOSE MATTERS FAIRLY AND ACCURATELY. NOTHING IN THIS DISCLOSURE STATEMENT IS AN ADMISSION OF FACT OR LIABILITY BY ANY DEBTOR, A WAIVER OF ANY CLAIM, DEFENSE, PRIVILEGE, OR RIGHT, OR A CONCESSION THAT ANY CLAIM ASSERTED AGAINST A DEBTOR HAS MERIT. THE DEBTORS DISPUTE THE ALLEGATIONS MADE AGAINST THEM IN THE PENDING LITIGATION AND RESERVE ALL RIGHTS AND DEFENSES. THIS DISCLOSURE STATEMENT IS SUBMITTED IN CONNECTION WITH SETTLEMENT DISCUSSIONS AND A PROPOSED PLAN AND IS PROTECTED, TO THE EXTENT APPLICABLE, BY FEDERAL RULE OF EVIDENCE 408 AND ANY COMPARABLE STATE RULE.**

**THE FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED. MUCH OF IT IS DRAWN FROM THE DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES, STATEMENTS OF FINANCIAL AFFAIRS, AND**

**MONTHLY OPERATING REPORTS, WHICH WERE PREPARED FROM RECORDS RECONSTRUCTED IN PART. THE VALUES STATED FOR REAL PROPERTY ARE COUNTY APPRAISAL DISTRICT VALUES FOR TAX PURPOSES, NOT APPRAISALS OF MARKET VALUE. ANY ESTIMATES, PROJECTIONS, LIQUIDATION ANALYSES, AND FORWARD-LOOKING STATEMENTS ABOUT THE SALE PROCESS, THE OUTCOME OF LITIGATION, INSURANCE RECOVERIES, AND THE TIMING AND AMOUNT OF DISTRIBUTIONS ARE BASED ON ASSUMPTIONS THAT THE DEBTORS BELIEVE TO BE REASONABLE BUT THAT DEPEND ON EVENTS THAT HAVE NOT YET OCCURRED AND ON DECISIONS BY COURTS, BIDDERS, INSURERS, AND CLAIMANTS THAT THE DEBTORS DO NOT CONTROL. ACTUAL RESULTS WILL DIFFER, AND MAY DIFFER MATERIALLY.**

**NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ABOUT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS IN THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT ITS OWN ADVISORS ABOUT THE PLAN AND ITS CONSEQUENCES. THE DEBTORS' COUNSEL AND ADVISORS REPRESENT THE DEBTORS ONLY.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT, WHEN GIVEN, WILL MEAN ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT A HOLDER OF A CLAIM TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. IT WILL NOT BE A RULING ON THE MERITS OF THE PLAN, A FINDING THAT THE PLAN SHOULD BE CONFIRMED, OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION IN THIS DISCLOSURE STATEMENT.**

**THE CLAIMS AND NOTICING AGENT IN THESE CASES IS EPIQ CORPORATE RESTRUCTURING, LLC ("EPIQ"). THE COMPLETE PUBLIC RECORD OF THESE CASES, INCLUDING EVERY DOCUMENT CITED IN THIS DISCLOSURE STATEMENT BY DOCKET NUMBER, IS AVAILABLE FREE OF CHARGE ON EPIQ'S CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/CASE/CAMPMYSTIC. QUESTIONS ABOUT VOTING MAY BE DIRECTED TO EPIQ.**

## TABLE OF CONTENTS

**ARTICLE I. INTRODUCTION AND PURPOSE .......... 7**
A. The Debtors, the Court, and These Cases .......... 7
B. Purpose of This Disclosure Statement .......... 8
C. The Plan in Brief .......... 8
D. Key Parties and Professionals .......... 9
E. Questions and Answers About the Plan .......... 11
**ARTICLE II. CAMP MYSTIC .......... 12**
A. A Century on the Guadalupe .......... 12
B. The Stacy and Eastland Families .......... 13
C. The Property .......... 14
D. The Program and the Camp Mystic Community .......... 14
E. Dick Eastland and the River .......... 16
F. Why the Camp's Continuation Matters to Creditors .......... 16
**ARTICLE III. THE FLOOD OF JULY 4, 2025, AND ITS AFTERMATH .......... 17**
A. The Flood .......... 17
B. Camp Mystic's Loss .......... 19
C. The Days That Followed .......... 20
D. The Governmental Reviews and Investigations .......... 20
E. The Debtors' Position .......... 21
**ARTICLE IV. THE LITIGATION AND THE PENDING MATTERS .......... 22**
A. The Prepetition Lawsuits .......... 22
B. The Claims and the Defenses .......... 23
C. The Temporary Injunction in the *Steward* Case .......... 25
D. Removal, Remand, and the Motion to Transfer Under 28 U.S.C. § 157(b)(5) .......... 26
E. The Automatic Stay Litigation .......... 26
F. The Committee's Motion to Appoint a Chapter 11 Trustee and the Debtors' Response .......... 28
G. The Debtors' Independent Fiduciary Motion (Docket No. 205) and the Debtors' Reply .......... 32
H. The Committee's Retention Applications and the Composition of the Committee .......... 35
**ARTICLE V. ASSETS AND LIABILITIES OF EACH ESTATE .......... 36**
A. Summary, Sources, and Limits .......... 36
B. Camp Mystic, LLC (Case No. 26-90621) .......... 37
C. Natural Fountains Properties, Inc. (Case No. 26-90622) .......... 41
D. Mystic Camps Family Partnership, Ltd. (Case No. 26-90624) .......... 45
E. Mystic Camps Management, LLC (Case No. 26-90623) .......... 45
F. The Insurance Program .......... 46
G. Employees .......... 48
**ARTICLE VI. THE CHAPTER 11 CASES .......... 48**

A. Why the Debtors Filed ....48
B. First-Day and Second-Day Relief ....49
C. The Chief Restructuring Officer and the Debtors' Professionals ....50
D. The Official Committee of Unsecured Creditors ....50
E. Schedules, Statements, and the Meeting of Creditors ....50
F. The Bar Date Order ....51

**ARTICLE VII. SUMMARY OF THE PLAN ....51**

A. Overview ....51
B. The Sale Transactions ....52
C. Governance Before and After the Effective Date ....53
D. Classification and Treatment of Claims and Interests ....54
E. Treatment of the Flood Claims ....56
F. Treatment of Camper Deposit Claims ....56
G. Administrative Claims, Professional Fees, and Priority Claims ....57
H. Intercompany Claims, Insider Claims, Indemnification Claims, and Equity ....57
I. Means of Implementation, Distributions, and Claims Administration ....61
J. Executory Contracts and Unexpired Leases ....62
K. Releases, Exculpation, and Injunction ....62
L. Conditions to the Effective Date, Retention of Jurisdiction, and Modification ....64

**ARTICLE VIII. VOTING AND CONFIRMATION ....64**

A. The Disclosure Statement Hearing ....64
B. Who May Vote ....64
C. How to Vote ....65
D. Acceptance by a Class ....65
E. The Confirmation Hearing ....66
F. Requirements for Confirmation ....66
G. The Best Interests Test and the Liquidation Analysis ....67
H. Feasibility ....67
I. Confirmation Over a Rejecting Class ....67
J. Effect of Confirmation ....68

**ARTICLE IX. RISK FACTORS ....69**

A. Risks Relating to the Sale ....69
B. Risks Relating to the Flood Claims and Insurance ....70
C. Risks Relating to the Chapter 11 Cases ....70
D. Risks Relating to Distributions ....72
E. The Debtors Make No Representation About the Outcome of Litigation ....73

**ARTICLE X. ALTERNATIVES TO THE PLAN ....73**

**ARTICLE XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ....73**

A. Consequences to the Debtors ....74

B. Consequences to Holders of Claims....................74
C. Withholding and Reporting....................75
**ARTICLE XII. RECOMMENDATION AND CONCLUSION....................75**

## ARTICLE I.
## INTRODUCTION AND PURPOSE

### A. The Debtors, the Court, and These Cases

On June 24, 2026 (the "**Petition Dat**e"), Camp Mystic, LLC ("**Mystic LLC**"), Natural Fountains Properties, Inc. ("**NFP**"), Mystic Camps Management, LLC ("**MC Management**"), and Mystic Camps Family Partnership, Ltd. ("**MC Family Partnership**," and together with Mystic LLC, NFP, and MC Management, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").[2] The cases are jointly administered for procedural purposes only under Case No. 26-90621 and are pending before the Honorable Christopher M. Lopez.[3] Joint administration does not merge the four estates; each Debtor remains a separate legal entity with its own assets, its own creditors, and its own estate, and the Plan treats them that way.

The Debtors continue to manage their affairs as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed; the Committee's motion for the appointment of a chapter 11 trustee is pending. The Debtors' Chief Restructuring Officer is Karen G. Nicolaou, CPA, CVA, of HMP Advisory Holdings, LLC d/b/a Harney Partners (the "**CRO**"), whose retention the Bankruptcy Court approved on August 18, 2026. The Debtors have also asked the Bankruptcy Court to approve the appointment of two independent fiduciaries, Mark Andrews as Independent Manager of Mystic LLC and the Honorable Craig A. Gargotta (Ret.) as Independent Director of NFP (together, the "**Independent Fiduciaries**"), each serving as the sole member of a special committee of that Debtor's governing body (each, a "**Special Committee**") with delegated authority over the matters in which a member of the Eastland family could have a conflict (the "**Conflict Matters**"). Contemporaneously with the Plan and this Disclosure Statement, the Debtors are filing an omnibus reply in support of that motion, with a revised proposed order (the "**Reply**"), that responds to the objections to the motion and requests modified relief (the "**Modified Relief**") giving the Special Committees the sole and exclusive authority of Mystic LLC and NFP over the Plan, including the Plan Supplement and any amendment of the Plan, and over the sale process, and vesting the same authority for MC Family Partnership and MC Management in the CRO. The Eastland family members who serve as the Debtors' managers and directors (the "**Eastland Board Members**") have no vote, veto, or consent right over those matters; they may be heard and may object to the Bankruptcy Court, but they may not decide. Final authority over the defense and conduct of the Flood Claims against the Debtors, and over any settlement of them outside the Plan, remains with each Debtor's full governing body, on which the applicable Independent Fiduciary has a vote. The Reply also seeks approval of a tolling agreement between the Debtors and the Eastland Parties (defined below) (the "**Tolling Agreement**"), under which every claim of the estates against the Eastland Parties, and every

[2] Voluntary Petition, Docket No. 1. Unless otherwise stated, "Docket No." refers to the docket of the jointly administered lead case, Case No. 26-90621 (CML), and "Adv. Docket No." refers to the docket of Adversary Proceeding No. 26-03604 (CML). All docketed documents are available without charge at https://dm.epiq11.com/case/CampMystic.

[3] *Order for Joint Administration*, Docket No. 17 (June 29, 2026); *Order Granting Complex Chapter 11 Bankruptcy Case Treatment*, Docket No. 18 (June 29, 2026).

objection and defense to the Eastland Parties' claims against the Debtors, is preserved while the Flood Claims are litigated.

The Debtors own and, until the flood of July 4, 2025, operated Camp Mystic, a private, nondenominational Christian summer camp for girls that has stood on the South Fork of the Guadalupe River near Hunt, in Kerr County, Texas, since 1926. Mystic LLC operated the camp. NFP owns the approximately 749 acres of land on which the camp sits and leases that land to Mystic LLC. MC Family Partnership owns all of the equity of Mystic LLC and NFP, and MC Management is the general partner of MC Family Partnership.

**B. Purpose of This Disclosure Statement**

The Debtors submit this disclosure statement (this "**Disclosure Statement**") under section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject the *Joint Chapter 11 Plan of Camp Mystic, LLC and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, or supplemented, the "**Plan**"), a copy of which is attached as **Exhibit A**. Section 1125 requires that, before votes are solicited, holders of claims receive a court-approved disclosure statement containing "adequate information," meaning information of a kind and in sufficient detail to allow a reasonable creditor to make an informed judgment about the Plan.

Many of the creditors in these cases are not businesses. They are the families of the twenty-seven campers and counselors who died on July 4, 2025; the families of the girls who survived that night and whose session did not run its full term; the families who hold deposits for camp sessions that did not take place; and the employees who have kept the camp property in order since the flood. The Debtors have therefore tried to write this Disclosure Statement in plain language wherever the subject permits.

The Bankruptcy Court has scheduled a hearing on the adequacy of this Disclosure Statement for **[●]**. If the Bankruptcy Court approves it, the Debtors will distribute it, together with the Plan, a ballot, and voting instructions, to every holder of a claim entitled to vote. **The deadline to vote will be [●].** The hearing to consider confirmation of the Plan is scheduled for **[●]** (the "**Confirmation Hearing**"), and objections to confirmation must be filed by **[●]**.

**C. The Plan in Brief**

The Plan, described in detail below, rests on four principles. First, the camp property and the Camp Mystic operating assets will be sold to an independent buyer through a competitive, court-supervised sale process under section 363 of the Bankruptcy Code, which will proceed on a parallel track with confirmation of the Plan, with a stalking horse purchaser and overbid protections. The Debtors anticipate that the Stalking Horse Purchaser will be a purchaser backed by an ad hoc group of interested Camp Mystic families and alumnae. [INSERT: the identity of the Stalking Horse Purchaser and the purchase price.] Second, the Plan is a separate plan for each Debtor: the proceeds of the sale stay in the estates that generated them, are held in separate escrow accounts by independent Plan Administrators, and are distributed to each estate's own creditors in the order of priority the Bankruptcy Code requires. Third, the wrongful death, tort, and personal injury claims arising from the July 4, 2025 flood (the "**Flood Claims**," which the Plan calls

"**Wrongful Death Claims**") will be liquidated in the tort system, not adjudicated by the Bankruptcy Court. Thirty days after the district courts decide the pending venue and remand motions, the automatic stay will lift as to each family's claim against the Debtors, and each Flood Claim, in whatever amount it is finally determined, is paid first from the Debtors' liability insurance and then, for any unpaid balance, *pro rata* from the escrow account of each estate against which it is allowed, without double recovery. The Debtors also offer to mediate such claims. Fourth, the camper families who paid deposits and tuition for sessions that did not occur will be paid in full, to the extent of the $3,800 statutory priority cap, in cash on the effective date of the Plan (the "Effective Date") or, at each family's election, by transfer of the full amount of the family's Deposit Claim to the buyer as a credit toward a future session under new ownership, which election is available only if the Stalking Horse Purchaser, or another bidder that will continue to operate a camp on the property, is the successful bidder.

Nothing in the Plan requires any buyer to operate the property as a camp, but the Plan states an express preference, in determining the highest or otherwise best bid, for a buyer that will maintain the historic mission of the camp, and any operation of a camp on the property will require a new license from the Texas Department of State Health Services under the camp-safety statutes enacted in 2025. The Plan does not release the Flood Claims against any Individual Defendant or any member of the Eastland family, and the estates' claims against the Eastland Parties are tolled under the Tolling Agreement and preserved for the Plan Administrators. The Plan cancels the Eastland family's equity in the Debtors on the Effective Date; new equity in each Post-Effective Date Debtor is issued to the Plan Administrators, who hold it as custodians to carry out the Plan, and the family, as former owners, receives nothing on account of that equity. The Independent Fiduciaries, once appointed as the Reply proposes, hold the sole and exclusive authority of Mystic LLC and NFP to prosecute the Plan and to conduct the sale process, and the CRO holds that authority for MC Family Partnership and MC Management; the Eastland Board Members have no vote, veto, or consent right and may not direct either.

### D. Key Parties and Professionals

| | |
|---|---|
| **The Debtors** | Camp Mystic, LLC (Case No. 26-90621); Natural Fountains Properties, Inc. (Case No. 26-90622); Mystic Camps Management, LLC (Case No. 26-90623); Mystic Camps Family Partnership, Ltd. (Case No. 26-90624). Service address: 2689 Highway 39, Hunt, Texas 78024. |
| **The Bankruptcy Court** | United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas 77002, the Honorable Christopher M. Lopez presiding. |
| **Chief Restructuring Officer** | Karen G. Nicolaou, CPA, CVA, HMP Advisory Holdings, LLC d/b/a Harney Partners (retained effective June 26, 2026; approved Docket No. 173). |

| | |
|---|---|
| **Proposed Independent Fiduciaries** | Mark Andrews (Trinity River Advisors), proposed Independent Manager of Mystic LLC; Hon. Craig A. Gargotta (Ret.), proposed Independent Director of NFP (Docket No. 205; the Debtors' omnibus reply in support of the motion, filed contemporaneously with this Disclosure Statement with a revised proposed order, requests Modified Relief that gives the Special Committees the sole and exclusive authority of Mystic LLC and NFP over the Plan and the sale process and seeks approval of the Tolling Agreement; set for hearing October 9, 2026). |
| **Debtors' Counsel and Financial Advisor** | Vartabedian Katz Hester & Haynes LLP (approved Docket No. 172); CR4 Partners, LLC (William Roberts, CPA) (approved Docket No. 174). |
| **Claims, Noticing, and Solicitation Agent** | Epiq Corporate Restructuring, LLC ("**Epiq**") (approved Docket No. 61). Case website: https://dm.epiq11.com/case/CampMystic. |
| **Official Committee of Unsecured Creditors** | Thirteen members (the "**Committee**") appointed by the United States Trustee on July 22, 2026 (Docket No. 94), each the parent of a camper or counselor who died on July 4, 2025. Proposed counsel: Willkie Farr & Gallagher LLP; Lawson & Moshenberg PLLC (Texas and conflicts counsel). Proposed financial advisor: FTI Consulting, Inc. (retention applications pending, Docket Nos. 218–220). |
| **Certain Heaven's 27 Families** | Twenty-four families represented by Gray Reed, plaintiffs or prospective plaintiffs in the Flood Claims litigation (the "**Families**"); "**Heaven's 27**" is the name the bereaved parents gave to the campers and counselors who died in the flood. |
| **The Lawrence Family** | John B. and Lacy M. Lawrence, who lost two daughters, represented by Akin Gump Strauss Hauer & Feld LLP. |
| **The Individual Defendants** | Willetta "**Tweety**" Eastland; George Albritton "**Britt**" Eastland, as representative of the Estate of Richard G. "**Dick**" Eastland; Edward S. Eastland; Mary E. "**Mary Liz**" Eastland; and William Neely Bonner III (President of NFP), each a defendant in one or more of the Flood Claims lawsuits, represented in these cases by Kane Russell Coleman Logan PC.<br>**The Eastland Parties**<br>The individuals and trusts, other than the Debtors, whose potential claims and liabilities are discussed in this Disclosure Statement: Willetta A. Eastland; George A. Eastland, individually and as representative of the Estate of Richard G. Eastland; Edward S. Eastland; Richard G. Eastland, Jr.; Mary E. Eastland; the trustees of the 1990 Richard G. Eastland Generation-Skipping Trusts and of the Richard G. Eastland Appointment Trust; and William Neely Bonner III. |
| **United States Trustee** | Office of the United States Trustee for Region 7 (Jana Whitworth and Jayson Ruff, Trial Attorneys). |

| | |
|---|---|
| **Plan Administrators** | A CM Plan Administrator for Mystic LLC and an NFP Plan Administrator for NFP, who together administer the Plan for MC Family Partnership and MC Management, to be selected by the Independent Fiduciaries, after consultation with the Committee, identified in a notice filed before the hearing on this Disclosure Statement, and designated in the Plan Supplement. The Plan Administrators will hold the new equity of MC Family Partnership and MC Management as custodians for the former equity holders in the event every Allowed Claim is paid in full. |

## E. Questions and Answers About the Plan

The answers below are summaries. The Plan governs.

**I paid a deposit or tuition for 2026 (or rolled over a 2025 deposit). What happens to my money?** Your claim is a Camper Deposit Claim against Mystic LLC. The Plan pays those claims in full in cash on the Effective Date, up to $3,800 per family, which covers most deposit creditors but not all. On your ballot you may instead elect to transfer the full amount of your Deposit Claim to the buyer, to be held in a segregated account and credited toward a future session under new ownership (the "Deposit Election"), which is available only if the buyer will continue to operate a camp on the property. The risk factors in this Disclosure Statement describe the risks of that election.

**I am one of the families who lost a daughter. Do I have to file a proof of claim?** If you are one of the families who sued before the Petition Date, or one of the Baker, Lawrence, or Marsh families, the Bankruptcy Court's Bar Date Order provides that you are deemed to have timely filed a proof of claim against each of the four Debtors in an unliquidated amount.[4] Any other person who believes he or she holds a claim arising from the flood, including a surviving camper, counselor, or family member, was required to file a proof of claim by the General Bar Date of September 18, 2026, at 5:00 p.m. (prevailing Central Time), unless the Bankruptcy Court orders otherwise.

**Who gets to vote?** Holders of claims in Class 2 (Camper Deposit Claims), Class 4 (Flood Claims), and Class 5 (General Unsecured Claims) at each Debtor are entitled to vote; the Plan treats the deposit claims as impaired because of the Deposit Election, so the deposit-holding families vote. Holders of priority and secured claims, which are paid in full, are deemed to accept and do not vote. Holders of the Existing Equity Interests in MC Family Partnership and MC Management (Class 8), which the Plan cancels without any recovery to their holders, are deemed to reject the Plan and do not vote.

**Does the Plan release the Eastland family or Mr. Bonner?** No. Each family's Flood Claim against the Individual Defendants survives confirmation, subject to the pending stay litigation. The Plan releases no member of the Eastland family, no Eastland trust, and not Mr. Bonner, in any capacity, from any claim, and the estates' own claims against them are

[4] *Order (I) Establishing Deadlines for the Filing of Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief,* Docket No. 176 ¶ 10(h)–(i) & nn.3–4 (Aug. 19, 2026) (the "**Bar Date Order**").

preserved for the Plan Administrators. Under the Tolling Agreement described in the summary of the Plan below, every claim of the estates against the Eastland Parties is tolled while the Flood Claims are litigated, so that no limitations period runs against the estates on those claims, and no distribution will be made on any claim of an Eastland Party against a Debtor unless and until that claim is allowed by a final order or by written agreement with the estates' representative. The Plan's releases run only to the Debtors, the Plan Administrators, and the buyers, and its exculpation runs only to the Debtors and the Committee and its members; whether the Independent Fiduciaries will also be exculpated under the Plan will be decided by the Bankruptcy Court at the Confirmation Hearing. A family that holds a Flood Claim releases nothing arising from the flood, whether or not it returns a ballot.

**What role will the Eastland family have after the Plan?** The sale under the Plan transfers the camp real estate and the operating assets to a third-party purchaser, free and clear of liens, claims, and interests under section 363(f) of the Bankruptcy Code. On the Effective Date, the Eastland family's equity in the Debtors is cancelled, and no member of the family will serve as an officer of any Post-Effective Date Debtor; the Plan Administrators become the sole officers of every Post-Effective Date Debtor and the sole directors, managers, and Governing Bodies of MC Family Partnership and MC Management. The Post-Effective Date Debtors will be administered by the Plan Administrators, who hold the New Equity Interests as custodians, wind down the estates, and make the distributions the Plan provides. Unless the Plan Supplement provides otherwise, the Eastland Board Members remain on the Governing Bodies of Mystic LLC and NFP for one purpose, the defense of the Flood Claims, and every other power of those Debtors is vested in the Plan Administrators. The family receives nothing on account of its former equity unless every Allowed Claim against a Debtor has been paid in full, in which case any surplus goes to the former holders.

## ARTICLE II.
## CAMP MYSTIC

### A. A Century on the Guadalupe

Edward J. "Doc" Stewart, a former University of Texas football coach, opened a girls' camp on the South Fork of the Guadalupe three miles southwest of Hunt in 1926; within about a year it took the name Camp Mystic.[5] Camp Mystic is one of many summer camps that operate in Kerr County, most of them along the Guadalupe and its tributaries, and for a century those camps and their traditions have given generations of Texans lifelong memories and friends.[6]

Texas has regulated youth camps by statute since 1989, when the Legislature enacted the Texas Youth Camp Safety and Health Act, which requires a license and makes the Department of State Health Services ("**DSHS**") "the principal authority on matters relating to health and safety

---

[5] Rebecca J. Herring, *Camp Mystic*, Handbook of Texas Online (rev. Sept. 3, 2025), https://www.tshaonline.org/handbook/entries/camp-mystic; Camp Mystic, *Mystic History*, https://campmystic.com/mystic-history/.

[6] Joy Addison, *Most Texas Hill Country summer camps reopen one year after deadly floods*, KPRC 2 (June 28, 2026), https://www.click2houston.com/news/local/2026/06/28/most-texas-hill-country-summer-camps-reopen-one-year-after-deadly-floods/ (roughly fifteen camps in the Hunt and Kerrville area reopened for the 2026 season).

conditions at youth camps."[7] Camp Mystic held a license and had passed the State's inspections just days before the tragic event.

By 2025 the camp offered two four-week terms and one two-week term to girls from seven to seventeen, and approximately 750 girls attended that summer. The camp did not open in the summer of 2026. The question the Plan puts to creditors is whether the institution ends with the sale of the land or continues under an owner unconnected to the family that has run it.

**B. The Stacy and Eastland Families**

The camp's character was formed by Agnes "Ag" Stacy, who sent her daughter to the camp in 1933, worked there as a director the next year, and in 1939 bought it with her husband, William Gillespie "Pop" Stacy. The camp credits the Stacys with beginning "many of the traditions which are still followed by Mystic's campers."[8] Inez "Iney" and Frank Harrison served as the camp's directors from 1948 until 1987. The dining hall on the Guadalupe River campus is named Harrison Hall in their honor.[9]

Dick Eastland was Ag Stacy's grandson. He and Tweety Eastland married in 1975 while students at The University of Texas, moved to the camp after college, and in 1987 became its executive directors, the third generation of the family to manage it. The same family has owned and operated the camp for approximately eighty-five years.[10] Dick Eastland was the director of Camp Mystic, and he was admired and respected by the camp community. Tweety Eastland led Bible studies and devotionals and worked with the children at the camp. The Eastlands raised four sons at the camp. James, who with his father initiated the plans for the second campsite that became Camp Mystic Cypress Lake, died suddenly in 2015. James' death brought Britt, then a criminal defense attorney in San Antonio, and Britt's wife Catie back to help run the camp. Richard, trained as a chef, joined the camp full time in 2012 as executive chef and kitchen manager. Edward and his wife Mary Liz, a lifetime Camp Mystic camper and a nurse, moved to the camp full time, where she served as medical director.[11] When Cypress Lake opened in 2020, Dick Eastland, while keeping the title of executive director, named Britt and Catie Eastland its directors and Edward and Mary Liz Eastland the directors of the Guadalupe River campus. Craig and Betsy Althaus, longtime family friends, began working full time for the camp in 2002; Craig supervised facilities, equipment, the grounds crew, and security, and Betsy served as assistant director in the office.

[7] Tex. Health & Safety Code ch. 141; *id.* §§ 141.003 (license required), 141.006 (principal authority).

[8] Camp Mystic, *Mystic History*, *supra*.

[9] Camp Mystic, *Mystic History*, *supra*.

[10] *Declaration of Karen Nicolaou, Debtors' Proposed Chief Restructuring Officer, in Support of Chapter 11 Petitions and Second Day Motions*, Docket No. 45 (July 2, 2026) (the "**Second Day Declaration**") ¶¶ 8, 17; Camp Mystic, *Mystic History*, *supra*.

[11] Camp Mystic, *Directors & Staff*, https://campmystic.com/directors-staff/.

**C. The Property**

Camp Mystic occupies approximately 725 acres near Hunt, at the confluence of the South Fork of the Guadalupe River and Cypress Creek.[12] NFP owns the land, and Mystic LLC operates the camp under a lease from NFP.[13] There are two campuses: the original Camp Mystic Guadalupe River, which opened in 1926 along the river, and Camp Mystic Cypress Lake, which opened in 2020 on the hill that overlooks the lake.[14]

The Guadalupe River campus historically included approximately forty buildings. The ten camper cabins on "Senior Hill" were built at higher elevations and housed the older campers. The younger campers stayed in thirteen cabins on the "Flats," lower, closer to the river, and near the administrative buildings: eight of them, Bug House, Look Inn, Hang Out, Tumble Inn I and II, Jumble House, Nut Hut, and Chatterbox, were built with their backs to the steep bluff, and the other five, Bubble Inn, Twins I and II, Giggle Box, and Wiggle Inn, stand across the paved road called Camp Mystic Way South.[15] The other buildings on the Flats include the Rec Hall, built in 1927 from local cypress, the office, Harrison Hall, the camp store, the infirmary, called "Heaven Can Wait," the stables, and the family residences.

The Cypress Lake campus lies on the hill past the springs called Natural Fountains, completely independent from the older Guadalupe River camp, with a separate entrance, waterfront, dining hall, office, pavilion, infirmary, playing fields, archery range, stables, chapel, and cabins, and its swimming area is a spring-fed lake that feeds Cypress Creek, a completely different body of water from the Guadalupe. Developed in approximately 2019 and 2020, it has fifteen cabins and its own dining hall, James Hall, named for James Eastland, and accommodates roughly 200 campers per session; 171 campers were there in July 2025.[16] In September and October 2018, before development began, Hewitt Engineering, Inc., a registered engineering firm in Kerrville, prepared a floodplain delineation and a Cypress Creek floodplain study for the site. All of the cabins and buildings at Cypress Lake sit above the 100-year floodplain lines and, by FEMA's estimated base flood elevation viewer, above the 500-year floodplain, and the campus did not flood on July 4, 2025.

**D. The Program and the Camp Mystic Community**

Camp Mystic is a private, nondenominational Christian summer camp for girls who have completed the second grade, whose stated purpose has been to provide young girls "a wholesome

---

[12] Second Day Declaration ¶¶ 12, 18; Kerr Central Appraisal District, 2026 Notices of Appraised Value (May 29, 2026) (Property IDs 18507, 18940, 18941, 19022, 21587, 21590, 22727, 29667, and 29678), https://esearch.kerrcad.org/ (nine parcels; 749.25 acres in the aggregate). The Debtors' pleadings describe the property as 725 acres.

[13] Independent Fiduciary Motion ¶ 34; Second Day Declaration ¶ 12.

[14] Camp Mystic, *Cypress Lake*, https://campmystic.com/cypress-lake/.

[15] Second Day Declaration ¶ 19; *Order Granting Temporary Injunction* at 3, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. Apr. 15, 2026), filed as Exhibit D to Docket No. 227 (Docket No. 227-5) (the "**April 15 Injunction Order**").

[16] Second Day Declaration ¶¶ 18–19.

Christian atmosphere in which they can develop outstanding personal qualities and self-esteem."[17] The cabins were not air conditioned, campers had no access to the internet and could bring no device with a camera, touch screen, Wi-Fi, or games, and even the counselors surrendered their telephones to the office except during time off.[18] Prayer and Bible study occurred several times daily.

Counselors were, by preference, former campers, and demand for places exceeded supply: many families placed their daughters on the waiting list soon after they were born, and sisters and cousins commonly attended together.[19] On June 29, 2025, the first day of the second session, 557 campers arrived, 386 for the Guadalupe River campus and 171 for Cypress Lake.[20] Tuition for the 2026 season was approximately $3,475 per camper per session, and approximately 863 girls had committed to attend before the season was cancelled.[21]

Attending Camp Mystic is a generational tradition for many Texas families. Texas Governors Dan Moody, Price Daniel, and John Connally sent daughters there; three generations of Lyndon Johnson's family attended; former First Lady Laura Bush served as a drama counselor at the camp in her youth; and many campers can say that their mothers, aunts, cousins, and grandmothers attended the camp as children. The Debtors' schedules list 2,790 families holding

---

[17] Camp Mystic, *Home*, https://campmystic.com/.

[18] Camp Mystic, *Final Instructions 2025 (Guadalupe River)*, https://www.campmystic.com/wp-content/uploads/2025/02/FINAL-INSTRUCTIONS-2025-Guadalupe.pdf ("UNACCEPTABLE ELECTRONIC DEVICES – devices that have a camera, touch screens, WiFi capabilities, video or gaming features are not allowed"; listing "Cell phones (even those with SIM card removed)"); Laura Romero & Peter Charalambous, *Camp Mystic began evacuating 45 minutes after 'life-threatening flash flooding' alert: Spokesperson*, ABC News (July 14, 2025), https://abcnews.com/US/camp-mystic-began-evacuating-45-minutes-after-life/story?id=123754999 ("young campers who were sleeping in their cabins without access to electronics"); Dalia Faheid & Pamela Brown, *Girls as young as 7 were startled awake by flooding that devastated their beloved Camp Mystic. How the deadly tragedy unfolded*, CNN (July 13, 2025), https://www.cnn.com/2025/07/13/us/camp-mystic-flooding-texas (counselor Caroline Cutrona "and other counselors were told to turn in their phones at work"); Laura Trujillo, *Camp Mystic girls had a safe haven by the river for 100 years. Then, the flood came.*, USA Today (July 2025), https://www.aol.com/camp-mystic-girls-had-safe-090449933.html ("the unair-conditioned cabins").

[19] *Former camper and counsellor tells what makes Camp Mystic so special to her*, NPR (July 7, 2025), https://www.npr.org/2025/07/07/nx-s1-5458540/former-camper-and-counsellor-tells-what-makes-camp-mystic-so-special-to-her (Lauren Garcia attended "first as a camper and then as a camp counselor"; host: "I understand your mom and her sisters all went. And your sisters all went." Garcia: "Yes."); *Texas's Camp Mystic was 'a place of joy'. Floods turned it into a site of great loss*, The Guardian (July 2025), https://www.aol.com/news/texas-camp-mystic-place-joy-120050484.html ("It's so popular that fathers have been known to call the registrar to get their daughters on the list from the delivery room."); Trujillo, *supra* ("her mom put her on the waiting list"; Julia Hawthorne "followed her older sister, who had followed their aunt," and "later became a counselor at the camp").

[20] DSHS Youth Camp Inspection Report (July 2, 2025) (386 campers and 64 staff at the Guadalupe River campus); Laura Romero, *Inspectors signed off on Camp Mystic's emergency plans days before catastrophic flooding, records show*, ABC News (July 9, 2025), https://abcnews.com/US/inspectors-signed-off-camp-mystics-emergency-plans-days/story?id=123601635 ("The youth camp had 557 campers and 108 staffers between its Guadalupe and Cypress Lake locations at the time of the inspection."; "DSHS released the July 2 inspection report along with five years of reports.").

[21] Second Day Declaration ¶ 20.

deposit, tuition, or camp-store credits.[22] A former camper and counselor said after the flood: "I believe that the spirit of Mystic isn't defined by the physical buildings or the river. It's in the people. It's in the shared experiences. It's in lifelong bonds."[23] That is the one thing the camp offered for a century that no Schedule can value: friendships formed in childhood and kept for life, faith practiced daily, and the confidence that comes to a girl who spends a month away from home, without a telephone, learning to live with others.

**E. Dick Eastland and the River**

The Guadalupe had overflowed its banks before 2025. In July 1932, the campers were led up the hill, and no one was hurt. In August 1978, Tropical Storm Amelia stranded the camp without loss of life. In July 1987, the river again overflowed its banks, and the campers from the two cabins closest to it were moved to the Rec Hall, again without loss of life. In Dick Eastland's lifetime the river had never flooded a camper cabin, and in the camp's ninety-nine years no one had died there in a flood. The Debtors dispute liability and do not attempt to resolve those questions here.

**F. Why the Camp's Continuation Matters to Creditors**

The Debtors do not minimize what the families who lost daughters have suffered, and nothing in this Disclosure Statement should be read to suggest that a summer camp is more important than the lives that were lost there. But the Debtors' creditors include thousands of families whose connection to the camp did not end on July 4, 2025. When the 2026 season was cancelled, some of the families holding deposits asked the Debtors to hold their deposits and roll them forward to a hoped-for 2027 season rather than refund them, and the Debtors have said in these cases that those families want the camp to reopen.[24] Parents of girls who survived the flood have said publicly that they intend to send their daughters back.[25] The Plan takes both sets of families' concerns seriously. It does not ask any bereaved family to accept the camp's continuation as a condition of its recovery, and it does not ask any family that wishes to return to accept that the camp must close.

The camp's name and its community retain value. Before the camp withdrew its 2026 license application, more than 800 girls had signed up to return to Cypress Lake, and approximately fifteen camps in the Hunt and Kerrville area reopened for the 2026 season under the new laws.[26] On August 31, 2026, Lieutenant Governor Dan Patrick released an episode of his

---

[22] Herring, *Camp Mystic*, *supra*; Schedule E/F of Camp Mystic, LLC, Docket No. 152 at 38–749; Transcript of Section 341 Meeting of Creditors (Aug. 26, 2026), Docket No. 227-1 (the "**341 Transcript**"), at 100:24–101:3.

[23] *Remembering Camp Mystic: Devastated by flood waters, loved by generations of Texans*, KPRC 2 (July 10, 2025), https://www.click2houston.com/news/local/2025/07/10/remembering-camp-mystic-devastated-by-flood-waters-loved-by-generations-of-texans/.

[24] Second Day Declaration ¶ 21; July 9 Transcript at 32:17–25, 35:12–16.

[25] Sean Murphy, *Camp Mystic's reopening plans in Texas has drawn outrage, but some families want to return*, Associated Press (Dec. 23, 2025), https://www.pbs.org/newshour/nation/camp-mystics-reopening-plans-in-texas-has-drawn-outrage-but-some-families-want-to-return.

[26] *Camp Mystic won't reopen this summer, withdraws its application to renew license*, KSAT (Apr. 30, 2026), https://www.ksat.com/news/local/2026/04/30/camp-mystic-wont-reopen-this-summer-withdraws-its-application-to-renew-license/; Miranda Suarez & Ron Corning, *A community divided: What does the future hold for Camp Mystic?*,

podcast titled "Camp Mystic: Heaven's 27," a conversation with two fathers who each lost a daughter at Camp Mystic. Its published description states that the fathers "explain why their work isn't about ending summer camps - it's about making sure another family never has to experience what they did."[27] Any camp on the property would be required to comply with the law as it now stands. The Debtors believe that a court-supervised sale to an independent owner is the path most likely to allow the camp's mission to continue, and that a trustee's sale would more likely put the land on the market for whatever it will bring, with the trademarks and goodwill abandoned or given a *de minimis* value. Whether that mission continues, and on what terms, will be decided by the market, not by the Eastland family.

The response of the camp's community has been substantial. In August 2025, a group of Camp Mystic mothers organized a fund, known as Friends of Camp Mystic, to raise money to rebuild the Guadalupe River campus. The fund raised more than $400,000 from camp families and other supporters. It was initially established under the auspices of the San Antonio Area Foundation, which later discontinued its administration of the fund; the Debtors understand that the donated money is presently held in escrow by the Debtors' general contractor, the same contractor that built the Cypress Lake campus in 2018 and 2019. The funds were designated for the reconstruction of the Guadalupe River campus. Since the flood, the general contractor has helped secure the Guadalupe River site, including with temporary perimeter fencing, and the repair of the flood-damaged entrance and other work at that campus remains subject to the temporary injunction. This support, together with the returning and deposit-holding families described above, reflects that there is a community that wishes to see the camp restored.

## ARTICLE III.
## THE FLOOD OF JULY 4, 2025, AND ITS AFTERMATH

### A. The Flood

The flood of July 4, 2025 came from a storm that stalled over the headwaters of the South Fork of the Guadalupe River and delivered, in about three hours, rainfall that exceeded the 1,000-year event for the basin. The remnants of a tropical system met a weak front over the Hill Country, and multiple rounds of thunderstorms passed over the same ground from late on July 3 until about 5:00 a.m. on July 4.[28] The hydrologic assessment that Kerr County's engineer commissioned after

KERA (Apr. 6, 2026), https://www.keranews.org/news/2026-04-06/camp-mystic-hill-country-floods; Addison, *supra*.

[27] Lt. Dan Podcast with Dan Patrick, *Camp Mystic: Heaven's 27* (Aug. 31, 2026), https://www.ltdan.com/ (episode description).

[28] National Weather Service, Austin/San Antonio Weather Forecast Office, *July 2025 Monthly Hydrologic and Flood Stage Report (E-5/E-3)*, https://www.weather.gov/media/ewx/Hydro/MonthlyReports/E-5%20EWX%202025-07.pdf (the "**NWS Monthly Report**") ("The combination of the remnants of a tropical system and a weak frontal boundary allowed for the development of multiple rounds of training thunderstorms."); Waterway Engineering (Michael G. Pantell, P.E., C.F.M.), *Guadalupe River Hydrologic Assessment for the July 4, 2025 Flood Event* (July 24, 2025), prepared for Kerr County (the "**Kerr County Hydrologic Assessment**"), at 1–2, attached as **Exhibit H**. The Kerr County Hydrologic Assessment was delivered to the Kerr County Engineer on July 24, 2025; its cover letter states that the floodplain modeling on which it rests was provided to Kerr County and to the Texas Division of Emergency Management, which used it from July 13, 2025 to direct search and recovery resources.

the flood found that radar data showed 9.78 inches of rain over the storm's center between 11:00 p.m. and 5:00 a.m., that 8.72 inches of it fell between 1:00 a.m. and 4:00 a.m., and that roughly ninety percent of the rain fell within three hours. The highest rain gauge reading in the storm, at the Upper Guadalupe River Authority's gauge in the South Fork watershed, was 11.99 inches in six hours, and the radar estimates ran below the gauge readings; correcting for that, the county's engineer put the peak rainfall at 13.27 inches in six hours and 11.94 inches in three hours. Both totals exceed the 1,000-year rainfall for the South Fork watershed under NOAA's published frequency estimates, and they amount to sixty to seventy percent of the probable maximum precipitation, the greatest rainfall that is considered physically possible at that location.[29] NOAA's Physical Sciences Laboratory reached the same conclusion: the event exceeded the "1/1000 year" annual exceedance probability, "an event with a 0.1% probability over a given location each year."[30] The forecasts the day before had called for four to eight inches of rain in the Hill Country. As the Chief of the Texas Division of Emergency Management said afterward, "[t]he amount of rain that fell in this specific location was never in any of those forecasts." Kerr County's judge said on the morning of the flood, "Rest assured, no one knew this kind of flood was coming," and the county's sheriff later testified that "no alert system would've changed the outcome or prevented the tragic loss of life."[31]

The flood of July 4, 2025, killed at least 135 people across central Texas, the deadliest flash flood in the United States since 1976. Kerr County bore the heaviest loss: 117 confirmed deaths, including 37 children, and two people who have never been found, one of them a Camp Mystic camper.[32] Governor Greg Abbott issued a state disaster declaration on July 4, and the President

---

[29] Kerr County Hydrologic Assessment at 1–5 & tbls. 1–7. Probable maximum precipitation is "theoretically the greatest depth of precipitation for a given duration that is physically possible over a given size storm area at a given location and time." *Id.* at 4.

[30] Andrew Hoell et al., *Weather Whiplash in Texas: Drought to Flood*, NOAA Physical Sciences Laboratory (Aug. 11, 2025, updated Aug. 28, 2026), https://psl.noaa.gov/news/2025/texasfloods.html ("10-12 inches of rain falling in just six hours over some locations"; the event "was found to exceed the '1/1000 year' annual exceedance probability, or an event with a 0.1% probability over a given location each year").

[31] Joe Hernandez, *How good was the forecast? Texas officials and the National Weather Service disagree*, NPR (July 7, 2025), https://www.opb.org/article/2025/07/07/how-good-was-the-texas-weather-forecast-before-the-flood/ (quoting Chief W. Nim Kidd: "The original forecast that we received on Wednesday from the National Weather Service predicted three to six inches of rain in the Concho Valley and four to eight inches of rain in the Hill Country. The amount of rain that fell in this specific location was never in any of those forecasts."); Uriel J. García & Hannah Fingerhut, *Death toll from Hill Country flash floods rises to 24 as rescue efforts continue*, Texas Tribune (July 4, 2025), https://www.texastribune.org/2025/07/04/texas-flooding-deaths/ (quoting Kerr County Judge Rob Kelly); Texas Senate News, *Committee Assesses Flood Response, Responsibility in Kerr County* (July 31, 2025), https://senate.texas.gov/news.php?id=20250731a (quoting Sheriff Larry Leitha); Testimony of Sheriff Larry Leitha, July 31, 2025, https://www.youtube.com/watch?v=N23lA05TIiw.

[32] OIG Report at 1 (at least 135 people killed, 117 of them in Kerr County, including 37 children, with two people still missing as of September 2025); Kerr County, *July 4 Ceremony at Memorial Cross Planned in Kerr County* (July 2026), https://kerrcountytx.gov/blog/july-4-ceremony-at-memorial-cross-planned-in-kerr-county; AMS Review, *supra* ("It was the deadliest flash flood in the United States since 1976."); Jonathan Erdman, *Texas Flood Was America's Deadliest Rainfall Flash Flood In 49 Years*, weather.com (July 29, 2025), republished at https://www.yahoo.com/news/texas-flood-americas-deadliest-rainfall-160000683.html (the last deadlier flash flood was the Big Thompson Canyon, Colorado flood of July 31, 1976).

declared a major disaster for Texas on July 6, 2025.[33] The loss of life extended far beyond the camp, and the adequacy of the county's and the State's own flood warnings that night has been the subject of public inquiry and legislation.

**B. Camp Mystic's Loss**

Twenty-eight people died at Camp Mystic that morning: twenty-five campers, two counselors, and the camp's co-executive director, Richard "Dick" Eastland.[34] All of them were at the Guadalupe River campus. The campers who died were eight, nine, and ten years old. Most were first-time campers who had arrived less than four days earlier. The two counselors were eighteen and nineteen. The twenty-seven campers and counselors came from twenty-six families. The Lawrence family lost two daughters.[35] The body of one camper has never been recovered, and the search for her continues.[36] Their families have named them, together, "Heaven's 27," a name the parents chose in the weeks after the flood and that the Legislature adopted in the title of the Heaven's 27 Camp Safety Act.[37] In keeping with Bankruptcy Rule 9037 and out of respect for the families' own decisions about how their daughters are remembered, the Debtors do not reproduce the children's names in this Disclosure Statement, except where a court order or a pleading is quoted. The Families' own filings in these cases, which are public, do.[38]

Mr. Eastland died in the river while evacuating campers. He was found with the girls he had been trying to save. Hundreds of girls spent the night on the second floor of the Rec Hall, above the water, singing camp and worship songs and praying until the rain stopped at about 6:00 a.m. The Cypress Lake campus, on higher ground, never flooded, and the 171 campers there were not physically harmed. The tragedy of that day lives on for the families of those who were lost at Camp Mystic and in the general area, for everyone who was in the area during the storm, and for all Camp Mystic campers, alumnae, and their families. The Eastlands were also affected that day, losing Dick Eastland and their family's purpose of operating Camp Mystic and promoting its mission of helping girls become confident, better people, and grow spiritually in their Christian faith.

---

[33] Office of the Texas Governor, *Governor Abbott Provides Update On Texas' Response To Hill Country Flooding* (July 4, 2025), https://www.tdem.texas.gov/press-release/7-4-25 (disaster declaration for Kerr and fourteen other counties); Office of the Texas Governor, *Governor Abbott Announces Federal Disaster Declaration Approval For Hill Country Flooding* (July 6, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-federal-disaster-declaration-approval-for-hill-country-flooding; Presidential Declaration of a Major Disaster for the State of Texas, FEMA-4879-DR, 90 Fed. Reg. (July 9, 2025), Doc. No. 2025-12730.

[34] Second Day Declaration ¶ 23.

[35] Official Committee of Unsecured Creditors' Motion for an Order Appointing a Chapter 11 Trustee, Docket No. 227 (Sept. 8, 2026) (the "**Trustee Motion**") ¶ 21 n.6; *Certain Heaven's 27 Families' Motion for Relief from the Automatic Stay*, Docket No. 204 (Aug. 31, 2026) (the "**Lift-Stay Motion**") ¶¶ 10–15.

[36] Trustee Motion ¶ 23 n.8; Lift-Stay Motion ¶ 14.

[37] Emily Foxhall, *Camp Mystic parents pushed for new laws. Now they are figuring out how to grieve*, Texas Tribune (Sept. 16, 2025), https://www.texastribune.org/2025/09/16/texas-camp-mystic-parents-new-laws-grief/.

[38] *See* Lift-Stay Motion ¶¶ 9–15.

### C. The Days That Followed

The camp had no power, water, or internet on the morning of July 4, and the highway had washed out.[39] Most of the Guadalupe River campers spent the night in the Rec Hall and in other buildings above the water. During the morning the staff moved them to the Cypress Lake dining hall, where the Cypress Lake campers shared dry clothes with them, and helicopters and buses then carried them to Ingram Elementary School, where their parents collected them later that day.[40] Hundreds of surviving campers and counselors, most of them children, lived through the night, and some of them may hold claims; one such claim, a personal injury claim asserted by a camper who was rescued during the flood and by her family, is described below.

### D. The Governmental Reviews and Investigations

**The Commerce OIG Report.** The United States Department of Commerce Office of Inspector General reviewed the National Weather Service's actions in the OIG Report, issued April 9, 2026.[41] It measures a warning lead time of 106 minutes for Hunt, from the 1:14 a.m. warning to the moment the Hunt gauge reached flood stage. It reports that the forecast office called the Kerr County emergency management coordinator at 3:38 and 3:39 a.m. without answer, that three calls to the sheriff's office between 3:40 and 3:43 a.m. "were immediately disconnected," and that the office did not reach the coordinator until 6:19 a.m.[42]

**DSHS, the Texas Rangers, and the license.** DSHS's annual inspection of the camp on July 2, 2025 recorded no deficiency. On April 7, 2026, DSHS wrote to the camp that it had received hundreds of complaints concerning the camp's care of campers during the 2025 season and was investigating them, and the Texas Department of Public Safety announced the same day that the Texas Rangers were assisting that investigation. Lieutenant Governor Patrick described the Rangers' role as a criminal investigation.[43] On April 30, 2026, the camp withdrew its 2026 license application. On information and belief, the Texas Rangers' investigation is ongoing; Mystic LLC disclosed it in its Statement of Financial Affairs, and as of the date of this Disclosure Statement the Debtors are not aware of any charges having been filed against any Debtor or any individual. In September 2026, the Texas Rangers reportedly obtained search warrants in the course of that investigation, which the Texas Department of Public Safety has designated Texas DPS Case No. 2026-0014378, from the 216th Judicial District Court of Kerr County, Texas. A

---

[39] Colleen DeGuzman, *Camp Mystic, a haven for generations of Texas girls, becomes a center of tragedy*, Texas Tribune (July 5, 2025), https://www.texastribune.org/2025/07/05/camp-mystic-texas-hill-country-flooding-rescue/ (reporting the camp office's July 4 message to families: "All power, wi-fi and water had been shut off at the facilities"; "'The highway was washed away so we are struggling to get more help,' the message said.").

[40] Faheid & Brown, *supra* ("The campers' next stop: the Cypress Lake dining hall."; the Cypress Lake campers were asked to hand over "one pair of shorts, one top and a pair of underwear"; "Finally, helicopters arrived to bring the hundreds of girls and their counselors to safety."; "The girls who made it onto the school buses arrived at Ingram Elementary, where they were reunited in tearful embraces.").

[41] OIG Report, *supra*, at 7–21.

[42] OIG Report at 1 n.5, 11–12 & nn.19–20, App. 5.

[43] *Texas Rangers join Camp Mystic flood investigation amid neglect allegations*, CBS Texas (Apr. 8, 2026), https://www.cbsnews.com/texas/news/texas-rangers-join-camp-mystic-flood-investigation-amid-neglect-allegations/.

search-warrant affidavit is not a charge, an indictment, or a finding of any court; it states the affiant's beliefs for the purpose of obtaining records. No Debtor and no individual has been charged with any offense. If the investigation results in a charge against a Debtor, a governmental unit could assert a claim against that Debtor for fines, restitution, or other amounts. Under the Bar Date Order, a governmental unit may file a proof of claim through the Governmental Bar Date of December 21, 2026, and the State of Texas or another governmental unit could file such a claim against one or more of the Debtors before that date. The Debtors will amend their Schedules to disclose the investigation and the search warrants and to list, as contingent, unliquidated, and disputed, any claim of a governmental unit that the allegations could give rise to, although no such claim has been asserted.

On February 23, 2026, nine of the bereaved families sued six DSHS officials, including the inspector who visited the camp on July 2, 2025, in their individual capacities in the United States District Court for the Western District of Texas, No. 1:26-cv-00413-RP (the "**DSHS Suit**"). No Debtor is a party to the DSHS Suit. The parties to the DSHS Suit, its status, and the stay of discovery in it are described below with the other litigation. Any camp operated on the property after the sale will require a new DSHS license under the youth camp statutes as amended in 2025, which, among other things, bar the licensing of a camp that houses campers in cabins within a floodplain, with narrow exceptions, and require annual state approval of emergency plans, weather radios, an emergency public-address system that works without the internet, and redundant communications.[44]

**The Board of Nursing.** On May 19, 2026, the Texas Board of Nursing temporarily suspended the nursing license of Mary Elizabeth Eastland, the camp's medical director. The Board entered an agreed order under which Ms. Eastland neither admitted nor denied the Board's allegations and her license was restored subject to restrictions. The Debtors are not parties to that proceeding, and an agreed order without admission is not a finding of fact against any Debtor. The Debtors include it because the Committee or the Families may cite it in the Flood Claims litigation.

### E. The Debtors' Position

The Debtors' position is that they are not at fault. The flood of July 4, 2025 was a natural disaster of a kind and scale that no one at the camp, in Kerr County, or at the National Weather Service foresaw, and the Debtors deny that any act or omission of any Debtor caused the deaths and injuries the Families have suffered. The Families are entitled to try their claims, and the Plan preserves that right in full, in the forum the district courts designate. The Debtors will defend those claims there, on the evidence and the applicable law, and nothing in this Disclosure Statement concedes any element of any claim or waives any defense. The Debtors have denied liability.

None of the governmental reviews described above adjudicates any claim against a Debtor. The OIG Report reviewed the Weather Service, not the camp, and the Texas Rangers' investigation has produced no charge. Whether any report, or any part of one, is admissible in the trial of the Flood Claims, and what weight it deserves, will be decided by the court that tries them.

---

[44] Tex. Health & Safety Code §§ 141.005, 141.0052, 141.0056, 141.0071, 141.0091–.0092; Tex. Water Code §§ 16.501–.502; 25 Tex. Admin. Code §§ 265.31–.37.

# ARTICLE IV.
# THE LITIGATION AND THE PENDING MATTERS

## A. The Prepetition Lawsuits

Beginning in November 2025, the Families filed five lawsuits in the District Courts of Travis County, Texas, against one or more of the Debtors and one or more of the following individuals (the "**Individual Defendants**"): Willetta "Tweety" Eastland; George Albritton "Britt" Eastland, as representative of the Estate of Richard G. "Dick" Eastland; Edward S. Eastland; Mary E. "Mary Liz" Eastland; and William Neely Bonner III, the President of NFP, who is not a member of the Eastland family and holds no equity interest in any Debtor.[45] As of the Petition Date, twenty-two of the twenty-six bereaved families were plaintiffs in those suits; four had not sued, three of which (the Baker, Lawrence, and Marsh families) are members of the Committee.[46] The five lawsuits (the "**Prepetition Lawsuits**") are:

| Case | Travis County Cause No. | Filed | Removed to W.D. Tex. as |
|---|---|---|---|
| *Bellows, et al. v. Camp Mystic, LLC, et al.* (seven families, with two intervening claimants) | D-1-GN-25-009963 (455th District Court) | Nov. 10, 2025 | No. 1:26-cv-01916-RP |
| *Getten, et al. v. Natural Fountains Properties, Inc., et al.* (six families) | D-1-GN-25-009976 (459th District Court) | Nov. 10, 2025 | No. 1:26-cv-01919-RP |
| *Peck, et al. v. Camp Mystic, LLC, et al.* (one family) | D-1-GN-25-009983 (261st District Court) | Nov. 10, 2025 | No. 1:26-cv-01922-RP |
| *Naylor, et al. v. Camp Mystic, LLC, et al.* (six families) | D-1-GN-25-010016 (200th District Court) | Nov. 10, 2025 | No. 1:26-cv-01923-RP |
| *Steward, et al. v. Camp Mystic, LLC, et al.* (one family) | D-1-GN-26-000758 (200th District Court) | Feb. 4, 2026 | No. 1:26-cv-01926-RP |

On March 4, 2026, all five cases were assigned to the Honorable Maya Guerra Gamble of the 459th District Court for pretrial purposes, and the first case was set for trial on May 3, 2027, with additional settings later in 2027.[47] In the Bankruptcy Court, twenty-four of the twenty-six families are represented by Gray Reed, and the Lawrence family is represented by Akin Gump Strauss Hauer & Feld LLP.

**The Families' suit against DSHS officials.** Nine of the bereaved families have also sued six DSHS officials in their individual capacities under 42 U.S.C. § 1983 in *Bonner v. Shuford*, No. 1:26-cv-00413-RP, in the United States District Court for the Western District of Texas, Austin Division, the DSHS Suit. No Debtor, no Individual Defendant, and no other member of the

---

[45] Second Day Declaration ¶¶ 13, 29; *Stipulation and Agreed Scheduling Order on Pending Stay Motions and Adversary Proceedings*, Docket No. 226 ¶ C (signed Sept. 1, 2026; entered Sept. 8, 2026) (the "**Agreed Scheduling Order**").

[46] Trustee Motion ¶ 21 n.6.

[47] Trustee Motion ¶ 22; April 15 Injunction Order at 5.

Eastland family is a party. The plaintiffs are Blake and Caitlin Bonner, Matthew and Wendie Childress, Ryan and Elizabeth DeWitt, John and Andrea Ferruzzo, Ben and Natalie Landry, Lindsey McCrory, Warren and Patricia Bellows, Patrick and Jill Marsh, and Christopher Jacobe and Samantha Jordan, each individually and as representative of a daughter who died in the flood; they are represented by Yetter Coleman LLP and Mithoff Law, except that the Marshes are represented by Jefferson Cano and Mr. Jacobe and Ms. Jordan by Stevenson & Murray. The defendants are Jennifer A. Shuford, Timothy H. Stevenson, Jeffrey Adam Buuck, Annabelle R. Dillard, Lindsey R. Eudey, and Maricela Torres Zamarripa, each sued in an individual capacity only and represented by the Office of the Attorney General of Texas. The case, filed on February 23, 2026, is assigned to Judge Robert Pitman, who also presides over the removed Prepetition Lawsuits, and is docketed as related to two of them. The original complaint was sealed on the defendants' unopposed motion, and a redacted copy is on file. After the defendants withdrew a first motion to dismiss by agreement, the plaintiffs filed a First Amended Complaint on May 22, 2026, and the defendants moved to dismiss it on June 22, 2026, asserting qualified immunity. On July 17, 2026, on the defendants' unopposed motion, the court stayed all discovery pending its ruling on the motion to dismiss, because the defendants assert qualified immunity, and deferred entry of a scheduling order until fourteen days after any ruling that allows the claims to proceed. The motion to dismiss was fully briefed on August 20, 2026, the plaintiffs filed a notice of supplemental authority on September 8, 2026, and, as of the date of this Disclosure Statement, no ruling has issued, no scheduling order has been entered, and discovery remains stayed. The Debtors take no position on the merits of the DSHS Suit. It may bear on the apportionment of responsibility among all persons whose conduct contributed to an injury, discussed below.[48]

## B. The Claims and the Defenses

The plaintiffs plead wrongful death and survival claims under Chapter 71 of the Texas Civil Practice and Remedies Code on theories of negligence, negligence per se, negligent undertaking, gross negligence, premises liability, failure to warn, breach of warranty, and, in the *Steward* case, intentional infliction of emotional distress. They plead vicarious liability and alter ego, veil-piercing, and single-business-enterprise theories, and they seek compensatory and exemplary damages, jointly and severally.[49] The factual theories, as pleaded, are that the Debtors and the Individual Defendants (i) located and kept campers' cabins in a known floodplain; (ii) failed to maintain written emergency and evacuation plans that complied with 25 Tex. Admin. Code § 265.15(k); (iii) failed to train staff and counselors on flood evacuation; (iv) failed to act on the National Weather Service warnings; (v) failed to evacuate the cabins nearest the river while there was time to do so on foot; (vi) failed to use the camp's public-address system or to call 911; and (vii) after the flood, communicated with parents in ways the plaintiffs allege compounded their injuries.[50] Each of these is an allegation. No court has adjudicated any of them.

---

[48] *Bonner v. Shuford*, No. 1:26-cv-00413-RP (W.D. Tex.), Docket Nos. 1, 24, 25, 28, 29, 30, 32, 34, 35, and 36, and text orders entered Apr. 14, July 17, and July 22, 2026 (docket as of Sept. 21, 2026).

[49] First Amended Complaint, Adv. Docket No. 5 ¶ 28 & App. B (Adv. Docket No. 5-2); Lift-Stay Motion ¶ 21; Docket No. 147 ¶ 10.

[50] Plaintiffs' Original Petition ¶¶ 329–74, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. Feb. 4, 2026); Trustee Motion ¶¶ 16–18, 21, 25.

**A personal injury claim.** In addition to the wrongful death and survival claims, a camper who was rescued during the flood, and her family, have asserted a personal injury claim against the Debtors. They had not filed suit before the Petition Date and are not plaintiffs in the Prepetition Lawsuits. Under the Plan the claim is a Flood Claim: it will be liquidated in the tort system on the same terms as the wrongful death claims, is paid first from the Debtors' insurance, and shares, for any unpaid balance, in the funds the Plan sets aside for the unsecured creditors of each Debtor against which it is allowed. The Debtors dispute liability and reserve every defense, and, consistent with their practice in this Disclosure Statement, they do not state the child's name.

The Debtors dispute liability. The Flood Claims are scheduled as contingent, unliquidated, and disputed against every Debtor. The Debtors have denied the allegations in the Families' pleadings and reserve their defenses. Without limiting those reservations, the positions the Debtors and the Individual Defendants have taken include the following.

**The nature of the flood and proportionate responsibility.** The defendants described the event in the state court as an unprecedented flood, and the public record bears that out: rainfall beyond the 1,000-year event over the South Fork, a rise of about thirty feet in less than two and one-half hours, a crest more than ten feet above the 100-year base flood elevation at the camp, and a river that passed every flood in the camp's history within about twenty minutes of leaving its banks.[51] The camp held the license required by the Texas Youth Camp Safety and Health Act and had passed its state inspections, including the inspection of July 2, 2025. The National Weather Service could not reach Kerr County's emergency management coordinator or its sheriff's office by telephone when it issued its river flood warnings at 3:19 and 3:33 a.m., and Kerr County had no siren or other outdoor warning system.[52] Under Texas law, responsibility for an injury is apportioned among all persons whose conduct contributed to it, including non-parties designated as responsible third parties.[53] Nine of the bereaved families have themselves sued six DSHS officials in their individual capacities under 42 U.S.C. § 1983 in the DSHS Suit described above.

**The Participation Agreements and arbitration.** Each family that enrolled a camper signed an online Participation Agreement that disclosed risks, including the risk of floods, contained a release and indemnity in favor of Mystic LLC, NFP, and their owners, directors, officers, and employees, and required that disputes be mediated and then arbitrated under the Commercial Arbitration Rules of the American Arbitration Association.[54] The defendants' motions to compel arbitration were heard by the state court on June 10, 2026 and taken under advisement. No ruling was entered before the Petition Date.[55] The Debtors reserve their rights

[51] *Defendants' Response to Plaintiffs' Application for Temporary Restraining Order and Temporary Injunction* at 3, 6–7, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. Mar. 3, 2026) (the "**Injunction Response**"); *see* Article III.A above.

[52] OIG Report at 11, 13–14 & App. 5; García & Fingerhut, *supra* (quoting Kerr County Judge Rob Kelly: "We do not have a warning system").

[53] Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013.

[54] *Defendants' Amended Motions to Compel Arbitration and Stay Proceedings* at 3–5, 15, *Bellows v. Camp Mystic, LLC*, No. D-1-GN-25-009963 (Travis Cnty. Dist. Ct. May 12, 2026).

[55] *Plaintiffs' Response to Defendants' Amended Motion to Compel Arbitration and Motion to Stay* at 1–4, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. June 3, 2026); Trustee Motion ¶ 23; Lift-Stay Motion ¶ 33.

under the Participation Agreements, and the Plan does not waive them. The Plan does not address the Prepetition Lawsuits except to lift the stay and preserve every party's rights in them.

**The Individual Defendants, NFP, and the holding companies.** The Individual Defendants denied the allegations against them and stated that each of them "was employed by the Debtors and were all acting in the course and scope of their employment," and that Mr. Bonner "is solely an officer of Debtor Natural Fountains Properties, Inc." who "has no role in managing or operating the Camp itself."[56] NFP is the landlord; it owns the land and leases it to Mystic LLC, which operated the camp, employed the staff, enrolled the campers, and held the license. NFP has defenses that differ from Mystic LLC's. MC Family Partnership and MC Management are holding entities with no operations, no employees, and no role in the camp. The Plan's separate treatment of the four estates reflects these differences.

### C. The Temporary Injunction in the *Steward* Case

On February 6, 2026, Will and Cici Steward, the parents of the one camper who has not been found, applied in *Steward v. Camp Mystic, LLC* for a temporary restraining order and a temporary injunction to prevent alteration of the camp site and to bar its use for camp operations pending trial.[57] The defendants opposed the application, representing that the Guadalupe River campus would not reopen in 2026, that the cabins that housed campers who died "will never again be used to house campers," that the physical structure of those cabins remained untouched, and that the plaintiffs and their counsel had visited the site three times.[58] The court entered an *Order Granting Temporary Injunction* on March 5, 2026 and, after the defendants appealed and the hearing was reopened on April 13, 14, and 15, 2026, executed on April 15, 2026 a revised order that replaced it (the "**April 15 Injunction Order**," attached as **Exhibit E**).[59] The order enjoins the four Debtors, the five Individual Defendants, and those acting in concert with them from altering, repairing, or removing any structure or physical feature of the thirteen cabins in which minor campers were housed during the flood; from modifying the other buildings and facilities shown on its maps; from using the Guadalupe River facilities and the surrounding flood-affected grounds "for any camp operations purpose," with a requirement that the defendants "erect and maintain an appropriate barrier"; and from reshaping the terrain around the Twins and Bubble Inn cabin clusters.[60] It permits Craig and Betsy Althaus to reside in the Sugar Shack, remains in effect "until final judgment in this cause or further order of this Court," and sets the case for trial on May 3, 2027.[61] It does not reach the Cypress Lake campus, and it did not ban anyone from merely being on the property. The order also recites the findings a Texas court must make before granting a temporary injunction, including that the plaintiffs showed a probable right to relief on their negligence, gross negligence, and premises liability claims and that the defendants potentially

---

[56] Docket No. 147 ¶ 28.

[57] *Plaintiffs' Application for Temporary Restraining Order and Temporary Injunction*, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. Feb. 6, 2026), filed as Exhibit C to Docket No. 227 (Docket Nos. 227-3, 227-4) (the "**Steward Injunction Application**"); Trustee Motion ¶ 23 & n.8.

[58] Injunction Response at 2–6.

[59] Trustee Motion ¶ 23; April 15 Injunction Order at 1, 5.

[60] April 15 Injunction Order at 3–4.

[61] April 15 Injunction Order at 4–5.

violated 25 Tex. Admin. Code § 265.15(k). Those findings were made on a preliminary record for the limited purpose of preserving the site pending trial; they are not findings of liability, the Debtors dispute them, and the Committee relies on them in the Trustee Motion.

The Committee and the Families have alleged that the Debtors and members of the Eastland family have violated the April 15 Injunction Order. The Debtors have not altered, repaired, or used for camp operations any structure the order covers.

**D. Removal, Remand, and the Motion to Transfer Under 28 U.S.C. § 157(b)(5)**

On July 13, 2026, the Debtors removed all five Prepetition Lawsuits to the United States District Court for the Western District of Texas, Austin Division, under 28 U.S.C. § 1452(a), where they were assigned to the Honorable Robert Pitman.[62] On July 15, 2026, the Debtors moved in the United States District Court for the Southern District of Texas, *In re Camp Mystic, LLC*, Case No. 4:26-mc-01321, for a determination under 28 U.S.C. § 157(b)(5) that the removed actions be tried in the Southern District of Texas, where these cases are pending (the "**Transfer Motion**"). Section 157(b)(5) provides that personal injury tort and wrongful death claims "shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." The Transfer Motion, assigned to United States District Judge Nicholas J. Ganjei, is fully briefed. No hearing has been set and no ruling has issued.[63] On August 5, 2026, the plaintiffs in all five removed actions moved for abstention and remand.[64] The Debtors' omnibus response asks the Western District to defer ruling until the Southern District decides the Transfer Motion or, in the alternative, to deny abstention and remand, because personal injury tort and wrongful death claims are excluded from mandatory abstention by 28 U.S.C. § 157(b)(4), because the claims cannot be timely adjudicated in a state forum while the automatic stay is in effect, and because remand for five separate jury trials would risk inconsistent rulings and the piecemeal depletion of the Debtors' insurance.[65] The remand motions are fully briefed. No ruling has issued. Until the district courts rule, no Flood Claim is positioned for trial.

**E. The Automatic Stay Litigation**

The filing of these cases automatically stayed the Prepetition Lawsuits as to the Debtors. Whether, and for how long, the stay also protects the Individual Defendants has been a contested question.

**The Families' Substituted Stay Motion (Docket No. 132).** On July 13, 2026, an ad hoc group of the Families moved for an order confirming that the automatic stay does not apply to their direct claims against the Individual Defendants. After the Committee was appointed on

[62] *Debtors' Notice to the Court of Related Proceedings Bearing on Stay Relief Request*, Docket No. 179 ¶ 7 (Aug. 20, 2026); Agreed Scheduling Order ¶ C.

[63] Docket No. 179 ¶¶ 8–9; Trustee Motion ¶ 28; Debtors' motion under 28 U.S.C. § 157(b)(5), *In re Camp Mystic, LLC*, No. 4:26-mc-01321 (S.D. Tex. filed July 15, 2026) (the "**Transfer Motion**") ¶¶ 1–3, 6, 11.

[64] Docket No. 179 ¶ 10; Plaintiffs' Motion for Abstention and Remand, *Bellows v. Camp Mystic, LLC*, No. 1:26-cv-01916-RP, Docket No. 22 (W.D. Tex. Aug. 5, 2026).

[65] Docket No. 179 ¶¶ 11–12 & Ex. A (Docket No. 179-1) (the "**Omnibus Remand Response**") at 3–4, 7–20.

July 22, 2026, all of the Families filed a substantively identical Substituted Motion on August 2, 2026 in their individual capacities.[66] The Individual Defendants objected on August 5, 2026, arguing that the stay applies of its own force because (i) the plaintiffs plead that the individuals and the entities operated as a single enterprise and (ii) any judgment against the Individual Defendants would reduce the Debtors' coverage dollar for dollar. The Individual Defendants plead in the alternative that "unusual circumstances" warrant extending the stay.[67] On the same date the Debtors commenced the Adversary Proceeding and filed the Stay Extension Motion, which present the same question in the form the Bankruptcy Rules require for injunctive relief.

**Adversary Proceeding No. 26-03604 and the Agreed Scheduling Order.** The Stay Extension Motion states that "[t]he Debtors fully recognize the Claimants' need to liquidate their claims, and the Debtors do not seek to prohibit the Claims from moving forward indefinitely." The Debtors submit that if the claims cannot be resolved consensually, "all Claims should be liquidated against the Debtors and the Individual Defendants as part of a consolidated proceeding."[68] The First Amended Complaint of August 25, 2026 added the Baker, Marsh, and Lawrence families. The Debtors nonsuited the Lawrences without prejudice on August 27, 2026, at the Lawrences' request.[69] On August 28, 2026, the Debtors, the Families, the Committee, and the Individual Defendants filed a Stipulation and Agreed Scheduling Order, signed September 1 and entered September 8, 2026 (the "**Agreed Scheduling Order**"), that sets the Substituted Stay Motion, the complaint, the Stay Extension Motion, and any stay-relief motion filed by August 31, 2026, for a single evidentiary hearing on October 9, 2026, with a discovery schedule leading to it.[70] Three days after signing the stipulation, the Committee filed an emergency motion to intervene in the Adversary Proceeding, stating that it "does not believe that extending the stay serves the interests of its constituency." The Debtors objected, because the Committee will be heard on the same question at the same hearing under section 1109(b) and identified no interest of its own distinct from the interests of the Families, who are already parties.[71] The Bankruptcy Court took the motion under advisement.

**The Families' Motion for Relief from the Automatic Stay (Docket No. 204).** On August 31, 2026, the Families filed the Lift-Stay Motion, which asks the Bankruptcy Court to modify the automatic stay under section 362(d)(1) to allow the Prepetition Lawsuits to proceed to final judgment against the Debtors and the Individual Defendants in whichever court the district courts designate, to allow the Baker and Marsh families to sue or intervene, and to require the

---

[66] Docket Nos. 77, 94; S*ubstituted Motion for Entry of Order Confirming That the Automatic Stay Does Not Apply to Direct Claims Against Non-Debtor Individual Defendants*, Docket No. 132 (Aug. 2, 2026) (the "**Substituted Stay Motion**") ¶¶ 1–3, 10–24; Agreed Scheduling Order ¶ E.

[67] Docket No. 147 ¶¶ 1–5, 16–33.

[68] Complaint for Declaratory and Injunctive Relief, Adv. Docket No. 1 (Aug. 5, 2026); Stay Extension Motion ¶¶ 12, 60.

[69] First Amended Complaint, Adv. Docket No. 5 & Apps. A–B (Aug. 25, 2026); Adv. Docket No. 8.

[70] Agreed Scheduling Order ¶¶ H, 3–4.

[71] Official Committee of Unsecured Creditors' Emergency Motion for Entry of an Order Authorizing Intervention in Adversary Proceeding, Adv. Docket No. 11 ¶¶ 1–5, 23, 26, 36–43, 55–58 (Aug. 31, 2026); Adv. Docket Nos. 13, 14, 15.

Families to return to the Bankruptcy Court to collect any judgment against the Debtors.[72] The Debtors dispute the motion's characterizations of the filing, the Debtors' conduct before and after the Petition Date, and the Debtors' prospects. Objections are due September 21, 2026, and the motion is set for evidentiary hearing on October 9, 2026.[73]

**The Debtors' position.** The Debtors have never contended that the Families should be denied a trial or a recovery. The stay the Debtors seek is temporary, tied to the shared insurance and the plan process, and reviewable at any time.[74] The Plan itself provides for the liquidation of every Flood Claim in the forum the district courts designate and grants relief from the automatic stay and the Plan injunction for that purpose. If the Plan is confirmed and becomes effective, the principal purpose of the requested stay will have been served.

### F. The Committee's Motion to Appoint a Chapter 11 Trustee and the Debtors' Response

**The motion.** On September 8, 2026, the Committee filed the Trustee Motion, joined the same day by the Lawrences and by the Families.[75] The Committee asks the Bankruptcy Court to order the appointment of one trustee for all four Debtors, "for cause" under section 1104(a)(1) of the Bankruptcy Code and, in the alternative, because appointment "is in the interests of creditors" under section 1104(a)(2). It acknowledges that appointment "may involve additional costs" that are "inevitable" where the Debtors "have limited cash, are non-operational, and are not generating money," but contends that it has identified unnamed candidates and counsel who might serve "on a pro bono basis."[76] Under section 1104(d) of the Bankruptcy Code, the United States Trustee, not the Committee, selects any trustee.

Section 1104(a)(1) directs the court to order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause." The Committee argues cause on three theories: that the Eastland Board Members managed the camp before the flood, and that the events of July 4, 2025 and the CRO's testimony establish incompetence and gross mismanagement before and after the Petition Date; that the Eastland Board Members are conflicted as co-defendants, indemnitees, noteholders, transferees, residents of the property, and possible subjects of the Rangers' investigation and of estate claims; and that acrimony between the Debtors and the bereaved families prevents the cases from advancing.[77] Nothing in the motion gives voice to the hundreds of creditors who are interested in the camp resuming operations, or to the numerous creditors who believe that Camp Mystic was a cherished institution because of the Eastland family's management. The Debtors' objection is due September 29, 2026.

---

[72] Lift-Stay Motion ¶¶ 5, 79–81, 84.

[73] Notice of Hearing, Docket No. 213 (Sept. 3, 2026).

[74] Stay Extension Motion ¶¶ 12, 60.

[75] Trustee Motion, Docket No. 227; Docket Nos. 230, 232.

[76] Trustee Motion ¶¶ 5–6, 46, 63 & nn.19–20, 64–65; 11 U.S.C. § 1104(a)(1)–(2); Fed. R. Bankr. P. 2009(c)(2).

[77] Trustee Motion ¶¶ 3, 5, 47–57 & nn.15–17.

**The principal allegations and the Debtors' responses.** The Debtors dispute each allegation and will contest it, and their objection will respond in full. Nearly every fact the Committee cites for its post-petition allegations came from the Debtors' own disclosures and from a meeting of creditors at which the CRO answered questions for approximately three and a half hours. In summary, the CRO's testimony that she knew of "no plans to apply for a license" for 2027 remains accurate because the Plan contemplates a sale. Since June 26, 2026, the Debtors' affairs have been directed with the assistance of the CRO, who had never worked for the family or the camp and who testified that she decides "what gets spent, how it gets spent," that she alone decided to segregate the camper deposits, and that if any family member resisted she has "recourse to the court, and I would use it." The Committee cites other portions of the same testimony, including her statement that she could not act over the objection of the managers, who are the board, for the proposition that the Eastland Board Members control every decision. The Modified Relief requested in the Reply answers that point directly: on every delegated matter the CRO reports to and takes direction from the Independent Fiduciaries, and no Eastland Board Member may direct her. The Independent Fiduciary Motion places every matter on which a family member could be conflicted in the hands of two Independent Fiduciaries whose decisions bind the Debtors. Under the Modified Relief, the Special Committees also hold the sole and exclusive authority of Mystic LLC and NFP to prosecute the Plan and to conduct the sale process, the same authority for MC Family Partnership and MC Management is vested in the CRO, and the Debtors seek approval of the Tolling Agreement, under which every claim of the estates against the Eastland Parties is preserved while the Flood Claims are litigated.

No court has adjudicated any question of fault. Whether the camp's preparation for and response to the flood was negligent is the merits of the Flood Claims, which federal law reserves for trial in a district court.[78] The Committee nonetheless asks the Bankruptcy Court to decide those questions now, on the strength of investigative materials that afforded no cross-examination; the Debtors will contest the admissibility of those materials for that purpose in the Bankruptcy Court and in the court that tries the Flood Claims.

The facts cited as "self-dealing" came from the Debtors' own Global Notes. The family members reside on the Cypress Lake portion of the property outside the enjoined area. The family's presence on an otherwise vacant property deters trespass, and since the Petition Date, the CRO has required the family to pay their own utilities and cellular service and to reimburse any personal expense the estates are found to be paying. Whether a use-and-occupancy charge should be imposed despite a custom and practice for years of providing accommodations on premises before closing is a Conflict Matter for the Special Committees under the terms of the motion to appoint an independent director.[79] The CRO testified that the property "is secure," "is not operating and it's gated," and that the enjoined buildings "are taped off."[80]

---

[78] Trustee Motion ¶¶ 48–49, 51; Adv. Docket No. 14 ¶¶ 46, 49; 28 U.S.C. § 157(b)(2)(B), (b)(5).

[79] Global Notes to the Schedules of Camp Mystic, LLC, Docket No. 152 at 11–12; Trustee Motion ¶¶ 38, 50, 56; July 9 Transcript at 25:18–26:20, 83:13–18; 341 Transcript at 10:1–3, 30:2–11, 71:19–23, 74:12–16, 78:11–80:5, 81:19–24.

[80] 341 Transcript at 73:7–75:3, 77:13–14, 105:21–107:23, 111:7–115:2; Schedule A/B of Camp Mystic, LLC, Docket No. 152 at 30–32; Trustee Motion ¶¶ 42, 50.

The $405,000 flood-insurance payment was found by the CRO's own team in reconciling NFP's bank records after the Schedules were filed. She disclosed it in answer to the United States Trustee's first question at the meeting of creditors. The funds remain in NFP's accounts, and the amended Schedules will report it. A recovery found by the estates' own professional in what she called a "scavenger hunt" is not evidence of mismanagement.[81]

The Eastlands' and Mr. Bonner's indemnification claims are scheduled as contingent and unliquidated, and every objection to them is reserved. The Trustee Motion describes those claims as scheduled as undisputed. They are scheduled as contingent and unliquidated, which under section 1111(a) of the Bankruptcy Code meant that each holder had to file a proof of claim by the General Bar Date to assert the claim. They filed proofs of claim by the September 18, 2026 deadline. The Debtors reserve every objection to those claims. The 2026 season was to be held at the Cypress Lake campus, which did not flood. The state-court sanctions motions were taken under advisement on June 10, 2026, and none has been decided. No court has found that any defendant or lawyer engaged in sanctionable conduct or violated the injunction.

Each filing the Committee calls a "multi-pronged strategy" asks a federal court to decide where and when the Flood Claims will be tried; none asks that any claim be reduced or extinguished. The Individual Defendants are included because a judgment against any of them paid from the shared policies reduces, dollar for dollar, what remains for every family.[82] The Plan does not release the Flood Claims against any Individual Defendant, and the Supreme Court has held that a plan may not discharge claims against a non-debtor without the consent of the affected claimants.[83]

The relationship between the Eastland family and the Families is a painful one, but the docket shows the cases advancing. The Bar Date Order was entered on a certificate of no objection, the Agreed Scheduling Order was signed, and two stipulated protective orders were entered on September 14, 2026. The Families and the Committee have declined every effort of the Debtors to resolve issues consensually or to mediate, and the representations the Committee makes in the Trustee Motion show that the Debtors' efforts to promote mediation and to address the Families' concerns through the appointment of an independent manager and director were treated as futile because the Families have drawn a line in the sand.[84] The Debtors renew their invitation to mediate at any time before the Confirmation Hearing.

**Discovery and document preservation.** The Trustee Motion states that the Debtors had produced fewer than 500 documents when it was filed and that the CRO could not identify the steps taken to preserve records relating to the flood. When the motion was filed, no protective order had been entered. The Debtors had provided the Committee with a draft protective order but had received no response. While waiting for the Committee to agree to a protective order, on August 24, 2026 and August 25, 2026, the Debtors informally produced the records of the removed

[81] 341 Transcript at 15:20–17:25, 18:9–11, 19:22–21:1, 61:8–62:23, 65:21–66:1; Trustee Motion ¶¶ 42, 50.

[82] Trustee Motion ¶¶ 53, 56; Transfer Motion ¶ 26; Omnibus Remand Response at 3; Stay Extension Motion ¶¶ 19, 38; Docket No. 147 ¶ 22.

[83] *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).

[84] First Amended Complaint, Adv. Docket No. 5 ¶ 26; Stay Extension Motion ¶ 21; Trustee Motion ¶ 56 n.17.

actions and the corporate, insurance, and other records that did not require a protective order, and were holding the financial statements and tax returns for a protective order. Two protective orders were entered on September 14, 2026, and the Debtors served their responses to the Families' requests for production, with a further production, the same day, with rolling productions to follow. The Debtors continue to assemble, review and produce records. The Debtors have also made the records at the premises available for inspection including the paper records damaged in the flood which are held in storage shed on the property.

The Committee served 2004 Requests on September 18, 2026, after weeks of discussion on the scope of draft Rule 2004 requests which were emailed on August 24, 2026. The requests attached to the Committee's Notice of Rule 2004 Examination [Doc. 247] (the "**Notice**") differ materially from the draft requests Committee counsel circulated to the Debtors on August 24, 2026 (the "**Draft Requests**"). The Draft Requests contained eighty-three requests, many of them directed to the financial diligence a creditors' committee ordinarily performs: bank and investment account statements, financial statements, tax returns, the Debtors' debts and intercompany notes, insurance policies and coverage positions, preference-period and post-petition transfers, the support for the Schedules and Statements, budgets, cash flow, and the retention of estate professionals. The Notice sets aside sixty-eight of those requests and carries forward fifteen. The fifteen are the fourteen "priority" requests Committee counsel identified by email on September 8, 2026, plus one addition, and the Notice demands production of all of them by October 2, 2026. Seven of the fifteen (Requests 1 through 7) concern estate matters: title to the Camp Property, valuations, transfers to insiders, board materials, the Eastland family's ownership interests, the formation of NFP, and the Debtors' revenues. The other eight (Requests 8 through 15) concern the July 4 Flood Event: the Debtors' DSHS licensure and inspection history, every communication and text message among the Eastland family and camp personnel from July 3 through July 10, 2025, the Debtors' knowledge of flood risk, the FEMA floodplain designations and the LOMA and LOMR applications, the camp's safety and evacuation protocols, the decisions concerning reopening, and the governmental investigations of the flood. Those are the subjects of the wrongful-death actions pending against Camp Mystic, LLC and the Individual Defendants in the Western District of Texas. Many of the requests in the prepetition litigation were the subject of disputes and discovery has been stayed in the DSHS suit and the applicability of the automatic stay remains pending with the District Courts still having issues related to removal, transfer, and remand under advisement. Before the Notice was filed, the Debtors advised the Committee that the request for records, specifically the subject of the discovery in the pending litigation, was objectionable. The Debtors will timely object to the Rule 2004 Notice. The Committee also filed the Notice after filing the Trustee Motion after commencing that contested matter.

The Debtors agree that a criminal investigation, and the evaluation of any estate claim against an insider, are matters on which no family member should decide for the estates; that is why the Independent Fiduciary Motion assigns every Conflict Matter, including the assessment and prosecution of estate claims against insiders, to the Special Committees, and why the proposed Tolling Agreement preserves claims of the estates against the Eastland Parties.

**A trustee is unnecessary.** Everything a trustee would bring to these estates is already before the Bankruptcy Court, at a fraction of the cost: independent decision-makers in the CRO, the Independent Fiduciaries, and the Plan Administrators; the consensual removal of the Eastland family from ownership, from management, and from every decision in which any family member

could be conflicted pursuant to the Debtors' proposed Plan; a court-supervised sale to an independent buyer; ratable distribution of the insurance and the sale proceeds; the investigation and preservation, including under the Tolling Agreement, of every claim the estates may hold against insiders; and a process in which the Committee, the Families, and the United States Trustee are heard at every step.

The appointment of a trustee is the exception in chapter 11, not the rule; the Bankruptcy Code gives a debtor in possession the rights and duties of a trustee, requires the movant to establish cause, provides an examiner as the tool for investigating allegations of mismanagement without displacing management, and assigns the selection of any trustee to the United States Trustee.[85] The cost of a trustee would fall on estates that have no operating revenue and held $4,750,384 in cash on August 26, 2026. A trustee would have to learn four estates, a reconstructed set of books, five removed actions, and an insurance program that the CRO and the Debtors' professionals already know. Appointment would terminate the Debtors' exclusive right to propose a plan just as the Plan is before the Bankruptcy Court, and a single trustee for all four estates would hold both sides of the landlord-tenant relationship between NFP and Mystic LLC that the two-fiduciary structure separates.[86]

The Committee also does not speak for every creditor: the Families have stated that "there are no significant non-insider claims against the estates, other than the claims asserted by the Heaven's 27 families," but the Schedules list 2,790 families holding approximately $1.3 million in deposits, as well as other creditors, whose interest in a prompt sale and in payment of their claims the Trustee Motion does not mention.[87] Nor can the Eastland family act unsupervised without a trustee: a sale, a settlement of a Flood Claim, and a plan each require an order of the Bankruptcy Court, and the Committee has the right to investigate under section 1103(c) and to be heard under section 1109(b) on every one of those steps.

**G. The Debtors' Independent Fiduciary Motion (Docket No. 205) and the Debtors' Reply**

The Debtors previewed the Independent Fiduciary Motion at the status conference on August 26, 2026, and filed it on September 1, 2026, one week before the Trustee Motion. The motion asks the Bankruptcy Court to authorize the appointment of Mark Andrews, through Trinity River Advisors, as Independent Manager of Mystic LLC, and of the Honorable Craig A. Gargotta (Ret.) as Independent Director of NFP; to establish a Special Committee of each of Mystic LLC and NFP consisting solely of that Debtor's Independent Fiduciary; and to approve governance amendments that give each Special Committee full delegated authority over the conduct of the chapter 11 cases, the negotiation of a plan, direction of the CRO, all Conflict Matters (including the evaluation, prosecution, release, or settlement of any estate claim against any insider or affiliate), claims reconciliation, oversight of professionals, and review of every intercompany transaction and insider payment. No Eastland family member may direct the CRO on any delegated

[85] 11 U.S.C. §§ 1104(a), (c), (d), 1107(a); 341 Transcript at 19:22–21:1, 23:8–22, 35:24–36:1, 78:11–80:5; July 9 Transcript at 9:6–22, 25:18–26:10, 34:21–35:9.

[86] 341 Transcript at 35:24–36:1; July 9 Transcript at 60:23–61:11; 11 U.S.C. §§ 326, 327, 330, 1121(c)(1); Trustee Motion ¶ 63 n.19; Independent Fiduciary Motion ¶ 34.

[87] Lift-Stay Motion ¶ 37; Schedule E/F of Camp Mystic, LLC, Docket No. 152 at 38–749; Adv. Docket No. 14 ¶¶ 6–7, 28–29; 11 U.S.C. §§ 363(b), 1103(c), 1109(b); Fed. R. Bankr. P. 9019.

matter. A Special Committee's decision supersedes any contrary direction of the Eastland family, the Independent Fiduciaries may not be removed without a further order, and they report quarterly to the Bankruptcy Court, the Committee, and the United States Trustee.[88] Separate fiduciaries are proposed because the lease places NFP, as landlord, and Mystic LLC, as tenant, on opposite sides of questions about rent, the intercompany note, and the disposition of the property.

The Families filed a preliminary objection to the motion on September 8, 2026, the United States Trustee objected on September 21, 2026 (and filed a corrected objection the following day), and the Committee objected on September 22, 2026.[89] Contemporaneously with the Plan and this Disclosure Statement, the Debtors are filing the Reply, with a revised proposed order, which responds to each objection and requests the Modified Relief. The Modified Relief removes every reservation to the Eastland Board Members of authority over a plan or a sale. It gives the Special Committees, acting through the Independent Fiduciaries, the sole and exclusive authority of Mystic LLC and NFP over the "**Plan Matters**," meaning every chapter 11 plan, disclosure statement, and plan supplement and every amendment or modification of any of them, including the treatment of claims, the disposition of estate assets, the retention of estate causes of action, and any settlement embodied in a plan, and over the "**Sale Process**," meaning every aspect of the marketing and sale of the Debtors' assets, from the retention of a broker and the selection of a stalking horse purchaser through the Bidding Procedures, the Auction, the choice of the Successful Bidder, and closing, including a preference in the Bidding Procedures for a bid that provides for the continued operation of the camp consistent with its traditions. MC Family Partnership and MC Management have no Special Committee; for those two Debtors the same authority is vested, by written consent of their governing bodies, in the CRO, who exercises it as an officer and not as a manager, coordinates with the Independent Fiduciaries on any matter affecting more than one Debtor, and acts on any Conflict Matter of those Debtors, including the Tolling Agreement, only with the approval of both Independent Fiduciaries. The Modified Relief also broadens the Conflict Matters to include any estate claim or matter on which the Eastland Board Members are conflicted, expressly including any use or occupancy of estate property by an insider and any relief sought in the Adversary Proceeding to the extent it would benefit an Eastland Board Member individually. No Eastland Board Member has a vote, a veto, or a consent right on any Plan Matter, any part of the Sale Process, or any Conflict Matter.

The Eastland Board Members retain no consultation, consent, or veto right over any Plan Matter, any part of the Sale Process, or any Conflict Matter. As holders of claims and interests, they may object to the Plan, to this Disclosure Statement, or to a sale, and they may be heard by the Bankruptcy Court; they may not decide. Either Independent Fiduciary may present to the Bankruptcy Court, on notice to the Committee and the United States Trustee, any disagreement between a Special Committee and the Eastland Board Members concerning any matter within the Special Committees' authority or any matter reserved to the full governing bodies, and, pending the Bankruptcy Court's determination, the Debtors may not act on any decision of a full governing body that is contrary to the position of the applicable Special Committee. The Special Committees' authority over the Sale Process is also subject to any further order of the Bankruptcy Court establishing a steering committee or other representative body of the camper families that are

---

[88] Independent Fiduciary Motion at 1 & ¶¶ 2, 12, 18, 22, 34–35 & Ex. A ¶¶ 2–30; Trustee Motion ¶ 44.

[89] Docket Nos. 228, 249, 250, 258.

claimants to consult on the Bidding Procedures and the Sale Process (a "**Steering Committee**"), which the Debtors will propose; if the Bankruptcy Court establishes a Steering Committee, the Special Committees will exercise their authority in accordance with the consultation, information, and other rights the Bankruptcy Court grants that body and will consider its views in good faith. Nothing in the delegation to the Special Committees preempts, limits, or delays any investigation the Committee may conduct under section 1103 of the Bankruptcy Code.

One matter is reserved to the full governing bodies. Final authority over the defense and conduct of the Flood Claims against the Debtors, including the selection and direction of defense counsel, the assertion of defenses, and any settlement outside a chapter 11 plan, remains with each Debtor's full governing body, subject to the terms of the insurance policies and to Bankruptcy Court approval under Bankruptcy Rule 9019 where required; each Independent Fiduciary has a vote on the governing body of the Debtor he serves on those matters and receives notice of, and may participate in, every meeting and decision concerning them. If a governing body declines to approve a settlement that a Special Committee has recommended, the impasse must be disclosed to the Bankruptcy Court within seven days, on notice to the Committee and the United States Trustee, and either Independent Fiduciary may present the disagreement to the Bankruptcy Court for determination; pending that determination, the Debtors may not act on any decision of a governing body that is contrary to the position of the applicable Special Committee. The classification and treatment of the Flood Claims under the Plan, the reservation of sale proceeds pending their resolution, and every claim of the estates against an Eastland Party, including any objection, counterclaim, setoff, or defense to an Eastland Party's proof of claim, remain with the Special Committees. The summary of the Plan below describes how the Plan carries that allocation forward after the Effective Date.

The Reply attaches the Tolling Agreement as its Exhibit B and asks the Bankruptcy Court to approve it under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 in the same order; the Tolling Agreement is described in the summary of the Plan below. Judge Gargotta serves without compensation, subject to reimbursement of his reasonable out-of-pocket expenses, and Mr. Andrews serves through Trinity River Advisors at a fixed fee of $15,000 per month plus reasonable expenses; neither files fee applications, and every amount paid or reimbursed to either is disclosed in the Debtors' monthly operating reports. The Debtors also ask for authority to indemnify the Independent Fiduciaries on the same terms that apply to the Debtors' other officers and directors and to purchase directors' and officers' liability coverage for them at the estates' expense, and for an order that neither Independent Fiduciary may be removed, and the governance amendments may not be rescinded, without a further order of the Bankruptcy Court, without limiting any party's rights under sections 1104 and 1112 of the Bankruptcy Code. In the Reply, the Debtors withdrew the request in the original motion that the order itself exculpate the Independent Fiduciaries. In its place, the Debtors ask that the order provide that no person may commence or continue an action against an Independent Fiduciary for acts or omissions in that capacity during the Chapter 11 Cases without first obtaining a determination of the Bankruptcy Court that the claim states a colorable claim of gross negligence or willful misconduct. That provision, which the Fifth Circuit described in *In re Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022), releases no one; it routes claims against the estates' fiduciaries through the court that supervises them. Whether the Independent Fiduciaries are entitled to exculpation under the Plan will be decided at the Confirmation Hearing, with the rights of the United States Trustee and every other party in interest to be heard on that question preserved, as described in the

summary of the Plan below. Neither Independent Fiduciary nor any affiliate of either may invest in the Debtors or their successors for three years after his service ends, and each reports quarterly to the Bankruptcy Court, the Committee, and the United States Trustee. The Debtors also ask that the order be effective immediately notwithstanding Bankruptcy Rule 6004(h).[90]

The Committee has characterized the motion as "woefully inadequate" and "at best a half-measure."[91] The Committee is directed solely by the Families who lost children, and in the Trustee Motion it stated that the Families will not agree to anything the Debtors propose unless there is a governance change. The Committee has noticed the depositions of Mr. Andrews for September 29, 2026, of the CRO for September 28, 2026, and of Judge Gargotta for September 30, 2026. The Reply responds that the Modified Relief addresses the central concern underlying each objection: on the Plan Matters, the Sale Process, and the Conflict Matters, the persons whose conflicts are alleged have no vote and no veto. The motion is set for hearing on October 9, 2026, at 9:00 a.m.[92]

**H. The Committee's Retention Applications and the Composition of the Committee**

On September 4, 2026, the Committee applied to retain Willkie Farr & Gallagher LLP as counsel effective as of July 27, 2026, Lawson & Moshenberg PLLC as Texas and conflicts counsel, and FTI Consulting, Inc. as financial advisor. The applications characterize each engagement as pro bono, although the arrangement is conditional. If the Debtors "propose and obtain confirmation of a chapter 11 plan or other resolution of these chapter 11 cases that is not supported by the Committee," each professional may seek allowance of all of its fees and expenses as administrative expenses, with any allowed amounts "contributed to the Debtors' unsecured creditors."[93] The applications waive monthly and interim fee applications, disclose hourly rates of $1,950 to $2,795 for Willkie's partners and senior counsel, and cite an order entered in *In re Alexander E. Jones* in this District as precedent, an order that was not objected to in that case and that was followed shortly by the debtor's own request for conversion to chapter 7.[94] The Debtors do not question the professionals' qualifications. They are objecting to the terms, because the engagement is pro bono only if the Committee prevails, and because the applications excuse the professionals from the rules that govern every other estate professional.

As presently constituted, the Committee includes none of the approximately 2,790 camper families holding deposit and tuition claims. Each of the Committee's thirteen members is a family member of a camper or counselor who died in the flood, most are plaintiffs in the Prepetition Lawsuits whether against the Debtors or in the DSHS Suit where discovery is stayed, and no member holds a deposit, employee, or trade claim. The Committee is composed of only one class of creditor, wrongful death claimants, and it has arguably already shown that it will not meet its

---

[90] Reply, Docket No. [●], Parts III and V–VII and Exhibits A and B (filed contemporaneously with the Plan and this Disclosure Statement).

[91] Docket No. 228; Trustee Motion ¶¶ 4, 53.

[92] Notice of Hearing and Objection Deadline, Docket No. 209 (Sept. 1, 2026); Agreed Scheduling Order ¶ 4.

[93] Docket Nos. 218 ¶¶ 3, 7, 12–13, 17, 219, 220.

[94] Docket No. 218 ¶¶ 13–14, 17.

fiduciary duties, given the bright-line position it has taken in the Trustee Motion that it will refuse to accept anything the Debtors propose absent a change in management.

## ARTICLE V.
## ASSETS AND LIABILITIES OF EACH ESTATE

### A. Summary, Sources, and Limits

| Debtor (Case No.) | Real Property | Personal Property | Total Scheduled Assets | Total Scheduled Liabilities (Excluding Undetermined Claims) |
|---|---|---|---|---|
| Camp Mystic, LLC (26-90621) | $344,605.00 | $7,531,900.95 | $7,876,505.95 | $1,312,129.36 |
| Natural Fountains Properties, Inc. (26-90622) | $14,278,650.00 | $3,146,646.78 | $17,425,296.78 | $7,546,073.97 |
| Mystic Camps Management, LLC (26-90623) | $0.00 | $147,000.00 | $147,000.00 | $0.00 |
| Mystic Camps Family Partnership, Ltd. (26-90624) | $0.00 | $14,707,482.73 | $14,707,482.73 | $0.00 |

The figures are from the *Schedules of Assets and Liabilities* and *Statements of Financial Affairs* that each Debtor filed on August 7, 2026 (the "**Schedules**" and the "**SOFAs**").[95] Mystic LLC's personal property includes a promissory note owed to it by NFP, scheduled at $5,743,657.53, which appears again as a liability of NFP. MC Family Partnership's assets consist almost entirely of its equity in Mystic LLC and NFP at book value. MC Management's only asset is its one percent interest in MC Family Partnership. Removing those intercompany items, the four estates together held, as of the Petition Date, approximately $4.9 million in cash according to the Schedules (approximately $4.68 million according to the general ledgers) and the real property scheduled at $14.28 million, together with the personal property, intangibles, and insurance rights described below.[96] As of August 26, 2026, the Debtors held $4,750,384 in cash across the four estates.[97]

Creditors should understand the limits of the Debtors' records.

- The camp's books were kept in QuickBooks by Dick Eastland, who died in the flood, and the paper records were kept in the camp office at the Guadalupe River

[95] Summary of Assets and Liabilities (Official Form 206Sum), Docket No. 152 at 13; Docket No. 153 at 10–11; Docket No. 154 at 10; Docket No. 155 at 10.

[96] Docket No. 152 at 14–15; Docket No. 153 at 12; Docket No. 155 at 11; Debtors' general ledgers as of June 24, 2026.

[97] 341 Transcript at 23:8–22, 35:24–36:1.

campus, which flooded; the damaged records were then stored in a storage shed on the Cypress Lake side and have been made available for inspection by the creditors.

- The last financial statements reviewed by an independent accountant are for 2023.
- For 2024 and 2025 the outside accountants prepared year-end adjusting entries for tax purposes that were never posted to the QuickBooks files. Accordingly, figures in the SOFAs and monthly operating reports differ from the figures on the tax returns, and no depreciation was recorded for 2025 or 2026. [98]
- The 2025 tax returns are on extension.
- The real property values are the Kerr Central Appraisal District's values for tax purposes, not appraisals of market value.

Since the Petition Date, the CRO and CR4 have maintained the books, reconciled the bank accounts, and prepared the monthly operating reports.[99]

**The Friends of Camp Mystic Fund.** As described above, more than $400,000 raised by camp families after the flood to rebuild the Guadalupe River campus is, the Debtors understand, held in escrow by the Debtors' general contractor and designated for that reconstruction. The Debtors did not raise these funds and have not treated them as unrestricted cash of any estate. Because the money was donated and is held for the specific, restricted purpose of rebuilding the Guadalupe River campus, the Debtors' position is that it is not property of any estate available for general distribution to creditors, and that any interest of a Debtor in the funds is limited to that restricted purpose. The Debtors intend to preserve these funds for the rebuilding of the campus including, if the Successful Bidder will continue to operate a camp on the property, by providing for their use by that buyer for the same restricted purpose rather than for general distribution, and will seek any approval of the Bankruptcy Court or other party that may be required. The Plan does not direct these funds to the payment of Claims.

## B. Camp Mystic, LLC (Case No. 26-90621)

**What Mystic LLC is.** Mystic LLC is the operating company. It employed the camp's staff, enrolled the campers and held their deposits, held the camp's license, owns the camp's personal property and trademarks, and is the named insured under the camp's insurance program. Organized in 1998 as Camp Mystic, Inc., an S corporation, it was converted to a Texas limited liability company in October 2021. Since January 31, 2023, when Richard G. and Willetta A. Eastland contributed their membership interests to MC Family Partnership, it has been wholly owned by MC Family Partnership.[100] Its managers are Willetta A. Eastland, Richard G. Eastland, Jr., George A. Eastland, and Edward S. Eastland. Under the company agreement Mrs. Eastland's vote carries

---

[98] 341 Transcript at 15:23–17:8, 61:8–62:23; Independent Fiduciary Motion ¶ 17; reviewed financial statements of Camp Mystic, LLC and NFP for 2022 and 2023 (Whitley Penn LLP); Debtors' books and records.

[99] 341 Transcript at 23:8–24:3; Docket Nos. 104, 113–115, 185–188.

[100] Certificate of Formation and Company Agreement of Camp Mystic, LLC (Oct. 26, 2021); Assignment and Contribution Agreements, dated January 31, 2023 (Debtors' records).

greater weight than the votes of the other managers.[101] According to its QuickBooks records, Mystic LLC's total income was $9.27 million in 2022, $10.32 million in 2023, $10.91 million in 2024, and $5.56 million in 2025, with net income of $833,331, $1,068,114, and $1,107,005 in 2022 through 2024 and a net loss of $557,178 in 2025.[102]

**Assets.**

- *Cash:* $1,511,893.44 scheduled as of the Petition Date (book cash of $1,333,870.02, with the difference being reconciled by CR4) and approximately $1,354,600 at August 26, 2026.[103] Before the flood, Mystic LLC's book cash was $7,882,084.85; the reduction to $1,717,419.62 at December 31, 2025, reflects principally the refund of camper deposits and tuition after the flood, the payment of the camp's payroll through the fall, and other post-flood expenditures.

- *The intercompany note from NFP:* the largest scheduled asset of the Mystic LLC estate and the largest scheduled liability of the NFP estate, scheduled at $5,743,657.53 (principal of $5,500,000 plus unpaid interest for 2025 and for the 174 days of 2026 before the Petition Date, at three percent).[104]

- *Prepaid rent:* a prepaid asset of $639,621.60 as of December 31, 2025, representing 2025 percentage rent paid to NFP in excess of the amount finally determined in September 2026, as described below under "The NFP lease." The Schedules will be amended to reflect it, and the claim is an Intercompany Claim under the Plan.

- *Real property:* Camp Mystic, Inc is identified in the KERR CAD owning two small parcels in the Dakota Hills subdivision near the camp, consisting of a building scheduled at $272,605.00 and a vacant half-acre homesite scheduled at $72,000.00. The property was used as employee housing.

- *Vehicles, equipment, animals, and inventory:* Mystic LLC owns fifteen titled vehicles and trailers scheduled at $218,675.00; farm machinery, kitchen equipment, cabin furnishings, a greenhouse, storage units, watercraft, and horses, all scheduled at undetermined value; camp-store merchandise scheduled at cost of $51,995.98; and office furniture scheduled at $3,029.00.[105]

- *Intellectual property:* Mystic LLC owns three federal trademark registrations for CAMP MYSTIC, the domain names, and the camper and family database, all

---

[101] Written Consent of the Sole Member of Camp Mystic, LLC (Jan. 1, 2026); Amended and Restated Company Agreement of Camp Mystic, LLC (Debtors' records).

[102] QuickBooks profit and loss statements of Camp Mystic, LLC for 2022 through 2025 (Debtors' records).

[103] Schedule A/B of Camp Mystic, LLC, Docket No. 152 at 14–15; Docket No. 185 at 1–2; 341 Transcript at 24:2–3, 34:21–35:9.

[104] Schedule A/B of Camp Mystic, LLC, Docket No. 152 at 35 (line 71.1); Schedule E/F of NFP, Docket No. 153 at 31 (line 3.6); 341 Transcript at 24:7–25:20; reviewed financial statements for 2022 and 2023; minutes of NFP board meetings (Dec. 2022 and Dec. 2023) (Debtors' records).

[105] Schedule A/B of Camp Mystic, LLC, Docket No. 152 at 24–25, 30–32.

scheduled at undetermined value. A fourth registration is held by NFP, and the Debtors have not located a recorded assignment of the two older registrations, which stood in NFP's name before 1998.[106]

- *Insurance:* Mystic LLC (under its former name) is the first named insured under the insurance program described below and recovered $190,472.50 for five vehicles lost in the flood. It also paid $139,179.53 of premiums between 2022 and April 2025 on life insurance policies referring to Richard G. or Willetta A. Eastland, and the Debtors are determining who owns those policies and whether any Debtor holds an interest in them or a claim for the premiums.[107]

- *Causes of action:* The potential causes of action include (i) all claims the estate may have against insiders and others, including claims to avoid and recover transfers under sections 544, 547, 548, and 550 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act, and (ii) the claims against third parties arising from the flood. The Debtors have not evaluated the merits or value of any such claim. Under the Plan they are Retained Claims and Causes of Action that vest in the Post-Effective Date Debtors. The estates' claims against the Eastland Parties are preserved under the Tolling Agreement, which tolls every limitations period on those claims while the Flood Claims litigation proceeds and defers any direct action on them until the Tolling Agreement terminates, as described in the summary of the Plan below.

**Liabilities.**

- *Secured claims:* Mystic LLC has one secured creditor, Kubota Credit Corporation, U.S.A., which holds a claim scheduled at $11,516.75. The claim is secured by a Kubota tractor package worth approximately $38,000.00. George A. Eastland is a co-obligor on the equipment loan.[108] No tax lien, mortgage, or other secured claim is scheduled against any Debtor.

- *Camper Deposit Claims:* Mystic LLC has scheduled 2,790 claims for "camp deposit, tuition, or store credit." The Deposit Claims are scheduled per family and total $1,295,482.17, of which $1,281,884.61 is entitled to priority under section 507(a)(7) of the Bankruptcy Code. Eight families' deposits exceed the cap, by a total of $13,597.56.[109] Additional Deposit Claims may be asserted by proof of claim.

---

[106] Schedule A/B of Camp Mystic, LLC, Docket No. 152 at 33–34; Schedule A/B of NFP, Docket No. 153 at 24–25; Consent of the Shareholders of Natural Fountains Properties, Inc. (Nov. 2012) (Debtors' records).

[107] SOFA of Camp Mystic, LLC, Docket No. 156 at 17–18 (Question 7); general ledger of Camp Mystic, LLC (Debtors' records).

[108] Schedule D of Camp Mystic, LLC, Docket No. 152 at 37; Schedule H, Docket No. 152 at 757.

[109] Schedule E/F of Camp Mystic, LLC, Docket No. 152 at 38–749; 11 U.S.C. § 507(a)(7); general ledger of Camp Mystic, LLC (Debtors' records).

Mystic LLC's books carry advance deposits and unearned revenue of $1,854,680.97 at the Petition Date, and CR4 is reconciling the book balance to the scheduled claims.

- *Employee claims:* Mystic LLC has one scheduled claim for unpaid compensation of $50,100.00, of which $15,600.00 is entitled to priority under section 507(a)(4). Prepetition wages for June 1 through June 23, 2026 were paid under the Bankruptcy Court's wage orders.[110]

- *Trade claims:* Mystic LLC has scheduled one trade claim of $3,128 owed to Texas Power & Controls. Additional trade claims may be asserted by proof of claim.

- *Tax claims:* The Internal Revenue Service has issued a notice of intent to levy for $5,343.15 relating to the final S corporation return of Camp Mystic, Inc. for the period ending January 31, 2023, and filed a proof of claim on September 10, 2026.

- *Flood Claims:* Camp Mystic scheduled the twenty-six wrongful death claims as contingent, unliquidated, and disputed in undetermined amounts. The Bar Date Order deems twenty-five of those families to have timely filed proofs of claim against each Debtor, and surviving campers, counselors, and family members who hold personal injury or other claims were required to file by the General Bar Date. One personal injury claim, asserted by a camper who was rescued during the flood and by her family, is described above.

- *Indemnification claims:* Mystic LLC scheduled eight contingent and unliquidated claims asserted by Edward Eastland, the Estate of Richard G. Eastland, George A. Eastland, Richard G. Eastland, Jr., Willetta A. Eastland, William Neely Bonner, NFP, and MC Family Partnership. Mystic LLC's company agreement requires it to indemnify its managers, members, and officers, including for their own negligence but not for gross negligence, willful misconduct, or breach of the agreement, and contains no provision for the advancement of defense costs. The 2019 Lease requires Mystic LLC to indemnify NFP and its officers, directors, and shareholders for damage occurring on the property. The Debtors reserve every right to contest these claims, including under section 502(e)(1)(B) of the Bankruptcy Code. Those asserted by the Eastland Parties are among the Eastland Parties' claims against the Debtors (the "**Eastland Claims**"). Every objection and defense to the Eastland Claims is preserved, and the deadline to assert it is extended, under the Tolling Agreement described in the summary of the Plan below, and no distribution will be made on an Eastland Claim unless and until it is allowed.

**The NFP lease.** Mystic LLC leases the land and buildings from NFP under a Lease Agreement effective January 1, 2019 (the "**2019 Lease**"), as amended by a First Amendment to Lease Agreement dated April 29, 2021 (the "**First Amendment**") and a Second Amendment to Lease Agreement made as of July 5, 2025 (the "**Second Amendment**"). The lease runs for an indefinite term that renews automatically on each anniversary date unless either party gives at least ninety days' written notice of termination. The Schedules describe the lease as dated June 1, 1998,

[110] Schedule E/F of Camp Mystic, LLC, Docket No. 152 at 734; Docket Nos. 30, 64.

and the Debtors will amend Schedule G.[111] Under the First Amendment, the rent is $80,000 per month, payable in advance on the first day of each month, plus, as additional rent payable within sixty days after the end of each fiscal year, seventy-five percent of Mystic LLC's "net cash flow" from its operations on the property (the "**Annual Revenue Sharing Amount**"). The Second Amendment states that it supersedes the First Amendment. The books record percentage rent of $2,377,227 for 2022, $718,808 for 2023, and $2,384,446 for 2024, and for 2025 Mystic LLC paid NFP $1,925,000 on May 27 and June 6, 2025, as estimated 2025 percentage rent, in anticipation of a full year of operation, before the season had ended, before the flood, and before any Annual Revenue Sharing Amount for 2025 was due. Mystic LLC's 2025 books show a net loss. The percentage rent for 2025 could not be determined until Mystic LLC's net cash flow for the year was calculated, and that calculation was completed in September 2026 in connection with the preparation of the Debtors' 2025 tax return. It showed that Mystic LLC had overpaid its 2025 percentage rent by $639,621.60. Mystic LLC has recorded a prepaid asset in that amount, and NFP has recorded a corresponding unearned rent liability, each as of December 31, 2025, and the Debtors are amending the Schedules to reflect them.

By the Second Amendment, made as of July 5, 2025, NFP and Mystic LLC abated the monthly rent of $80,000 from July 5, 2025 through June 1, 2026 (the "**Abatement Period**"), with monthly rent to resume at the normal rate of $80,000 beginning July 1, 2026, after the Petition Date. NFP waived all late charges and penalties for unpaid rent during the Abatement Period and agreed to refund all rent paid during it. The Second Amendment recites that, as a result of the flood, the parties were unable to determine whether the property was so damaged that substantial alteration or reconstruction would be required or whether insurance proceeds would be insufficient to restore the improvements. It was signed for NFP by Mr. Bonner and for Mystic LLC by Mrs. Eastland. On December 29, 2025, NFP refunded $469,677.42 to Mystic LLC by six checks marked "Rent Refund," an amount equal to the monthly rent for July 5 through December 31, 2025, and no rent has been paid or accrued since.[112] Because no monthly rent came due between December 31, 2025 and the Petition Date, the Debtors expect to state the prepaid 2025 percentage rent in the amended Schedules at its December 31, 2025 amount. The 2019 Lease will be deemed rejected under section 365(d)(4) of the Bankruptcy Code unless Mystic LLC assumes it, or obtains an extension, by October 22, 2026. The Plan does not assume the lease, and any claim between the two estates arising from it, including the prepaid 2025 percentage rent and the refund, is an Intercompany Claim.

### C. Natural Fountains Properties, Inc. (Case No. 26-90622)

**What NFP is.** NFP is a Texas corporation, incorporated in 1956, that owns the camp's land and improvements and leases them to Mystic LLC. It was an S corporation until January 1, 2019, when it converted to a C corporation, and it is a taxpayer in its own right. It has one officer, its President, William Neely Bonner III, and no employees. Mr. Bonner serves as an independent

---

[111] Lease Agreement between Natural Fountains Properties, Inc. and Camp Mystic, Inc., effective January 1, 2019, and First Amendment to Lease Agreement (Apr. 29, 2021) (Debtors' records); Schedule G of Camp Mystic, LLC, Docket No. 152 at 753.

[112] General ledgers of Camp Mystic, LLC and NFP; Second Amendment to Lease Agreement, made as of July 5, 2025 (Debtors' records); Independent Fiduciary Motion ¶ 34; Lift-Stay Motion ¶ 22.

contractor for a stipend of $2,000 per month, reported on Form 1099.[113] Since January 31, 2023, it has been wholly owned by MC Family Partnership. The Second Day Declaration describes NFP's directors as the four Eastland managers of Mystic LLC.

NFP's total income was $4.99 million in 2024 (rent of $4.84 million and investment income of $147,804). Its QuickBooks records show net income of $2.70 million for 2025, which the outside accountants' unposted adjustments would reduce to $1.20 million.[114]

**The camp property.** NFP owns the land on which the camp sits in nine parcels near Hunt totaling approximately 749.25 acres according to the appraisal district's 2026 notices (the Debtors' pleadings, the 2012 deed of trust, the March 2026 bank commitment, and the January 2026 appraisal described below describe the property as approximately 725 acres (725.26 acres by the legal description used in the appraisal), and older conveyances as 761.875 and 764.625 acres).[115] The Schedules list the main campus land ($1,623,139.00), six agricultural tracts totaling approximately 564 acres ($5,064,762.00), two small homesite parcels ($44,478.00), and forty structures on the main campus ($7,546,271.00 in the aggregate). The total of $14,278,650.00 is the appraisal district's value as of January 1, 2026, which does not purport to reflect the flood's effect on market value, the temporary injunction, or the licensing restrictions that now apply to cabins in a floodplain.[116] The Cypress Lake campus, built approximately five years before the flood at a cost the Debtors have described as approximately $8 million, lies about seven-tenths of a mile from the Guadalupe River campus. Its cabins stand some 48 feet above the lowest cabins on the river, and no building at Cypress Lake flooded on July 4, 2025.[117]

The Debtors have located the following information bearing on the property's value. CBIZ Valuation Group, LLC appraised NFP's real estate at $22,850,000 as of June 30, 2022, and relied on that appraisal in valuation reports prepared as of January 31, 2023 for the family's estate-planning transactions, which valued the equity of NFP at $11,703,000 and the equity of Mystic LLC at $9,980,000. CBIZ also prepared valuation reports for NFP and for Mystic LLC as of October 31, 2023, the date of the family's gift of the partnership interests. Those values predate the flood, the injunction, and the 2025 camp-safety statutes.[118] The most recent is an appraisal report of Stouffer & Associates, LLP, a San Antonio appraisal firm, dated March 19, 2026, with an effective date of value of January 29, 2026, prepared for Security State Bank & Trust for loan underwriting in connection with the construction loan described below, for which NFP paid $10,000 in April 2026. The report values the fee simple interest in the surface estate of 725.26

[113] Form 1120 of NFP for 2024; Docket No. 24 n.3; Docket No. 15 n.5; Forms 1099-NEC to William Neely Bonner III (Debtors' records).

[114] Form 1120 of NFP for 2024; NFP profit and loss statements for 2025 and 2026 (Debtors' records); SOFA of NFP, Docket No. 157 at 11.

[115] Kerr Central Appraisal District, 2026 Notices of Appraised Value (May 29, 2026) (nine parcels; 180.64, 563.66, and 4.95 acres, totaling 749.25 acres); Security State Bank & Trust, commitment letter (Mar. 19, 2026); deed of trust (2012) (Debtors' records).

[116] Schedule A/B of NFP, Docket No. 153 at 19–23; Global Notes, Docket No. 153 at 6–7.

[117] Injunction Response at 4–5; 341 Transcript at 13:10–19.

[118] CBIZ Valuation Group, LLC, Valuation Reports, Natural Fountains Properties, Inc. and Camp Mystic, LLC, as of January 31, 2023 (Debtors' records).

acres, real estate only, excluding personal property, livestock, equipment, and any business or going-concern value, by a sales comparison approach for the land and a cost approach for the improvements; the appraiser did not develop an income approach. It concludes a market value "as is" of $22,170,000, consisting of a land value of $17,410,000 (725.26 acres at $24,000 per acre, derived from seven Hill Country ranch sales) and a contributory value of $4,760,000 for the improvements in their condition on January 29, 2026, with the flood-damaged structures at the Guadalupe River campus heavily depreciated and several assigned no value, and a market value of $28,040,000 "as if complete," on the hypothetical condition that the repairs and new construction then budgeted at approximately $18.5 million had been completed. The appraiser describes the highest and best use as agricultural and recreational ranch use with ancillary camp use, treats the camp structures as an over-improvement that narrows the pool of likely buyers, and assumes, as an extraordinary assumption, that the existing and proposed improvements are legally permissible under applicable floodplain regulations, while noting that several existing structures appear to lie within or near mapped flood hazard areas and that the values could be materially affected if their use is restricted. At the bank's request the report also summarizes an owner-provided estimate of $810,000 for furniture, fixtures, and equipment, which is personal property excluded from the values. The appraisal predates the April 15 Injunction Order, the withdrawal of the license application, and the decision not to pursue the rebuilding plan, and it was prepared for a lender, not for the Debtors or for a sale.[119] In March 2026, before the license application was withdrawn, the family obtained a construction budget of $20,572,647.50 for the repair and rebuilding of the camp in two phases and a bank commitment for an $11,677,800.00 construction loan for the first phase. The commitment was not accepted, no loan was made, and the rebuilding plan was not pursued after April 30, 2026.[120] In November 2025, Heart O' the Hills, a girls' camp on the Guadalupe near Hunt, was sold to new owners who intend to continue it at a new site; the price was not disclosed.[121] The property will be marketed and sold under the Plan, and its value will be established by the sale process. The property includes a small cemetery near Felix Fisher Road, surveyed in May 2017 with its own access easement, which Schedule A/B of NFP does not separately list. A member of the Eastland family is interred there, and the cremated remains of other persons have been placed there.[122]

[119] Stouffer & Associates, LLP, Appraisal Report, Camp Mystic, 725.26 acres, 2689 Highway 39, Hunt, Kerr County, Texas 78024 (File S-26-0002) (report date Mar. 19, 2026; effective date of value Jan. 29, 2026), prepared for Security State Bank & Trust (value conclusions at 5 and 92–93; extraordinary assumptions and hypothetical condition at 10–12; highest and best use at 51–56; land value at 80; contributory value of improvements at 89).

[120] JK Bernhard Construction Co., budget for Camp Mystic (Mar. 12, 2026); Security State Bank & Trust, commitment letter (Mar. 19, 2026); general ledger of NFP (Debtors' records).

[121] Louis Amestoy, *Heart O' the Hills camp sold, will relocate to Guadalupe River's North Fork after flood*, Kerr County Lead (Nov. 8, 2025), https://kerrcountylead.com/.

[122] Voelkel Land Surveying, PLLC, *Survey Plat for a 0.07 Acre Cemetery Site and a Thirty (30) Ft. Wide Access Easement* (May 2017) (Debtors' records).

**Cash, insurance recoveries, and other assets.**

- *Cash*: NFP held $3,146,646.78 in cash as of the Petition Date and $3,158,256 at July 31, 2026.[123]

- *Insurance Recovery*: NFP received $405,000.00 on August 27, 2025 under the five National Flood Insurance Program policies; the payment was first recorded as a reduction of insurance expense, was reclassified by the outside accountants as insurance proceeds, and the funds remain in NFP's accounts. The Schedules will be amended to reflect the insurance proceeds.[124]

- *Insurance Policies*: NFP is a named insured under the package, excess, and automobile policies described below. The Debtors' commercial property coverage excludes flood, and the Debtors are not aware of any further property-insurance claim available to NFP.

- *Intellectual Property*: NFP holds one CAMP MYSTIC trademark registration.

**Liabilities.**

- *Secured*: NFP has no secured debt. Its loan from Wells Fargo, secured by a deed of trust on the camp property, was paid in full on May 9, 2025, with a payment of $2,107,291.96.[125]

- *Unsecured Loans*: NFP is the obligor on two unsecured promissory notes payable to Eastland family trusts, described below.

- *Wage Claims*: NFP owes $2,000.00 in accrued compensation to Mr. Bonner, scheduled as entitled to priority.

- *Unearned Rent*: an unearned rent liability to Mystic LLC of $639,621.60 as of December 31, 2025, for the 2025 percentage rent that Mystic LLC prepaid in excess of the amount finally determined in September 2026, as described above under "The NFP lease." The Schedules will be amended to reflect it, and the claim is an Intercompany Claim under the Plan.

- *Flood Claims*: NFP scheduled the twenty-six wrongful death claims as contingent, unliquidated, and disputed in undetermined amounts.

- *Indemnification claims*: NFP scheduled six contingent and unliquidated indemnification claims asserted by Edward Eastland, the Estate of Richard G.

[123] Schedule A/B of NFP, Docket No. 153 at 12; Docket No. 186; NFP balance sheets as of June 24, 2026 and December 31, 2025 (Debtors' records).

[124] 341 Transcript at 19:22–21:1, 65:19–66:1; general ledger of NFP (journal entry of Aug. 27, 2025) (Debtors' records); Schedule A/B of NFP, Docket No. 153 at 24–25.

[125] Schedule D of NFP, Docket No. 153 at 28; general ledger of NFP (Debtors' records).

Eastland, George A. Eastland, Richard G. Eastland, Jr., Willetta A. Eastland, and Mr. Bonner. Those claims are Eastland Claims, subject to every objection and defense of the Debtors, which are preserved under the Tolling Agreement described in the summary of the Plan below.

- *Tax*: NFP also owes federal income tax for 2025. It paid $440,000.00 to the Internal Revenue Service on April 10, 2026, with its extension request, which showed a tentative tax of $471,326. The Internal Revenue Service assessed a $16,559.77 estimated-tax penalty for 2024 and filed a proof of claim on September 10, 2026.[126]

**D. Mystic Camps Family Partnership, Ltd. (Case No. 26-90624)**

MC Family Partnership is a Texas limited partnership organized in October 2021 as part of the estate planning for Richard G. and Willetta A. Eastland. On January 31, 2023, Mr. and Mrs. Eastland contributed all of the stock of NFP and all of the membership interests in Mystic LLC to the partnership, and on October 31, 2023, they gave ninety-eight percent of the partnership, in equal shares of 24.5 percent to each of their three sons and 12.25 percent to each of two trusts for the benefit of two granddaughters, "in exchange for no consideration whatsoever," retaining a preferred interest of one-half of one percent each. The typed minutes of NFP's board describe the purpose as being "to gift/sell a lot of Dick & Tweety's estate while they are still alive."[127]

MC Family Partnership owns all of the equity of Mystic LLC (scheduled at a book balance of $7,476,984.00) and NFP ($6,992,902.00) and held $237,596.73 in a checking account on the Petition Date. It has no revenue, no employees, and no contracts.

Its scheduled liabilities are the twenty-six Flood Claims and indemnification claims asserted by the Estate of Richard G. Eastland and Willetta A. Eastland. The partnership agreement indemnifies limited partners only to the extent of partnership assets and only for claims asserted against them solely because they are limited partners.[128]

**E. Mystic Camps Management, LLC (Case No. 26-90623)**

MC Management is a Texas limited liability company whose only function is to serve as general partner of MC Family Partnership. MC Management's only asset is its one percent partnership interest, scheduled at $147,000.00. It has no bank account, no contracts, and no scheduled liabilities other than the Flood Claims and five indemnification claims.[129]

---

[126] SOFA of NFP, Docket No. 157 at 12; Form 7004 of NFP for 2025; Internal Revenue Service notice (Debtors' records); Claims Register.

[127] Certificate of Formation of Mystic Camps Family Partnership, Ltd. (Oct. 2021); Third Amendment to the Limited Partnership Agreement (Oct. 31, 2023); typed minutes of NFP board meetings (Dec. 2022 and Dec. 2023); Forms 1065 of MC Family Partnership for 2023 and 2024 (Debtors' records); Second Day Declaration ¶¶ 12–15 & Exs. A–B.

[128] Schedule A/B and Schedule E/F of MC Family Partnership, Docket No. 155 at 11, 13, 23–30; Docket No. 188; SOFA of MC Family Partnership, Docket No. 159 at 10.

[129] Global Notes, Docket No. 154 at 7–9; Schedule A/B and Schedule E/F of MC Management, Docket No. 154 at 13, 23–31.

The Second Day Declaration and the Schedules describe MC Management as owned entirely by Willetta A. Eastland. Its company agreement, its public information reports, and MC Family Partnership's returns show Richard G. Eastland and Willetta A. Eastland each holding an undivided fifty percent interest. Mr. Eastlands equity transferred to Mrs. Eastland upon his death pursuant to his will. MC Management's June 23, 2026, resolution authorizing the filing also amended the partnership agreement of MC Family Partnership to remove the general partner's bankruptcy as an event of dissolution.[130]

**F. The Insurance Program**

The Debtors' insurance for the policy year March 1, 2025 to March 1, 2026, was placed by their broker, Hertel Insurors Group, LLP, of Austin, principally through K&K Insurance Group, Inc., a program administrator for member companies of American International Group, Inc. ("**AIG**").[131] The package, excess, and automobile policies name "Camp Mystic, Inc." (the name of Mystic LLC before its conversion) and NFP as named insureds. The workers' compensation policy names Camp Mystic, Inc., with NFP as an additional named insured. The flood policies name NFP alone. No policy names MC Family Partnership, MC Management, or any individual. The policies were: (i) a package policy issued by Granite State Insurance Company providing commercial general liability coverage with limits of $1,000,000 per occurrence and $2,000,000 in the aggregate, together with commercial property coverage (which excludes flood), inland marine, crime, and employment practices liability coverage; (ii) an excess liability policy issued by National Union Fire Insurance Company of Pittsburgh, Pa., with limits of $5,000,000 per occurrence and in the aggregate; (iii) a business automobile policy issued by New Hampshire Insurance Company, with a liability limit of $1,000,000 per accident; (iv) a workers' compensation and employer's liability policy issued by Texas Mutual Insurance Company; and (v) five National Flood Insurance Program policies issued to NFP by American Bankers Insurance Company of Florida, covering five buildings at the Guadalupe River campus for a total of $405,000. No other camp building was insured against flood.[132]

Under the general liability coverage, defense costs are paid in addition to the limits. For any one occurrence, the general liability and excess policies together provide up to $6,000,000, the figure the Debtors have used in their pleadings. For all occurrences during the policy year, up to $7,000,000.[133] On information and belief, if any Flood Claim is found to arise from the ownership, maintenance, or use of a covered auto, the automobile policy provides up to an additional $1,000,000 for each accident, subject to the reservation of rights described below. The limits are shared by every insured, so that a payment on behalf of any insured, including any Individual Defendant covered as an officer, director, manager, employee, or volunteer, reduces the

---

[130] Second Day Declaration ¶ 13 & Ex. B; Second Amended and Restated Company Agreement of Mystic Camps Management, LLC; Resolutions of the Members and Managers of Mystic Camps Management, LLC (June 23, 2026) (Debtors' records).

[131] Declaration of Karen Nicolaou in Support of the Debtors' Insurance Motion, Docket No. 39 ¶¶ 11–18 (July 2, 2026).

[132] Policy declarations for the March 1, 2025 to March 1, 2026 policy year (Debtors' records); Docket No. 39 ¶¶ 11–18.

[133] Injunction Response at 4; Stay Extension Motion ¶¶ 9, 19; Adv. Docket No. 14 ¶¶ 5, 62; 341 Transcript at 94:18–95:23.

coverage available to all. The Debtors have no directors' and officers' liability coverage.[134] The Reply seeks authority to purchase, at the estates' expense, directors' and officers' liability coverage (including Side A-only coverage) for the Independent Fiduciaries for their service during the Chapter 11 Cases, with the coverage to be bound before either begins to serve and its terms and cost disclosed to the United States Trustee and the Committee. For the prior policy year the excess limit was $10,000,000. At the March 1, 2025 renewal it was $5,000,000, and the renewal proposal shows two further options, described as "2x5" and "3x7," that were not purchased.[135] The decision was made before the flood, in the ordinary course of renewing the program, and the Debtors have no information that anyone anticipated the events of July 4, 2025.

AIG opened claims under the general liability and excess policies and is providing a defense in the Prepetition Lawsuits. On July 21, 2026, AIG Claims, Inc., as claims administrator for New Hampshire Insurance Company, sent reservation-of-rights letters under the automobile policy to Mystic LLC and NFP and to each of the Individual Defendants, in care of Arnold & Freeman, P.C. of Dallas. The letters state that a claim may be made under the automobile policy; that the insurer will defend any insured under that policy against a qualifying claim, subject to a reservation of its rights to deny or limit coverage, to allocate defense and indemnity payments between covered and uncovered claims, and to seek a declaratory judgment; that the anticipated claims will likely exceed the policy's $1,000,000 each-accident limit, so that the insureds may have personal exposure for any excess; and that Granite State Insurance Company is handling the claims under the general liability policy for all insureds on a coordinated basis, their interests appearing to the insurer to be aligned, with no actual conflict of interest identified. The letter to the Estate of Richard G. Eastland states that the most likely claim under the automobile policy would be one against the Estate, Mystic LLC, or NFP.[136] On November 19, 2025, the AIG companies gave notice of nonrenewal, citing loss severity. The package, automobile, and user-group policies were nevertheless renewed for March 1, 2026 to March 1, 2027. The Debtors have had no excess liability coverage since March 1, 2026, and the Bankruptcy Court has authorized the Debtors to maintain the program and pay premiums as they come due.[137] The flood policies expired on August 20, 2025, and were not renewed, on the broker's advice that the damaged buildings did not need flood coverage until rebuilt.[138] Claims were submitted to Texas Mutual Insurance Company for the deaths of Mr. Eastland and the two counselors who died in the flood, and for one injured employee.

The insurance policies and their proceeds are property of the estates to the extent provided by applicable law. The Plan preserves every right under them for the benefit of holders of Allowed

---

[134] Stay Extension Motion ¶¶ 19, 38; 341 Transcript at 95:24–96:9; Independent Fiduciary Motion ¶ 27.

[135] Hertel Insurors Group, LLP, proposal no. 62038 (Feb. 2025) (Debtors' records).

[136] Letters of Ron Mann, AVP, Severity Claims, AIG Claims, Inc., on behalf of New Hampshire Insurance Company, to Camp Mystic, LLC and Natural Fountains Properties, Inc.; to George Albritton Eastland, as Representative of the Estate of Richard G. Eastland; and to Willetta Eastland, Edward Eastland, Mary Liz Eastland, and William Neely Bonner III, each dated July 21, 2026 (Auto Policy No. 01-CA-044250184-2; Claim No. 0492740201US) (Debtors' records).

[137] AIG, notices of nonrenewal (Nov. 19, 2025); 2026–27 policy declarations (Debtors' records).

[138] Proofs of loss and payment records under the National Flood Insurance Program policies; email from Hertel Insurors Group, LLP (Aug. 2025) (Debtors' records).

Flood Claims, who recover first from the insurance and then, for any unpaid balance, from the GUC Escrow Accounts. Twenty-six families hold known wrongful death Flood Claims, and a camper who was rescued during the flood and her family hold a personal injury Flood Claim. Six million dollars of liability coverage for a single occurrence, shared with the Individual Defendants, is not enough to pay those claims if they are allowed in the amounts the plaintiffs seek. That arithmetic is the reason the Debtors filed these cases, and it is the reason the Plan holds the sale proceeds and the insurance proceeds together for ratable distribution rather than leaving them to be claimed by whichever family reaches judgment first.

### G. Employees

Mystic LLC had eleven salaried employees on the Petition Date and nine as of August 26, 2026: the maintenance supervisor, two office workers who share a position, a former media coordinator who now maintains the camp's inventory and databases, a horse breeder and trainer and two other grounds and stable workers, and two housekeepers. They maintain the buildings and grounds, care for the horses, secure the property, and assemble the records the Debtors must produce. None is a member of the Eastland family. Edward Eastland assists without compensation, and George Eastland assists on insurance matters.[139] The Company has adopted a Simple IRA retirement plan for the benefit of substantially all its employees. Employees are allowed to make contributions to the plan in accordance with IRS limitations. The Company makes matching contributions of up to 3% of employee compensation. The financial advisor for the plan is Wells Fargo Advisors. The Purchaser may offer employment to some or all of the remaining employees, and the Plan Administrators will retain such personnel as are needed to maintain the property until the sale closes. The Trustee Motion questions the payroll because the camp has no operations and no plans to reopen. The property these employees maintain and secure is the estates' principal asset, the horses in their care are estate property, and the records they are assembling are the ones the Committee has requested.

## ARTICLE VI.
## THE CHAPTER 11 CASES

### A. Why the Debtors Filed

By June 2026 the Debtors faced (i) five lawsuits consolidated for pretrial purposes before a single judge, with the first trial set for May 2027 and others to follow; (ii) a temporary injunction that barred any camp use of the Guadalupe River campus; (iii) a withdrawn license application and no revenue; (iv) other potential claims that could be asserted by those who survived the Flood and/or were injured during the Flood and (v) liability insurance of only $6 million to cover all claims arising from the flood. The Debtors also faced the potential for piecemeal litigation and additional claims by flood survivors and others injured in the flood. Chapter 11 offered a centralized process and a clear bar date for asserting those claims. In addition, hundreds of families wanted the camp to continue, but the litigation and the political pressure left no clear path forward. Chapter 11 offered a means to maximize the Debtors' value and to centralize the administration of

[139] First Day Declaration ¶ 11; Second Day Declaration ¶ 22; 341 Transcript at 9:20–10:16, 70:23–73:3.

all claims.[140] Outside of bankruptcy, the families who reached judgment first could have exhausted the insurance and the Debtors' assets, and the families who had not sued, or whose cases were tried later, could have recovered less or nothing.

The CRO described the purpose of the filing in her declaration: "The Debtors have commenced these chapter 11 cases to preserve the value of their business, to provide a single, orderly forum in which claims arising from the July 4, 2025, flood may be addressed, and to protect the interests of the Debtors' employees, campers and their families, creditors, and other stakeholders," through "a claims and plan process designed to resolve the prepetition litigation and other claims in a single forum, including through the marshalling of available insurance."[141] The Stay Extension Motion stated the same purposes: one forum for every flood-related claim, an end to "a proverbial 'race to the courthouse' and piecemeal litigation," and the preservation of the insurance for ratable distribution.[142] The Plan fulfills those purposes.

The Families contend that the cases were filed in bad faith to escape the state court and to protect the Eastland family.[143] The Debtors disagree. The Bankruptcy Code does not require a debtor to be insolvent, to be operating, or to wait for judgment before seeking relief. It permits an entity facing mass tort exposure that exceeds its insurance to use chapter 11 to marshal that insurance and its assets for all claimants alike.

**B. First-Day and Second-Day Relief**

The Bankruptcy Court entered orders for joint administration and complex case treatment on June 29, 2026. At the first-day hearing on June 30, 2026, at which the CRO testified, the Bankruptcy Court authorized the Debtors to pay prepetition wages, withholding taxes, and benefits for the camp's eleven employees, and at the second-day hearing on July 9, 2026 it approved the balance of that relief. The Debtors withdrew their request to pay the prepetition portion of the NFP President's stipend.[144] The Bankruptcy Court also authorized the Debtors to continue their cash management system in debtor-in-possession accounts, to provide adequate assurance to utilities (with the Eastland family members who reside on the property paying their own separately metered electricity), to pay prepetition taxes and fees, to maintain their insurance program, to file a consolidated creditor list with the addresses of camper families redacted, and to retain Epiq as claims, noticing, and solicitation agent.[145]

---

[140] Second Day Declaration ¶¶ 23–29; Stay Extension Motion ¶ 19; April 15 Injunction Order at 4–5; Trustee Motion ¶¶ 21 n.6, 23–24.

[141] Second Day Declaration ¶¶ 10, 30.

[142] Stay Extension Motion ¶¶ 1, 9–12.

[143] Lift-Stay Motion ¶¶ 1–4, 36–75.

[144] Docket Nos. 14, 17, 18, 28, 30, 63, 64; Declaration of Karen Nicolaou in Support of Certain First-Day Pleadings, Docket No. 15 (June 26, 2026) (the "First Day Declaration") ¶ 11; July 9 Transcript at 30:18–33:15.

[145] Docket Nos. 61, 79, 80, 81, 93, 101, 102; July 9 Transcript at 16:8–22:1, 25:18–26:10.

**C. The Chief Restructuring Officer and the Debtors' Professionals**

Two days after the Petition Date, the Debtors engaged Karen G. Nicolaou of Harney Partners as Chief Restructuring Officer. Ms. Nicolaou is a certified public accountant and certified valuation analyst with more than thirty years of restructuring experience, including service as chief restructuring officer in other chapter 11 cases in the Northern and Southern Districts of Texas. Neither she nor her firm had done any work for the Eastland family, the camp, or any related entity, and she had never met any member of the family before her engagement.[146] The Bankruptcy Court approved her retention on August 18, 2026 as a disinterested person. She has direct authority over the Debtors' spending, the accuracy of their reports, and the conduct of the cases.[147] Under the Modified Relief requested in the Reply, she reports to and takes direction from the applicable Independent Fiduciary on the chapter 11 affairs of each Debtor and from both Independent Fiduciaries on matters affecting more than one Debtor, no Eastland Board Member may direct her on any delegated matter, and she holds the authority of MC Family Partnership and MC Management over the Plan and the sale process, as described above in the discussion of the Independent Fiduciary Motion and the Reply. The Bankruptcy Court also approved the retention of (i) Vartabedian Katz Hester & Haynes LLP as the Debtors' counsel; (ii) CR4 Partners, LLC as financial advisor; and (iii) the Debtors' ordinary course professionals, including the camp's outside accountants, Whitley Penn LLP, and corporate counsel, Shackelford, McKinley & Norton LLP.

**D. The Official Committee of Unsecured Creditors**

On July 22, 2026, the United States Trustee appointed the Committee, consisting of thirteen members, each the parent of a camper or counselor who died in the flood: Clarke Baker, Ryan DeWitt, Matthew Childress, Brandt Dillon, Carrie Hanna, Davin Hunt, Christopher Jacobe, John Lawrence, J. Patrick Marsh, Michael McCown, Andrew Sheedy, Timothy Peck, and Cici Steward.[148] The Committee selected Willkie Farr & Gallagher LLP as counsel at its initial meeting on July 27, 2026, and later Lawson & Moshenberg PLLC as Texas and conflicts counsel and FTI Consulting, Inc. as financial advisor.

**E. Schedules, Statements, and the Meeting of Creditors**

The Debtors filed their Schedules and SOFAs for all four estates on August 7, 2026, forty-four days after the Petition Date, on the date the Families had requested.[149] The United States Trustee conducted the meeting of creditors under section 341 of the Bankruptcy Code on August 26, 2026, at which the CRO testified for approximately three and a half hours in response to questions from the United States Trustee and counsel for the Committee.[150] The Debtors have filed monthly operating reports for June and July 2026 for all four estates and intend to file amended Schedules and SOFAs to add the insurance payment, to disclose the Texas Rangers' investigation

[146] Application to Employ Karen Nicolaou, Docket No. 108 ¶¶ 7, 12, 18, 25 (July 24, 2026); 341 Transcript at 45:10–48:17; July 9 Transcript at 41:6–7, 66:12–16.

[147] Docket No. 173; 341 Transcript at 48:18–24, 58:23–59:6; July 9 Transcript at 59:6–11, 64:19–65:1.

[148] Notice of Appointment of Official Committee of Unsecured Creditors, Docket No. 94 (July 22, 2026).

[149] Docket Nos. 152–159.

[150] 341 Transcript at 6:18–24, 19:22–21:1.

and the search warrants described above and to list, as contingent, unliquidated, and disputed, any claim of a governmental unit that the allegations could give rise to, although no such claim has been asserted, and to address the other items identified in this Disclosure Statement.[151]

### F. The Bar Date Order

On August 19, 2026, on a certificate of no objection, the Bankruptcy Court entered the Bar Date Order.[152] It establishes September 18, 2026, at 5:00 p.m. (prevailing Central Time) as the General Bar Date for all claims other than governmental claims, and December 21, 2026 as the Governmental Bar Date. No governmental unit has asserted a claim arising from the Texas Rangers' investigation described above, and any such claim must be filed by the Governmental Bar Date. It requires a separate proof of claim against each Debtor and provides that a claim filed under the lead case number without identifying a Debtor is deemed filed only against Mystic LLC. It gives the Debtors, with the consent of the Committee, authority to extend a bar date for a particular claimant, and it deems the twenty-two plaintiff families and the Baker, Lawrence, and Marsh families to have timely filed proofs of claim against each of the four Debtors, without prejudice to any party's position on the pending abstention, remand, or transfer motions.[153] Epiq mailed bar date notices to every scheduled creditor, every person present at the camp on July 4, 2025, current and former employees, and regulators, and published the notice in newspapers in Austin, Houston, and Dallas.[154]

## ARTICLE VII.
## SUMMARY OF THE PLAN

**THIS ARTICLE SUMMARIZES THE PLAN. IT IS NOT A SUBSTITUTE FOR THE PLAN, WHICH IS ATTACHED AS EXHIBIT A AND WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY. CAPITALIZED TERMS NOT DEFINED IN THIS ARTICLE HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.**

### A. Overview

The Plan is a joint plan for all four Debtors, but it is not a consolidated plan. It "constitutes a separate chapter 11 plan for each Debtor," and the grouping of the Debtors "solely for the purpose of describing treatment under the Plan" does not merge the entities or transfer any assets. Each Debtor's creditors are paid from that Debtor's own assets, and a creditor with allowed claims against more than one Debtor receives a distribution from each, but never more than the allowed amount of its claim in total.

The Plan's core transaction is the sale of the camp. NFP will sell the camp property (the "**NFP Assets**") to the NFP Purchaser under an asset purchase agreement (the "**NFP APA**"), and Mystic LLC will sell its operating assets (the "**CM Assets**") to the CM Purchaser under a

[151] Docket Nos. 104, 113–115, 185–188.

[152] Bar Date Order, Docket No. 176.

[153] Bar Date Order ¶¶ 2, 4, 10(h)–(i) & nn.3–4.

[154] Bar Date Order ¶¶ 16–17; Docket Nos. 189, 196, 200, 239, 240.

separate agreement (the "**CM APA**"), which may be the same agreement with the same buyer, through bidding procedures approved by the Bankruptcy Court (the "**Bidding Procedures**") with a potential stalking horse purchaser (the "**Stalking Horse Purchaser**") whose bid sets the floor for an auction, free and clear of liens, claims, interests, and encumbrances, which attach to the proceeds. After the Effective Date, two Plan Administrators (a CM Plan Administrator for Mystic LLC and an NFP Plan Administrator for NFP, who together administer the Plan for MC Family Partnership and MC Management) administer the proceeds and the estates' remaining assets. On the Effective Date the equity interests in MC Family Partnership and MC Management held by the Eastland family and the Eastland Trusts are cancelled, and new equity interests in MC Family Partnership and MC Management (the "New Equity Interests") are issued to the Plan Administrators, who hold them as custodians; the former holders receive nothing on account of the cancelled equity unless every Allowed Claim against a Debtor has been paid in full, in which case they are the beneficiaries of any surplus. The Debtors will fund a Professional Fee Reserve Account before the Effective Date, and the Plan Administrators will fund a Wind Down Reserve; pay administrative, priority, and secured claims in full; pay Camper Deposit Claims in full up to the statutory priority cap, or transfer them to the Purchaser at the family's election; and deposit the net proceeds of the sale and each Debtor's remaining cash in a separate escrow account at each Debtor (each, a "GUC Escrow Account") from which that Debtor's Flood Claims and other general unsecured claims are paid *pro rata* as they are allowed. The Flood Claims will be liquidated in the tort system and paid first from the Debtors' insurance. The Debtors will be dissolved when the last distribution has been made, unless the Plan Administrators determine that dissolution would adversely affect any remaining asset. Because the Plan liquidates the Debtors, section 1141(d)(3) of the Bankruptcy Code does not permit a discharge, and the Plan grants none. It instead vests the Debtors' remaining assets in the Post-Effective Date Debtors and enjoins only the claims that the Plan releases or exculpates.

**B. The Sale Transactions**

**What is being sold.** The NFP Assets are the camp property owned by NFP: approximately 749 acres in nine parcels near Hunt, both campuses and their improvements, and NFP's trademark registration. The CM Assets are the personal property Mystic LLC uses to operate the camp (vehicles, equipment, furnishings, watercraft, kitchen equipment, camp-store inventory, and the horses); the CAMP MYSTIC trademarks, domain names, archives, photographs, and goodwill; the camper and alumnae database, subject to the privacy protections described below; and the executory contracts and leases the Purchaser elects to assume. The two Dakota Hills parcels owned will also be included. The insurance policies and their proceeds, the Debtors' cash, the estates' causes of action, and the intercompany note will not be sold. The Plan Administrators will retain and administer them. The Debtors will file a separate motion to approve bidding procedures for the sale of the Debtors' assets. The Bidding Procedures will give the Committee and the Families the consultation rights customary in bid procedures, and the Debtors will propose that the Bankruptcy Court establish a Steering Committee of camper-family representatives to consult on the Bidding Procedures and the sale process; under the Modified Relief requested in the Reply, the Special Committees' authority over the sale process is subject to any order establishing that body, and the Bidding Procedures will state a preference for a bid that provides for the continued operation of the camp consistent with its traditions.

**Court approval and closing.** The Confirmation Order will approve the Sale Transactions, transfer the assets free and clear under sections 363(f), 1123(a)(5)(D), and 1141(c) of the Bankruptcy Code, with liens and interests attaching to the Sale Proceeds, find under section 363(m) that each Purchaser is a good-faith purchaser, and provide that no Purchaser is a successor to or liable for any Debtor except as its APA provides. This Disclosure Statement assumes the sale closes on or before the Effective Date. If the Successful Bidder fails to close, the Debtors may close with the next-highest bidder.

## C. Governance Before and After the Effective Date

Before the Effective Date, the CRO manages the estates' day-to-day affairs and reports to the Independent Fiduciaries. The Independent Fiduciaries, once appointed as the Reply proposes, hold, through the Special Committees, the sole and exclusive authority of Mystic LLC and NFP to prosecute the Plan, including the Plan Supplement and every amendment or modification of the Plan, to conduct the sale process, and to decide every Conflict Matter, including the evaluation and prosecution of the estates' claims against insiders; the CRO holds the same authority over the Plan and the sale process for MC Family Partnership and MC Management under written consents of their governing bodies, and acts on any Conflict Matter of those two Debtors only with the approval of both Independent Fiduciaries. The Eastland Board Members have no vote, veto, or consent right on the Plan, the sale, or any Conflict Matter; they may object to the Bankruptcy Court as parties in interest, but they may not direct any of them. Final authority over the defense and conduct of the Flood Claims against the Debtors, including any settlement of them outside the Plan, remains with each Debtor's full governing body, on which the applicable Independent Fiduciary has a vote alongside the Eastland Board Members, subject to the terms of the insurance policies, to Bankruptcy Court approval under Bankruptcy Rule 9019 where required which apply before and after the Effective Date. Any settlement of a Flood Claim embodied in the Plan is a Plan Matter reserved to the Special Committees.

On the Effective Date, the two Plan Administrators, designated in the Plan Supplement, become the sole officers of the Post-Effective Date Debtors, the persons then serving as officers are deemed to have resigned, and the Plan Administrators are appointed to each Debtor's governing body with authority to carry out the Plan without further approval, and hold the New Equity Interests as custodians. Under a Plan Administrator Agreement filed with the Plan Supplement, they may, without further order, effectuate the Plan, reconcile claims other than the Flood Claims, make distributions, liquidate Remaining Assets, prosecute, settle, or abandon the Retained Claims and Causes of Action, including avoidance actions under chapter 5 of the Bankruptcy Code and the Claims and Causes of Action of the estates against the Eastland Family and their related parties (subject to the Tolling Agreement, which binds the Post-Effective Date Debtors and the Plan Administrators and defers any direct action against an Eastland Party on the tolled claims until it terminates, as described below), retain and pay professionals, and wind up and dissolve the Debtors. Under Article IV.N of the Plan, the persons serving as directors or managers of Mystic LLC and NFP immediately before the Effective Date continue to serve on the Governing Body of the applicable Post-Effective Date Debtor, alongside the Plan Administrator, except as otherwise set forth in the Plan Supplement, and the Plan Administrators become the sole officers, directors, managers, and Governing Bodies of MC Family Partnership and MC Management. The Governing Bodies of the Post-Effective Date Debtors retain the "Post-Effective Date Debtors' Defense Rights," meaning the right to defend, and if applicable to assert

counterclaims in, the Prepetition Lawsuits and any related suits, and after the Lift Stay Date they and the Individual Defendants retain the right to defend the Wrongful Death Claims in the appropriate forum. Every other power of each Post-Effective Date Debtor is vested in the Plan Administrator. That allocation mirrors the one in place before the Effective Date under the Modified Relief: the Independent Fiduciaries (and, for MC Family Partnership and MC Management, the CRO) control the Plan, the sale, and the estates' claims against insiders, and each Debtor's full governing body, with the applicable Independent Fiduciary voting, controls the defense of the Flood Claims. The Eastland Board Members were the Debtors' officers and employees, their knowledge of the camp's operations is necessary to the defense of the Flood Claims, and, as to that defense, the interests of the estates and of the Individual Defendants are aligned: every dollar of liability avoided is a dollar preserved for creditors. The Plan Supplement will contain the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtors' New Organizational Documents, and the post-Effective Date budget. The Plan Administrator Agreement, the identities and compensation of the Plan Administrators, the schedule of Retained Claims and Causes of Action, and, if the Bankruptcy Court has not ruled on the Independent Fiduciary Motion by then, the Tolling Agreement (Exhibit G) will be filed before the hearing on this Disclosure Statement, so that no term bearing on the Eastland family's role is left to a later filing.

**D. Classification and Treatment of Claims and Interests**

Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and United States Trustee fees are not classified. All other claims and interests fall into eight Classes that apply, Debtor by Debtor, to each of the four estates; a creditor with claims against two Debtors holds a claim in the same-numbered Class at each, votes at each if the Class is a Voting Class, and receives a distribution from each, but never more than its allowed claim in total. The Flood Claims are classified separately from other general unsecured claims because they must be liquidated outside the Bankruptcy Court, recover first from insurance, and require a procedure for lifting the stay. The Deposit Claims are classified separately because they are entitled to priority under section 507(a)(7) up to $3,800 and because the Plan offers the Deposit Election. The Debtors believe the classification satisfies section 1122 of the Bankruptcy Code. A Class with no allowed claim at a Debtor as of the Confirmation Hearing is disregarded for voting and confirmation at that Debtor.

| Class | Claims or Interests | Impaired? | Voting | Treatment |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | Paid in full in cash on the Effective Date or when allowed. |

| Class | Claims or Interests | Impaired? | Voting | Treatment |
|---|---|---|---|---|
| 2 | Deposit Claims | Impaired | Entitled to vote | At the holder's election, paid in full in cash on the Effective Date or when allowed, or, if the Stalking Horse Purchaser or another bidder that will continue to operate a camp on the property is the Successful Bidder, transferred in the full amount of the Deposit Claim to the applicable Purchaser and held in a segregated account as a credit toward future camp sessions (the Deposit Election). |
| 3 | Other Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | Paid in full in cash, or the collateral surrendered with any interest due under section 506(b), or otherwise left unimpaired. |
| 4 | Wrongful Death Claims | Impaired | Entitled to vote | Liquidated in the tort system after the Lift Stay Date; each allowed claim is paid first, pro rata, from the Debtors' insurance until the applicable occurrence limits are exhausted, and then, pro rata with Class 5, from the applicable GUC Escrow Account. |
| 5 | General Unsecured Claims | Impaired | Entitled to vote | Pro rata share, together with Class 4, of the applicable GUC Escrow Account; a claim assumed by a Purchaser is deemed paid in full. |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not entitled to vote (presumed to accept or deemed to reject) | Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution, or such other treatment as the Plan Administrators reasonably determine. |
| 7 | Intercompany Interests | Unimpaired | Not entitled to vote (presumed to accept) | Left unaltered; the interests remain effective and outstanding for administrative convenience, held by the same entity that held them before the Effective Date, subject to the Plan Administrators' authority under Article IV.G of the Plan to merge, dissolve, or liquidate the Post-Effective Date Debtors, and no property is distributed on account of them. |
| 8 | Existing Equity Interests | Impaired | Not entitled to vote (deemed to reject) | Discharged, cancelled, released, and extinguished on the Effective Date, with no recovery to holders; one new limited partnership interest in MC Family Partnership and one new membership interest in MC Management are issued to each of the Plan Administrators to hold as custodians for the former holders in the event all Allowed Claims are paid in full, and are deemed cancelled when the Chapter 11 Cases are closed. |

**Estimated recoveries.** The Debtors cannot estimate the percentage recovery on Flood Claims or other general unsecured claims and will not do so in a way that could be mistaken for a

valuation of any family's loss. The recovery depends on the price the assets bring at auction and its allocation between the two estates, the insurance proceeds actually recovered, the total amount of allowed general unsecured claims, the cost of administering the estates through the last distribution, and the aggregate amount at which the Flood Claims are finally allowed. The liquidation analysis attached as **Exhibit B** presents the Debtors' framework for estimating the funds available under the Plan and in a hypothetical chapter 7 liquidation.

## E. Treatment of the Flood Claims

The Plan defines "Wrongful Death Claims," which this Disclosure Statement calls Flood Claims, as every claim for personal injury, wrongful death, or survival against any "Covered Party" arising in whole or in part from the July 4, 2025 flood, under any theory, including the claims asserted or assertable in the Prepetition Lawsuits and the claims of the four families who had not sued as of the Petition Date; the Covered Parties are the Debtors, the Post-Effective Date Debtors, the Individual Defendants, and their related persons to the extent covered by the Debtors' insurance and indemnification obligations. The Plan does not channel, release, or enjoin the Flood Claims against the Individual Defendants. Each family remains free to pursue them, subject to the pending stay litigation.

No Flood Claim is adjudicated by the Bankruptcy Court. On the "Lift Stay Date," which is thirty (30) days after the later of (a) the ruling of the United States District Court for the Southern District of Texas on the Transfer Motion (Case No. 4:26-mc-01321) and (b) the ruling of the United States District Court for the Western District of Texas or the Southern District of Texas, as applicable, on the motions to abstain and remand pending in the Prepetition Lawsuits, the automatic stay is modified without further order to permit each family to liquidate its Flood Claim against the Post-Effective Date Debtors in the forum where the Prepetition Lawsuits are then pending. A family that has not sued may also commence its action there. A final judgment allows the Flood Claim against the applicable Debtor in the amount of the judgment. Each allowed Flood Claim is paid first, pro rata, from the Debtors' insurance until the applicable occurrence limits are exhausted, and second, for any balance, pro rata with the allowed general unsecured claims of the applicable Debtor from that Debtor's GUC Escrow Account. A family with allowed Flood Claims against more than one Debtor shares in each Debtor's GUC Escrow Account but may not recover more than one hundred percent of its allowed claim. No distribution will be made on a claim payable under an insurance policy until the holder has exhausted its remedies against the insurer, and a claim paid by a third party is reduced accordingly. The Plan assumes the insurance policies and preserves every right under them. The Debtors have offered mediation to the Families and the Committee at every stage of these cases and renew the offer.

## F. Treatment of Camper Deposit Claims

The portion of each family's deposit or tuition payment entitled to priority under section 507(a)(7) of the Bankruptcy Code (up to $3,800 per family) is a "Deposit Claim" in Class 2. Each holder receives, at its election on the ballot, either cash in the allowed amount on the Effective Date or as soon as practicable after allowance, or the transfer of the full amount of the Deposit Claim to the CM Purchaser or the NFP Purchaser, as applicable, to be held in a segregated account and credited toward future camp sessions (the "Deposit Election"), which is available only if the Stalking Horse Purchaser, or another bidder that will continue to operate a camp on the property,

is the Successful Bidder. The portion of a deposit above $3,800 (an "Excess Deposit Claim") is a Class 5 General Unsecured Claim and shares pro rata with the other General Unsecured Claims and the Flood Claims against Mystic LLC in that estate's GUC Escrow Account.

**G. Administrative Claims, Professional Fees, and Priority Claims**

Allowed administrative expense claims are paid in full in cash on the Effective Date or, if allowed later, within forty-five days after the allowance order becomes final. If the Stalking Horse Purchaser is not the Successful Bidder for the NFP Assets, its bid protections under the Stalking Horse APA are allowed administrative claims with priority over other administrative claims and are paid without further order. Requests for payment of administrative expenses (other than professional fee claims, section 503(b)(9) claims, United States Trustee fees, and claims already allowed or asserted by a timely proof of claim) must be filed within thirty days after the Effective Date (the "Administrative Claims Bar Date") or are barred. Professionals must file final fee applications within forty-five days after the Effective Date. Allowed fees are paid first from a Professional Fee Reserve Account funded before the Effective Date on the basis of each professional's estimate, then from Available Cash. After the Effective Date the Plan Administrators may retain and pay professionals without court approval. Priority tax claims are paid in full in cash or as section 1129(a)(9)(C) permits. Class 1 Other Priority Claims are paid in full in cash. The United States Trustee fees are paid when due until each case is closed.

**H. Intercompany Claims, Insider Claims, Indemnification Claims, and Equity**

**Intercompany Claims (Class 6).** Mystic LLC's note claim against NFP, scheduled at $5,743,657.53, and any other claim of one Debtor against another, including under the 2019 Lease, the refunded rent, and the prepaid 2025 percentage rent, are all Intercompany Claims, which on the Effective Date are "Reinstated, set off, settled, distributed, contributed, cancelled, and released without any distribution," or receive "such other treatment as is reasonably determined by the Plan Administrators." The Plan directs the Plan Administrators to choose the treatment "that is most beneficial to the Holders of General Unsecured Claims and Wrongful Death Claims." The 2019 Lease, unless assumed or rejected earlier, is deemed rejected on the Effective Date.[155] Because the Flood Claims are asserted against both estates, the treatment of the note principally affects the relative recoveries of NFP's other creditors and the creditors of Mystic LLC who are not also creditors of NFP (the camper families and employees).

**The Eastland trust notes and the Tolling Agreement.** The two promissory notes held by the Eastland Trusts against NFP, described above in the discussion of NFP's liabilities, are Promissory Notes Claims classified as General Unsecured Claims against NFP in Class 5. The Debtors' estates may hold Claims, Causes of Action, counterclaims, setoffs, rights of recoupment, and objections, including under section 502(d) of the Bankruptcy Code, with respect to the Promissory Notes Claims and the other Claims of the Eastland Parties, and the merits of those Claims and of the estates' objections may depend on the outcome of the Flood Claims litigation. The Debtors and the Eastland Parties have therefore agreed to the form of the Tolling Agreement, which is filed as Exhibit B to the Reply and which allows the Flood Claims litigation to proceed while every right of the estates against the Eastland Parties is preserved. The Eastland Parties are

[155] 11 U.S.C. § 365(d)(4).

Willetta A. Eastland; George A. Eastland, individually and as representative of the Estate of Richard G. Eastland; Edward S. Eastland; Richard G. Eastland, Jr.; Mary E. Eastland; the trustees of the 1990 Richard G. Eastland Generation-Skipping Trusts and of the Richard G. Eastland Appointment Trust; and William Neely Bonner III. Its principal terms are these.[156]

**Scope.** The Tolling Agreement applies to (a) every claim, right, demand, and cause of action, known or unknown, that the Debtors or their estates hold or may hold against any Eastland Party as of its effective date, whether under the Bankruptcy Code, including chapter 5, or under other applicable law, including the claims retained under the Plan that vest in the Post-Effective Date Debtors, the Plan Administrators, or another estate representative (the "**Estate Claims**"), and (b) every objection, counterclaim, setoff, recoupment, and defense, including under sections 502(d) and 502(e)(1)(B) of the Bankruptcy Code, to any proof of claim or scheduled claim of an Eastland Party against any Debtor (the "**Claim Objections**"). The Eastland Claims include the indemnification claims scheduled by each Debtor, the proofs of claim the Eastland Parties filed on September 18, 2026, which are listed on Schedule 1 to the Tolling Agreement, the Promissory Notes Claims, Mr. Bonner's claim for accrued compensation, and every other claim an Eastland Party asserts against any Debtor. The Estate Claims include claims to avoid and recover transfers under sections 544 through 553 of the Bankruptcy Code and chapter 24 of the Texas Business and Commerce Code, claims for breach of fiduciary duty and unjust enrichment, claims relating to the Debtors' insurance program and the allocation of insurance proceeds and defense costs, and claims for equitable subordination and recharacterization.

**Tolling.** The Estate Claims are tolled from the Petition Date, and the Claim Objections from the effective date of the Tolling Agreement, until the Tolling Agreement terminates. No time that elapses during the applicable tolling period counts toward any statute of limitations, statute of repose, laches period, or other deadline, including the periods under sections 546(a) and 549(d) of the Bankruptcy Code, chapter 16 of the Texas Civil Practice and Remedies Code, section 24.010 of the Texas Business and Commerce Code, and Bankruptcy Rule 3007, and any deadline under the Plan to object to claims or to commence retained causes of action. A period that had not begun to run when the tolling period began begins when it ends, a period that had begun resumes with its unexpired portion, and no period applicable to an Estate Claim expires earlier than ninety days after the tolling period ends. The Tolling Agreement revives no claim or objection that was already barred when the tolling period began, and it does not alter any claim.

**Standstill.** While the Tolling Agreement is in effect, neither the Debtors nor any estate representative will commence an action against an Eastland Party on an Estate Claim, and no Eastland Party will commence a direct action against the Debtors concerning the tolled claims or seek the allowance, estimation (other than for voting), payment, or setoff of any Eastland Claim. The standstill does not restrict any party's response to an action, motion, objection, or contested matter brought by another party; any Eastland Party's defense of a Flood Claim, or the defense and conduct of the Flood Claims by the Debtors' governing bodies; any party's right to vote on, support, or object to the Plan or this Disclosure Statement; the Debtors' evaluation of the tolled claims, including examinations under Bankruptcy Rule 2004; or an action the Debtors determine is necessary to preserve or pursue rights against a person who is not a party, including one in which

[156] Reply Part VI and Exhibit B (Tolling Agreement) ¶¶ 1–16 and Schedule 1.

an Eastland Party is joined as a necessary party. Each party must preserve the documents, records, and electronically stored information that relate to the tolled claims.

**The Eastland Claims under the Plan.** The deadline for the Debtors and any estate representative to object to any Eastland Claim on any ground, and to assert any counterclaim, setoff, recoupment, subordination, or defense to it, including under section 502(d) of the Bankruptcy Code, is extended to the termination of the Tolling Agreement, notwithstanding the Claims Objection Deadline or Bankruptcy Rule 3007, and the Plan will so provide; the Eastland Parties consent to that provision. Until an Eastland Claim is allowed by a final order or by written agreement with the estates' representative, it is treated as a Disputed Claim under the Plan and reserved for as the Plan provides for Disputed Claims, and no Distribution will be made on it. The Eastland Parties consent to that treatment without admitting anything about the merits of any Eastland Claim or any objection to it. Nothing in the Tolling Agreement obligates the Debtors to defer any objection or prevents the estates' representative from resolving an Eastland Claim by agreement before the extended deadline, and no Eastland Party may sell, assign, or pledge an Eastland Claim unless the transferee first agrees in writing to be bound by the Tolling Agreement.

**The estates' representative.** During the Chapter 11 Cases, the Debtors act with respect to the tolled claims through the Special Committees (or, for MC Family Partnership and MC Management, through the CRO) as authorized by the order granting the Independent Fiduciary Motion. After the Effective Date, the representative designated in the Plan or the Confirmation Order to hold the Estate Claims and the Claim Objections, whether the Post-Effective Date Debtors acting through the Independent Fiduciaries, the Plan Administrators, or another representative appointed under section 1123(b)(3)(B) of the Bankruptcy Code, holds them, and any trustee appointed in the Chapter 11 Cases, or in a chapter 7 case to which any of them is converted, may enforce the Tolling Agreement. The Plan vests the Estate Claims and the Claim Objections in the Plan Administrators, who are independent of the Eastland Parties and who will evaluate the Estate Claims and determine in their independent judgment whether to pursue, settle, or release any of them. Nothing in the Tolling Agreement releases, waives, or impairs any Estate Claim or Claim Objection, and the Debtors do not intend the Plan to release any Estate Claim other than through a settlement entered into by the estates' representative and approved by the Bankruptcy Court.

**Duration and termination.** The Tolling Agreement terminates ninety days after the delivery of a written notice that the "Final Adjudication" has occurred, meaning the first date on which every Flood Claim asserted against any Debtor or any Eastland Party has been resolved, in whichever forum it was determined, by a judgment or order that is no longer subject to appeal, rehearing, or a petition for certiorari; by a written settlement, approved by the Bankruptcy Court where approval is required, together with the dismissal with prejudice of the claims it resolves; or by a final order in the Chapter 11 Cases allowing or disallowing the claim. The resolution of some but not all of the Flood Claims is not a Final Adjudication. Either the Eastland Parties or the estates' representative may give the notice, so the Debtors need not wait on the Eastland Parties, and any dispute over whether or when a Final Adjudication occurred is decided by the Bankruptcy Court, with no tolled deadline expiring earlier than thirty days after that determination becomes a final order. Conversion or dismissal of any Chapter 11 Case, the appointment of a trustee or examiner, Confirmation, the Effective Date, and the dissolution of any Debtor do not terminate the Tolling Agreement, and its tolling, claims-treatment, estate-representative, defense-preservation, no-admission, notice, jurisdiction, and successor provisions survive termination.

**Successors, insurance, and no admission.** The Tolling Agreement binds, and may be enforced without further action by, the Post-Effective Date Debtors, the Plan Administrators, any trustee appointed in the Chapter 11 Cases or in a chapter 7 case to which a Chapter 11 Case is converted, and any other estate representative, and the Debtors may assign it to any estate representative without the Eastland Parties' consent. It is not an admission of liability by any party or of the existence, merit, amount, priority, or value of any claim; it and the negotiations leading to it are subject to Rule 408 of the Federal Rules of Evidence and Rule 408 of the Texas Rules of Evidence; and it neither expands nor limits any Eastland Party's right to a defense or to coverage under the Debtors' insurance policies, any Debtor's rights under those policies, or the allocation of insurance proceeds and defense costs between the Debtors and the Eastland Parties, which is governed by the policies, the Plan, and orders of the Bankruptcy Court. The Bankruptcy Court has exclusive jurisdiction over any dispute under the Tolling Agreement, consistent with the retention of jurisdiction under the Plan.

**Authorization and approval.** Because the Tolling Agreement is a Conflict Matter, it is approved and signed for Mystic LLC and NFP by their Special Committees, with every manager or director who is an Eastland Party abstaining, and for MC Family Partnership and MC Management by the CRO under written consents of their governing bodies, with the approval of both Independent Fiduciaries and with every member who is an Eastland Party abstaining. If it is signed before the Bankruptcy Court rules on the Independent Fiduciary Motion, the CRO signs for each Debtor on notice to counsel for the Committee, subject to ratification by the Special Committees within twenty days after the order is entered, failing which any party may terminate the Tolling Agreement. The Debtors seek approval of the Tolling Agreement under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 in the order granting the Independent Fiduciary Motion; if the Bankruptcy Court has not ruled before the hearing on this Disclosure Statement, the Debtors will file the Tolling Agreement as Exhibit G to this Disclosure Statement or with the Plan Supplement and may seek its approval in the Confirmation Order. If the Bankruptcy Court declines to approve it, the Tolling Agreement remains effective as a tolling agreement to the fullest extent permitted without approval. The Tolling Agreement is effective as to each Eastland Party on that party's signature, whether or not every Eastland Party has signed, and it is not a condition to Confirmation or to the Effective Date.

**Indemnification claims.** The Plan defines the Debtors' "Indemnification Obligations" as their obligations under leases and organizational documents in place on the Petition Date to indemnify current and former officers, directors, agents, members, managers, general partners, employees, and lessors, and it retains, as Retained Claims and Causes of Action, every cause of action relating to the Insurance Policies and the Indemnification Obligations. The Plan does not provide for the assumption of any Indemnification Obligation. Each Individual Defendant's claim for indemnification of a flood-related judgment, settlement, or defense is a prepetition General Unsecured Claim subject to every objection. The indemnification claims of the Eastland Parties are Eastland Claims under the Tolling Agreement: the deadline to object to them is extended until the Tolling Agreement terminates, and no distribution will be made on any of them unless and until it is allowed by a final order or by written agreement with the estates' representative. The Individual Defendants' defense in the Prepetition Lawsuits is provided by the Debtors' insurers under the policies; no estate funds pay it.

**Claims of the estates against insiders.** The "Retained Claims and Causes of Action," listed in a schedule filed with the Plan Supplement, will include all claims relating to the insurance policies and indemnification obligations, the flood-related claims of the Post-Effective Date Debtors, and all claims of the estates against the Eastland Family, the Eastland Trusts, and their related parties, including every claim against an Eastland Party, each of which is tolled and preserved under the Tolling Agreement described above (which the Plan refers to as the "Avoidance Actions Tolling Agreements"). The Retained Claims and Causes of Action are excluded from the releases, vest in the Post-Effective Date Debtors, and may be prosecuted, settled, or abandoned by the Plan Administrators without further order, and no person may rely on the absence of a specific reference to a cause of action as an indication that it will not be pursued. The Debtors intend that every claim of the estates against any member of the Eastland family, any Eastland trust, and any equity holder be preserved for investigation by the Plan Administrators.

**Equity (Classes 7 and 8).** The "Intercompany Interests" (Class 7) are Mystic LLC's and NFP's equity held by MC Family Partnership and the general partner interest in MC Family Partnership held by MC Management. The "Existing Equity Interests" (Class 8) are the interests in MC Family Partnership and MC Management held by persons other than the Debtors: the limited partner interests held by the three Eastland sons and by the two trusts for the benefit of two granddaughters, the preferred interests retained by Richard G. and Willetta A. Eastland, and the membership interests in MC Management. On the Effective Date all Existing Equity Interests are discharged, cancelled, released, and extinguished, and their holders receive no recovery on account of them. One new limited partnership interest in MC Family Partnership and one new membership interest in MC Management are issued to each of the Plan Administrators to hold as custodians for the former holders of the Existing Equity Interests in the event that all Allowed Claims are satisfied in full, and, unless the Plan Administrators determine otherwise, those new interests are deemed cancelled when the Chapter 11 Cases are closed. The Intercompany Interests (Class 7) are unimpaired: their legal, equitable, and contractual rights are unaltered by the Plan and remain effective and outstanding for administrative convenience, held by the same entity that held them before the Effective Date (subject to the Plan Administrators' authority under Article IV.G of the Plan to merge, dissolve, or liquidate the Post-Effective Date Debtors), and no property is distributed on account of them; any surplus of the Mystic LLC or NFP estate after every Allowed Claim against that Debtor has been paid in full accordingly flows through those retained interests to the MC Family Partnership estate. Class 8 is impaired and, because its holders receive no recovery, is deemed to reject the Plan under section 1126(g), so its holders are not entitled to vote. The cancellation of the Existing Equity Interests and the issuance of the New Equity Interests to the Plan Administrators leave no member of the Eastland family with any ownership interest in, or control of, any Post-Effective Date Debtor; the Eastland Board Members' limited continuing role in the defense of the Flood Claims, described above, derives from Article IV.N of the Plan and the New Organizational Documents, and the Plan Supplement may modify it. The forms of the New Organizational Documents will be filed as part of the Plan Supplement.

## I. Means of Implementation, Distributions, and Claims Administration

On the Effective Date, the Plan Administrators establish a separate escrow account for each Debtor, fund it with that Debtor's "Distributable Cash" (its Available Cash after allowed administrative, priority, tax, deposit, secured, and professional fee claims and the Wind Down Amount are funded), and distribute the funds to holders of that Debtor's allowed Flood Claims

and general unsecured claims. Any surplus in the Wind Down Reserve is transferred to the GUC Escrow Accounts in proportion to each Debtor's contribution. All Remaining Assets, including the Retained Claims and Causes of Action, vest in the applicable Post-Effective Date Debtor free and clear. Transfers under the Plan are exempt from stamp, transfer, and similar taxes under section 1146(a) of the Bankruptcy Code; and each Debtor is dissolved when its distributions are complete. Distributions under $100 need not be made. Undeliverable distributions unclaimed for 180 days revert to the Post-Effective Date Debtors, except that undeliverable amounts from the final distribution are deemed unclaimed 90 days after the distribution date. The Plan Administrators may set off estate claims against distributions on fourteen days' notice. The Plan Administrators may act through a Disbursing Agent, whose fees are paid from the Wind Down Reserve and which is exculpated for its distributions except for gross negligence, willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts. No postpetition interest accrues on any claim except as bankruptcy law requires. The Committee dissolves on the Effective Date, and neither the Debtors nor the Plan Administrators pay fees or expenses that its members or advisors incur after that date. The Plan Administrators alone may object to, settle, and reconcile claims other than the Flood Claims, without court approval. Claim objections must be filed within 180 days after the Effective Date (the "Claims Objection Deadline"), which the Plan Administrators or the Post-Effective Date Debtors may extend by presenting an order to the Bankruptcy Court, except that the deadline to object to the Eastland Claims, and to assert any counterclaim, setoff, recoupment, subordination, or section 502(d) defense to them, is extended under the Tolling Agreement to the termination of the Tolling Agreement, and the Plan will so provide. Claims may be estimated under section 502(c), and no distribution will be made on a disputed claim until it is allowed.

**J. Executory Contracts and Unexpired Leases**

On the Effective Date every executory contract and unexpired lease not previously assumed or rejected, not listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, and not the subject of a pending motion or unresolved cure dispute is deemed rejected. Contracts assumed and assigned to a Purchaser transfer with any monetary default cured on the Effective Date. A counterparty that fails to object to an assumption or cure amount within the time the Solicitation Order provides is deemed to consent. A claim for rejection damages must be filed within thirty days after the Effective Date or is barred; if allowed, rejection damages claims are classified as Class 5 General Unsecured Claims. The Debtors' insurance policies are deemed assumed under the Plan and will continue in accordance with their terms. The Debtors' employee compensation and benefit plans will be rejected on the Effective Date.

**K. Releases, Exculpation, and Injunction**

**The Debtor Release.** On the Effective Date the Debtors, the Post-Effective Date Debtors, and their estates release the "Released Parties" from every claim and cause of action, including derivative claims and Avoidance Actions, arising before the Effective Date from the Debtors, their capital structure, management, ownership, and operation, the transactions or events giving rise to any claim treated in the Plan, the Chapter 11 Cases, the Sale Transactions, and the Plan, except (i) post-Effective Date obligations under the Plan, (ii) claims determined by final order to have resulted from actual fraud, willful misconduct, or gross negligence, (iii) the Retained Claims and Causes of Action, and (iv) any claim against a Non-Released Party. The Released Parties are the Debtors, the Plan Administrators, the CM Purchaser, the NFP Purchaser, the Stalking Horse

Purchaser, and each of their "Related Parties"; the term does not include any Non-Released Party. A "Non-Released Party" is any Individual Defendant or Related Party of an Individual Defendant, but "only with respect to a Cause of Action for which such Entity is found liable by a Final Order of a court of competent jurisdiction for a Wrongful Death Claim arising from the July 4, 2025, flood."

**The Third-Party Release.** Each holder of a claim or interest that affirmatively opts in on its ballot or notice of non-voting status (the "Release Opt-In") releases the Released Parties from claims arising from the same subjects, except claims arising from a Released Party's willful misconduct, actual or criminal fraud, or gross negligence, post-Effective Date obligations, and claims against any Non-Released Party. Only a holder that opts in is a Releasing Party; a holder that does not opt in is not bound by the Third-Party Release. The Release Opt-In will be provided in each ballot and notice of non-voting status package, consistent with the Procedures for Complex Chapter 11 Cases in the Southern District of Texas.

**Exculpation.** The Plan exculpates the Debtors and the Committee and its members, each solely in its capacity as such (the "Exculpated Parties"), from any claim related to any act or omission taken or omitted to be taken before or during the Chapter 11 Cases, on or before the Effective Date, in connection with, relating to, or arising out of the Chapter 11 Cases; the formulation, preparation, dissemination, or negotiation of any document in connection with the Chapter 11 Cases, including this Disclosure Statement, the Plan, the Plan Supplement, and the Sale Documents; the pursuit of confirmation and consummation; and the administration and implementation of the Chapter 11 Cases and the Plan and the distribution of property under it (the "Exculpated Claims"), except for any act or omission determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. The Exculpated Parties are deemed to have acted in good faith and in compliance with applicable law in the solicitation of the Plan and the distributions under it. No member of the Eastland family or Eastland Trust is an Exculpated Party, nor is Mr. Bonner. The Independent Fiduciaries and the Plan Administrators are not Exculpated Parties under the Plan as filed. In the Reply, the Debtors withdrew their request that the order on the Independent Fiduciary Motion exculpate the Independent Fiduciaries and asked instead for the gatekeeping provision described above, which exculpates no one. Whether the Independent Fiduciaries, as disinterested fiduciaries who act with the rights and powers of a trustee, are entitled to exculpation under the Plan will be decided by the Bankruptcy Court at the Confirmation Hearing under section 1125(e) of the Bankruptcy Code and the law of this Circuit, including *In re Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022); the Debtors reserve the right to seek that relief by modification of the Plan or in the Confirmation Order, and the rights of the United States Trustee and every other party in interest to be heard on that question are preserved. The Plan Administrators' protection for their conduct after the Effective Date is the indemnification provided by the Plan and the Plan Administrator Agreement, which does not extend to bad faith, gross negligence, willful misconduct, or criminal conduct.

**Injunction.** From the Effective Date, every holder of a claim or interest that is released, discharged, or exculpated under the Plan is permanently enjoined from commencing or continuing any action, enforcing any judgment or lien, or asserting any setoff, subrogation, or recoupment against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties on account of that claim or interest, and every holder is enjoined from interfering with the implementation of the Plan. The injunction reaches only claims the Plan releases or exculpates; it

does not enjoin the Flood Claims against the Post-Effective Date Debtors, which the Plan sends to the tort system, or any claim against a Non-Released Party.

**L. Conditions to the Effective Date, Retention of Jurisdiction, and Modification**

The Effective Date occurs when each of these conditions has been satisfied or waived: (1) the Bankruptcy Court has approved the NFP Sale Transaction and the CM Sale Transaction in a form acceptable to the Purchasers, and every closing condition other than the Effective Date has been satisfied; (2) the Bankruptcy Court has approved this Disclosure Statement; (3) the Confirmation Order has been entered and not stayed, reversed, vacated, or amended; (4) all necessary authorizations, consents, and regulatory approvals have been obtained; (5) the Professional Fee Reserve Account has been funded; (6) the Plan Administrators have accepted their appointment; (7) all required governmental and third-party filings have become effective; (8) all Effective Date documents have been executed; (9) all United States Trustee fees then due have been paid; and (10) the Restructuring Transactions have been consummated. The Debtors may waive any condition without further order, except that a condition relating to a Sale Transaction may be waived only with the consent of the applicable Purchaser.

After the Effective Date, the Bankruptcy Court retains exclusive jurisdiction over the matters the Plan reserves to it, including claims, fee applications, contract disputes, the interpretation and enforcement of the Plan, the Confirmation Order, and the Sale Documents, the release, injunction, and exculpation provisions, distributions, the Retained Claims and Causes of Action, and the Tolling Agreement, which provides for the Bankruptcy Court's exclusive jurisdiction over disputes under it; provided, that the Plan provisions lifting the automatic stay and permitting liquidation of the Flood Claims in an appropriate forum "shall be given full force and effect." The Debtors may amend or modify the Plan before or after confirmation as section 1127 of the Bankruptcy Code permits, subject to any consent or consultation rights in the APAs, and may revoke or withdraw the Plan as to any Debtor before the Effective Date. The Confirmation Order approves every modification made since solicitation without resolicitation, and the Plan binds every holder of a claim or interest whether or not the holder voted.

## ARTICLE VIII.
## VOTING AND CONFIRMATION

**A. The Disclosure Statement Hearing**

The Bankruptcy Court will hold a hearing on **[date]** to consider whether this Disclosure Statement contains adequate information under section 1125 of the Bankruptcy Code and whether to approve the procedures for soliciting votes (the "Solicitation Procedures"). Objections must be filed and served by **[date]**. The Debtors may revise this Disclosure Statement before or at that hearing to address objections and rulings, including the Bankruptcy Court's rulings on the matters heard on October 9, 2026.

**B. Who May Vote**

Only holders of claims in impaired Classes that will receive or retain property under the Plan are entitled to vote: Class 2 (Deposit Claims), Class 4 (Flood Claims), and Class 5 (General

Unsecured Claims) at each Debtor (the "**Voting Classes**"). Holders of Class 1 and Class 3 claims are unimpaired, are conclusively presumed to accept the Plan under section 1126(f), and will not vote. Holders of Class 6 Intercompany Claims and Class 7 Intercompany Interests are not entitled to vote. Class 8 (Existing Equity Interests) is impaired, its holders receive no recovery, and it is deemed to reject the Plan under section 1126(g); its holders are not entitled to vote. Every holder of a claim or interest, whether or not entitled to vote, will receive a ballot or a notice of non-voting status that includes the Release Opt-In.

A holder of a Flood Claim deemed filed under the Bar Date Order votes in Class 4 at each Debtor against which its claim is deemed filed. Because the Flood Claims are unliquidated, the Debtors will ask the Bankruptcy Court, in the Solicitation Order, to allow each Flood Claim temporarily for voting purposes only, without any effect on the allowance or amount of any claim, in the amount of **[$1.00 or an amount fixed by the Bankruptcy Court in the Solicitation Procedures]**, so that each family's vote counts equally and no family is asked to state, for voting purposes, what its loss is worth. Any party may ask the Bankruptcy Court to allow a claim in a different amount for voting purposes under Bankruptcy Rule 3018(a). Other claims will be counted in the amount scheduled as undisputed, noncontingent, and liquidated, or in the amount stated in a timely proof of claim, unless the Bankruptcy Court orders otherwise. Each holder of a Class 2 Deposit Claim votes in the amount of its claim up to $3,800 and may make the Deposit Election on its ballot. A family whose deposit exceeds $3,800 also holds a Class 5 claim for the excess and will receive a Class 5 ballot. A holder of a claim against more than one Debtor votes at each, as the Solicitation Procedures provide.

**C. How to Vote**

If the Bankruptcy Court approves this Disclosure Statement, Epiq will mail each holder of a claim in a Voting Class a ballot, a copy of this Disclosure Statement and the Plan (in paper, on a flash drive, or by a link to Epiq's website, as the Solicitation Procedures provide), and instructions. To be counted, a ballot must be actually received by Epiq by **[Voting Deadline]** at 5:00 p.m. (prevailing Central Time), by mail, by overnight delivery, or through Epiq's online balloting portal at **[address]**. Ballots sent by email or fax will not be counted. A ballot that does not indicate an acceptance or rejection, or that indicates both, will not be counted. A ballot may be changed or withdrawn before the Voting Deadline by delivering a later-dated ballot to Epiq. Questions about voting may be directed to Epiq at **[telephone and email].** Epiq cannot give legal advice.

**D. Acceptance by a Class**

A class of claims accepts the Plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class that actually vote cast their votes to accept.[157] Votes not cast in good faith may be designated and disregarded under section 1126(e). Under the Plan, a Voting Class in which no holder casts a vote is presumed to have accepted the Plan.

---

[157] 11 U.S.C. § 1126(c).

**E. The Confirmation Hearing**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[date and time]**, in Courtroom 402, 515 Rusk Street, Houston, Texas 77002, or by video connection as the Bankruptcy Court directs. The Confirmation Hearing may be continued without further notice other than an announcement in open court or a notice filed on the docket. Objections to confirmation must be in writing, must state the grounds with specificity, and must be filed with the Bankruptcy Court and served on Debtors' counsel, Committee counsel, and the United States Trustee so as to be received by **[the Plan Objection Deadline]** at 5:00 p.m. (prevailing Central Time).

| | |
|---|---|
| **Debtors** | Camp Mystic, LLC<br>8911 N Capital of Texas Hwy, Suite 2120<br>Austin, Texas 78759<br>Attn: Karen Nicolaou, CRO |
| **Counsel to the Debtors** | Vartabedian Katz Hester & Haynes LLP<br>2200 Ross Avenue<br>Suite 5000<br>Dallas, TX 75201<br>Attn: Martin Sosland, Jeff Prostok, Candice Carson, Deirdre Brown, Suzanne K. Rosen, Emily S. Chou and Lynda L. Lankford |
| **United States Trustee** | Office of the United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn: Jana Smith Whitworth and Jayson B. Ruff |
| **Counsel to the Committee** | Willkie Farr Gallagher LLP<br>787 Seventh Ave.<br>NewYork, NY10019<br>Attn: Brett Miller and James Burbage |

**F. Requirements for Confirmation**

To confirm the Plan the Bankruptcy Court must find that the Plan satisfies section 1129(a) of the Bankruptcy Code and, if any impaired class rejects the Plan, section 1129(b). The principal requirements are that the Plan and the Debtors comply with the Bankruptcy Code and that the Plan has been proposed in good faith; that the identity of each Plan Administrator be disclosed and the appointment be consistent with the interests of creditors and public policy; that each holder of an impaired claim either accept the Plan or receive at least as much as it would receive in a chapter 7 liquidation; that each impaired class accept the Plan, or that the Plan satisfy section 1129(b) as to any rejecting class, and that at least one impaired class of non-insider claims accept; that administrative and priority claims be paid as section 1129(a)(9) requires; and that confirmation not be likely to be followed by liquidation or the need for further reorganization, except as the Plan itself proposes.[158] The Debtors believe that a plan that sells the estates' assets in an open process, provides for the liquidation of the Debtors, pays priority and deposit claims in full, allows the

[158] 11 U.S.C. § 1129(a)(1)–(5), (7)–(12).

Flood Claims to proceed in an appropriate forum, and preserves the remaining value of the estates for the Debtors' unsecured creditors satisfies the good-faith standard.

**G. The Best Interests Test and the Liquidation Analysis**

In a chapter 7 liquidation, a trustee appointed by the United States Trustee would take possession of the four estates, retain new counsel and advisors, and sell the camp assets, most likely without a stalking horse bid or the marketing process the Debtors have designed, and under time pressure created by the carrying costs of a property that generates no income. The trustee's commission and the fees of the trustee's professionals would be paid ahead of every prepetition claim. The trustee would face the same Flood Claims, the same insurance limits, and the same requirement that the Flood Claims be tried in the district courts, but with no plan structure coordinating the insurance, the reserves, and the distributions. The Deposit Claims, which the Plan pays in full on the Effective Date or transfers to the Purchaser at the holders' election, would be paid only after the costs of administration, and the trademarks and goodwill, which have value only to a buyer who intends to continue the camp, would likely be abandoned. The liquidation analysis attached as **Exhibit B** compares, for each estate, the estimated distributions under the Plan with those in a hypothetical chapter 7 liquidation commencing on the Effective Date. The Debtors believe that every holder of an impaired claim will receive at least as much under the Plan as in a chapter 7 liquidation, and that holders of Flood Claims, Camper Deposit Claims, and General Unsecured Claims will receive more, and sooner.

**H. Feasibility**

The Plan is feasible because it does not depend on the Debtors' future operations. Its funding comes from the sale of the camp assets, the estates' cash, and the insurance proceeds, and its obligations after the Effective Date consist of holding those funds, litigating and paying claims, and winding down. The Wind Down Amount will be fixed by the Debtors and the Plan Administrators before the Effective Date and funded into the Wind Down Reserve. The one contingency on which the Plan depends is the closing of the sale. The Bidding Procedures require every bidder to demonstrate its ability to close, and permit the Debtors to close with the next-highest bidder if the Successful Bidder fails to do so.

**I. Confirmation Over a Rejecting Class**

If any Voting Class rejects the Plan, the Debtors will ask the Bankruptcy Court to confirm the Plan under section 1129(b), which permits confirmation if the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each rejecting Class.[159] A plan is fair and equitable as to a rejecting class of unsecured claims if either the class is paid in full or no holder of a junior claim or interest receives or retains any property under the plan on account of that junior claim or interest. The Plan cancels the Existing Equity Interests and issues the New Equity Interests to the Plan Administrators to hold as custodians, and the former holders receive nothing on account of their cancelled interests unless every Allowed Claim against the applicable Debtor has been paid in full. The Debtors will contend that this treatment is fair and equitable as to any rejecting Class of unsecured claims, because no holder of a junior interest receives or retains any property

[159] 11 U.S.C. § 1129(b)(1)–(2).

under the Plan until that Class has been paid in full. A rejecting creditor could argue that the contingent right to a surplus is property retained on account of a junior interest, or that the Class must also receive interest before any surplus reaches the former holders; if the Bankruptcy Court agrees, the Debtors may modify the treatment of Class 8 or seek the acceptance of every impaired Class. The Plan provides that acceptance by one or more of the Classes entitled to vote satisfies section 1129(a)(10), which by its terms disregards the votes of insiders.[160] The Debtors reserve the right to modify the Plan to satisfy section 1129(b) as to any rejecting Class.

This treatment follows settled law on the position of out-of-the-money equity. Section 1129(b)(2)(C) supplies the fair-and-equitable test for a rejecting class of interests: the Plan is fair and equitable as to such a class if no holder of an interest junior to it receives or retains any property under the Plan on account of that junior interest. (11 U.S.C.A. § 1129 (West)) The absolute priority rule requires that a dissenting senior class be provided for in full before any junior class can receive or retain any property under a reorganization plan, and no chapter 11 plan can be confirmed over creditors' legitimate objections if it fails to comply. (*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)) The Supreme Court has rejected the argument that equity in an insolvent enterprise may be retained because it has no value to senior creditors: even where debts far exceed the value of assets, a retained equity interest is still "property" that its holder may keep only under an accepting plan or in compliance with the absolute priority rule. (*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)) The rule traces to the long-settled principle that creditors must be paid before stockholders may retain their interests for any purpose whatever.(*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999)) Because the estates are insolvent and no senior class is paid in full, the Existing Equity Interests are cancelled and their former holders receive nothing on account of them, save the contingent right to any surplus remaining after every Allowed Claim against the applicable Debtor has been paid in full. A Texas bankruptcy court, addressing an essentially liquidating plan under which equity holders retained nothing of value, held that the cancellation of such interests does not implicate the absolute priority rule at all, because an equity interest in a defunct entity "simply does not exist."(*In re CRB Partners, LLC*, No. 11-11915-CAG, 2013 WL 796566 (Bankr. W.D. Tex. Mar. 4, 2013)) No "new value" question arises here, because no holder of an Existing Equity Interest contributes new capital or receives any interest in a reorganized enterprise; and in any event the Fifth Circuit has not decided whether a new value exception survives the Bankruptcy Code, and the exception could not aid a holder who contributes nothing.(*In re OCA, Inc.*, 357 B.R. 72 (Bankr. E.D. La. 2006); *In re OCA, Inc.*, 357 B.R. 72 (Bankr. E.D. La. 2006))

**J. Effect of Confirmation**

Confirmation binds every holder of a claim against or interest in a Debtor, whether or not the holder voted or accepted the Plan.[161] Because the Plan provides for the sale of substantially all

[160] 11 U.S.C. §§ 101(31), 1129(a)(10).

[161] 11 U.S.C. § 1141(a).

of the Debtors' assets and the Debtors will not engage in business after consummation, the Debtors will not receive a discharge under section 1141(d)(3).[162]

## ARTICLE IX.
## RISK FACTORS

**HOLDERS OF CLAIMS SHOULD READ AND CONSIDER THE FOLLOWING RISK FACTORS, TOGETHER WITH THE REST OF THIS DISCLOSURE STATEMENT, BEFORE VOTING. THESE ARE NOT THE ONLY RISKS. THEY ARE THE ONES THE DEBTORS CONSIDER MOST LIKELY TO AFFECT THE TIMING OR AMOUNT OF DISTRIBUTIONS.**

### A. Risks Relating to the Sale

**The sale may bring less than the scheduled value of the property.** The real property is scheduled at the appraisal district's tax value of $14,278,650, the CBIZ appraisal of $22,850,000 as of June 30, 2022 predates the flood and was prepared on going-concern assumptions that no longer hold, and the January 2026 appraisal prepared for a prospective lender, which values the real estate at $22,170,000 "as is" and $28,040,000 "as if complete," assumes that the existing and proposed improvements may lawfully be used or rebuilt under the floodplain regulations and predates the April 15 Injunction Order and the withdrawal of the license application. The property is the site of a flood in which twenty-eight people died; its principal cabins are subject to a temporary injunction; the Heaven's 27 Camp Safety Act bars the licensing of any camp that houses campers in cabins in a floodplain; the March 2026 construction budget put the cost of repairing and rebuilding the camp at approximately $20.6 million; and a criminal investigation is ongoing. Each of those facts may reduce the number of bidders or the prices they offer. The auction, not the Schedules, will determine value.

**The Stalking Horse Purchaser has not been identified, the Bidding Procedures have not been approved, and the sale may not close.** The Bankruptcy Court may decline to approve the Stalking Horse APA or the Bid Protections, the Committee or the Families may object to them, and the Stalking Horse Purchaser may terminate the Stalking Horse APA under its terms before the Auction. The Successful Bidder may fail to obtain financing, satisfy closing conditions, or perform. A failed closing would delay the Effective Date and distributions. Any bidder that intends to operate a camp will price the injunction and the licensing requirements into its bid.

**A sale of the property may generate tax that is paid ahead of creditors.** NFP is a C corporation. Gain on the sale of the camp property, measured against NFP's tax basis, will be subject to federal income tax, an administrative expense of the NFP estate that must be paid before any distribution to its creditors. The Debtors have not yet quantified the tax; the property has been held for decades and its basis is likely to be far below any sale price.

[162] 11 U.S.C. § 1141(c), (d)(3).

**B. Risks Relating to the Flood Claims and Insurance**

**The amount and timing of Flood Claim recoveries cannot be predicted.** The Flood Claims are contingent, unliquidated, and disputed. They will be liquidated by trial or settlement in courts whose identity has not yet been determined, on a timetable those courts will set. The first trial in the state court was set for May 3, 2027, and the removed actions have no trial settings. The stay lifts on the Lift Stay Date, which is keyed to the district courts' rulings on the pending transfer and remand motions, and liquidation may take years. If the Flood Claims are allowed in amounts approaching those the plaintiffs seek, distributions will be a small fraction of the allowed amounts. The Plan distributes the available funds ratably.

**The insurance may be insufficient, and it is shared with the Individual Defendants.** The liability coverage available for the flood is $6 million for a single occurrence, shared by every insured, including the Individual Defendants. Insurers may assert coverage defenses, including defenses based on the number of occurrences, on the fact that the policies name Camp Mystic, Inc., a corporation that had been converted to a limited liability company, and on the capacity in which each Individual Defendant was acting. The automobile insurer has reserved its rights under that policy as well. The Debtors' current understanding is that defense costs do not erode the excess policy; if they do, the coverage available for distribution is less than $6 million, and prolonged litigation reduces it further.

**The pending stay, venue, and remand motions may be decided against the Debtors.** If the Bankruptcy Court declines to extend the stay to the Individual Defendants, if the district courts remand the Prepetition Lawsuits to the state court, or if the Lift-Stay Motion is granted, the Flood Claims litigation may proceed without the Debtors, and judgments against the Individual Defendants may be entered and paid from the shared insurance before the Plan is confirmed. The Plan does not depend on any particular outcome of those motions, but the outcomes will affect the timing and amount of insurance recoveries.

**Additional claims may be filed.** Governmental units may file claims through December 21, 2026, the Governmental Bar Date, including any claim arising from the Texas Rangers' investigation and the search warrants described above. No governmental unit has asserted such a claim, and the Debtors will schedule any such potential claim as contingent, unliquidated, and disputed in their amended Schedules.

**C. Risks Relating to the Chapter 11 Cases**

**The releases and exculpation may not be approved as drafted.** Since Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024), a plan may not release claims against non-debtors without the consent of the affected claimants. The Plan's Third-Party Release is consensual and binds only those holders who affirmatively opt in. The Bankruptcy Court may nonetheless decline to approve the Third-Party Release as drafted, may narrow the Released Parties, or may decline to confirm the Plan unless the releases are modified, and the Bankruptcy Court could likewise narrow the exculpation. The United States Trustee objected to any exculpation of the Independent Fiduciaries by order on the Independent Fiduciary Motion, the Debtors withdrew that request in the Reply, and the United States Trustee's right to object to any exculpation of the Independent

Fiduciaries under the Plan is preserved; if the Debtors seek that relief at confirmation, the Bankruptcy Court may deny or narrow it.

**The Plan may not be confirmed, or may be confirmed only over objection.** The Bankruptcy Court may find that the Plan does not satisfy section 1129, or one or more Voting Classes may reject the Plan and the Bankruptcy Court may decline to confirm it over their rejection. The Plan cancels the Existing Equity Interests and gives their former holders only a contingent right to any surplus that remains after every Allowed Claim against the applicable Debtor has been paid in full. If a Class of unsecured claims rejects the Plan, a rejecting creditor could argue that the contingent surplus right is property retained on account of a junior interest within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code, or that the rejecting Class must receive post-petition interest before any surplus reaches the former holders; if the Bankruptcy Court agrees, the Debtors may be required to modify the treatment of Class 8 or to obtain the acceptance of every impaired Class. The Families and the Committee have opposed the Debtors' positions on the stay and governance, and the Committee's counsel's retention application contemplates the possibility of a plan the Committee does not support.

**The Eastland Board Members' continued role in the flood litigation may be challenged.** The Committee and the Families have said they will oppose any plan under which any member of the Eastland family holds any role. The Plan leaves the Governing Bodies in place for the limited purpose of directing the defense of the Flood Claims, the Debtors will add to the Plan, described in the summary of the Plan above. The Bankruptcy Court may find that structure inconsistent with section 1129(a)(5) or with the good-faith requirement of section 1129(a)(3), may require the Plan to be modified, or may decline to confirm it. If the Bankruptcy Court denies the Independent Fiduciary Motion, grants relief different from the Modified Relief, or grants the Trustee Motion, the governance structure described above would change, and the Plan may have to be modified.

**The estates' claims against insiders may be worth less than they appear, and insider claims may dilute recoveries.** The Debtors have not evaluated the merits of any claim arising from the transactions between the Debtors and members of the Eastland family, the Eastland Trusts, and MC Family Partnership's partners. The persons involved dispute, or may dispute, that any claim exists; Some of the transfers may be defensible as compensation, distributions from a solvent company, or ordinary course transactions, and litigation would be expensive and slow. The Plan releases no insider, and every claim of the estates against a member of the Eastland family, an Eastland Trust, or an equity holder is a Retained Claim and Cause of Action; even so, creditors should not assume any recovery from those claims. The Tolling Agreement defers the prosecution of the estates' claims against the Eastland Parties, and any objection to their claims, until ninety days after notice that every Flood Claim has been finally adjudicated, which may take years. The deferral preserves the claims and holds every Eastland Claim as a Disputed Claim, but it delays any recovery on them. If the Bankruptcy Court declines to approve the Tolling Agreement, it remains effective only to the extent permitted without approval. The Individual Defendants have also asserted contingent indemnification claims against every Debtor.

**Administrative costs will reduce distributions.** The Debtors have no income. Every month in chapter 11 consumes cash for professional fees, insurance premiums, property maintenance, employee wages, and United States Trustee fees. The Committee's counsel has

reserved the right to seek allowance of its fees, which at its stated rates could be substantial, if the Debtors confirm a plan or other resolution the Committee does not support.[163] Litigation over the stay, governance, discovery, and confirmation increases costs on every side, and the Plan gives the Bid Protections and the Professional Fee Reserve priority over other uses of cash.

**The Debtors' financial records are incomplete, and the Schedules will be amended.** The camp's bookkeeper died in the flood, its records were damaged, its financial statements have not been reviewed by an accountant since 2023, and its QuickBooks records differ from its tax returns for 2024 and 2025. The amended Schedules, the claims register, and the reconciliation of the camper deposits may change the amounts stated in this Disclosure Statement. The Texas Comptroller notified Mystic LLC in August 2024 and NFP in January 2025 of its intent to forfeit their rights to transact business for delinquent franchise tax reports. The Debtors believe the reports were filed and the tax paid, but an uncured forfeiture could affect a Debtor's capacity to convey title until reinstated.[164]

**The criminal investigation is ongoing, and discovery disputes may delay the cases.** The Texas Rangers' investigation continues. In September 2026 the Texas Rangers obtained search warrants in Texas DPS Case No. 2026-0014378 from the 216th Judicial District Court of Kerr County on an affidavit that states the affiant's belief that Mystic LLC committed offenses under the Texas Penal Code, as described above. No charge has been filed. An indictment of any Debtor or any individual could affect the sale, the insurance, the litigation, and the estates' resources, and a charge against a Debtor could give rise to a claim by a governmental unit for fines, restitution, or other amounts, which may be filed through the Governmental Bar Date of December 21, 2026; no such claim has been asserted, and the Debtors will amend the Schedules to disclose any such potential claim as contingent, unliquidated, and disputed. Disputes over the scope of the discovery served by the Committee, the Families, and the Lawrence family may delay the October 9, 2026, hearing, the hearing on this Disclosure Statement, or confirmation.

**D. Risks Relating to Distributions**

Because the GUC Escrow Accounts must be held until the claims are liquidated, and because a reserve must be maintained for unliquidated claims when interim distributions are made, holders of claims in Classes 4 and 5 should expect to receive distributions in installments over a period of years, not in a single payment on the Effective Date. The Plan Administrators may object to claims, and the resolution of objections affects the amounts available to other creditors. A family that elects to transfer its deposit to the Purchaser as a credit toward a future session will depend on the Purchaser's operation of a camp and on the terms of the asset purchase agreement, which will govern the segregated account, refunds if the family does not enroll, and what happens if no camp operates. A family that prefers certainty should elect cash. The tax consequences of the Plan are uncertain.

---

[163] Docket No. 218 ¶¶ 12–13.

[164] Tex. Tax Code §§ 171.251–171.255, 171.2515; Texas Comptroller of Public Accounts, notices to Camp Mystic, LLC (Aug. 2024) and Natural Fountains Properties, Inc. (Jan. 24, 2025) (Debtors' records).

**E. The Debtors Make No Representation About the Outcome of Litigation**

Nothing in this Disclosure Statement predicts the outcome of any Flood Claim, the Transfer Motion, the remand motions, the DSHS Suit, the stay motions, the Trustee Motion, the Independent Fiduciary Motion and the Reply, the Tolling Agreement, the sanctions motions, or the criminal investigation. The Debtors have described each matter as it stands. Creditors should assume that any of them could be decided against the Debtors.

## ARTICLE X.
## ALTERNATIVES TO THE PLAN

**Conversion to chapter 7.** If the Plan is not confirmed, the cases could be converted to cases under chapter 7, with the consequences described in the best-interests discussion above. The Debtors believe conversion would produce lower recoveries for every class and would delay them.

**Appointment of a chapter 11 trustee.** If a trustee were appointed on the Committee's motion, the Debtors' exclusive period would end, and the trustee would decide whether to pursue the Plan, a different plan, or a sale under section 363 outside of a plan. The trustee and the trustee's professionals would be paid from the estates. The Debtors believe a trustee would add cost and delay without adding anything the Plan does not already provide.

**A different plan.** The Debtors' exclusive period to file a plan runs through October 22, 2026, and, because the Plan is filed within that period, their exclusive period to obtain acceptances runs through December 21, 2026. If the Debtors do not obtain the acceptances required by section 1129(a) by that date, or if the Bankruptcy Court terminates exclusivity earlier, the Committee, the Families, or any other party in interest could propose a competing plan. The Debtors are not aware of any competing plan. The Committee has stated that it "has already started developing potential constructs to resolve these cases" and would work with a trustee on "plan structures and asset monetization strategies."[165] Any plan that pays the Families' claims must sell the same assets, collect the same insurance, and try the same claims in the same courts. The Debtors welcome any proposal that improves on the Plan and have invited the Committee to negotiate.

**Dismissal.** Dismissal of the cases would return the parties to the position they occupied on June 23, 2026: five lawsuits proceeding on a state-court schedule against four entities and five individuals sharing $6 million of insurance, with no mechanism to treat the families alike, no protection for the deposit-holding families, and no orderly sale. The Debtors believe dismissal would serve no creditor's interest.

## ARTICLE XI.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING IS A GENERAL SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. IT IS NOT TAX ADVICE. IT DOES NOT ADDRESS STATE, LOCAL, OR FOREIGN TAXES, AND IT DOES NOT**

---

[165] Trustee Motion ¶¶ 6, 63.

**ADDRESS THE CIRCUMSTANCES OF ANY PARTICULAR HOLDER. EACH HOLDER OF A CLAIM SHOULD CONSULT ITS OWN TAX ADVISOR.**

**A. Consequences to the Debtors**

NFP is a corporation and a taxpayer in its own right. It was an S corporation until January 1, 2019, when it converted to a C corporation. Mystic LLC was an S corporation (as Camp Mystic, Inc.) from 1998 until January 2023. Since its membership interests were contributed to MC Family Partnership on January 31, 2023, it has been treated as an entity disregarded as separate from its owner, and its income, gain, loss, and deductions are reported on MC Family Partnership's partnership return and pass through to the partners. MC Family Partnership is a partnership, and MC Management is disregarded as an entity separate from its owner. The cancellation of the Existing Equity Interests and the issuance of the New Equity Interests to the Plan Administrators, to be held in trust, may affect the tax classification of MC Family Partnership and MC Management and the allocation of their income, gain, and loss after the Effective Date; the Debtors are evaluating those consequences, and holders of Existing Equity Interests should consult their own advisors.

The sale of the NFP Assets will generate taxable gain to NFP measured by the difference between the amount realized and NFP's adjusted tax basis in the property, which the Debtors have not yet determined. Because the land has been held since the 1920s and the improvements have been depreciated, the basis is likely to be far below the sale price. NFP's tax on that gain, together with any tax on its 2025 income that remains unpaid, is an administrative expense of the NFP estate that must be paid in full before any distribution to holders of Flood Claims or other unsecured claims against NFP, and the Plan directs that the transactions be structured to minimize current taxes. Gain on the sale of the CM Assets will pass through MC Family Partnership to its partners rather than being taxed to Mystic LLC. The Debtors do not expect that gain to be significant, because the CM Assets consist principally of depreciated equipment, vehicles, and intangibles. Transfers under the Plan, including the recording of the deed to the Purchaser, are exempt from stamp, transfer, and recording taxes under section 1146(a) of the Bankruptcy Code.

To the extent any Debtor's obligations are cancelled for less than their face amount under the Plan, the Debtor may realize cancellation of indebtedness income, which is excluded from gross income under section 108(a)(1)(A) of the Internal Revenue Code at the cost of a reduction of tax attributes under section 108(b). For the pass-through Debtors, the exclusion and the attribute reduction are applied at the partner level. The amount of any such income cannot yet be determined. The Plan authorizes the Plan Administrators to request a prompt determination of each Debtor's tax liability under section 505(b) of the Bankruptcy Code.

**B. Consequences to Holders of Claims**

A holder of a claim generally recognizes gain or loss equal to the difference between the amount of cash received under the Plan and the holder's adjusted tax basis in the claim, with the character of the gain or loss depending on the nature of the claim in the holder's hands. Amounts received on account of a claim for a refund of a camper deposit are generally a return of the holder's own funds and are not income; a family that makes the Deposit Election and applies its deposit to a future session should consult its own advisor about the treatment of the credit. Amounts received

on account of a wrongful death or personal physical injury claim are generally excluded from gross income under section 104(a)(2) of the Internal Revenue Code to the extent they compensate for physical injury or death, but amounts attributable to punitive damages, to interest, or to other components of a claim may be taxable, and the treatment of amounts received through a bankruptcy plan may differ from the treatment of a judgment. Holders of Flood Claims should consult their own tax advisors before agreeing to any allocation of a settlement or distribution among components of their claims.

### C. Withholding and Reporting

The Plan Administrators may be required to withhold taxes from distributions and to report distributions to the Internal Revenue Service. Holders may be asked to provide a Form W-9 or W-8 as a condition to receiving a distribution, and distributions to holders that fail to do so may be subject to backup withholding or, if the form is not provided within the time the Plan allows, may be treated as unclaimed.

## ARTICLE XII.
## RECOMMENDATION AND CONCLUSION

The Debtors filed these cases because a flood that no one at the camp had seen in a century took twenty-seven of the children and young women in their care, and because the amounts the families who lost them seek exceed, many times over, the insurance and the assets available to pay any claim that is allowed. Chapter 11 does not restore what was lost. It does allow the Debtors to do the things that can still be done: to sell what they own in an open process for the highest price; to put the estates' records, including the transactions described in this Disclosure Statement, before creditors and independent fiduciaries; to hold the insurance and the proceeds for every family alike, in whatever order their claims are tried; and to let the institution that generations of Texas families have loved continue, if a licensed and independent owner chooses to carry it forward.

The Debtors believe that the Plan provides the best recovery available to every class of creditor, that it does so more quickly and at less cost than any alternative, and that it deserves the support of the families it is designed to serve. The Debtors recommend that every holder of a claim entitled to vote accept the Plan.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN BY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY ARE ACTUALLY RECEIVED BY EPIQ ON OR BEFORE THE VOTING DEADLINE.**

Dated: September 25, 2026

Respectfully submitted,

**CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC., MYSTIC CAMPS MANAGEMENT, LLC, AND MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., Debtors and Debtors-in-Possession**

**By their counsel:**

By:*/s/ Martin Sosland*________________________________
Martin Sosland (State Bar No. 18855645)
Candice M. Carson (State Bar No. 24074006)
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
2200 Ross Avenue, Suite 5000
Dallas, Texas 75201
Telephone: (469) 654-1340
Email: martin.sosland@vkhh.com
candice.carson@vkhh.com
**- AND -**
Jeff P. Prostok (State Bar No. 16352500)
Emily S. Chou (State Bar No. 24006997)
Suzanne K. Rosen (State Bar No. 00798518)
Lynda L. Lankford (State Bar No. 11935020)
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Telephone: (817) 214-4990
Email: jeff.prostok@vkhh.com
emily.chou@vkhh.com
suki.rosen@vkhh.com
lynda.lankford@vkhh.com
**- AND -**
Deirdre Carey Brown (State Bar No. 24094116)
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
2019 Washington, Suite 105
Houston, Texas 77007
Telephone: 832-367-6722
Email: deirdre.brown@vkhh.com
*Counsel to Debtors and Debtors-in-Possession*

## EXHIBITS

| | |
|---|---|
| Exhibit A | Joint Chapter 11 Plan of Camp Mystic, LLC and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code |
| Exhibit B | Liquidation Analysis [To be filed before the hearing on this Disclosure Statement] |
| Exhibit C | Reserved |
| Exhibit D | Organizational Chart of the Debtors (attached) |
| Exhibit E | Order Granting Temporary Injunction, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Travis Cnty. Dist. Ct. Apr. 15, 2026) (Docket No. 227-5) |
| Exhibit F | Reserved |
| Exhibit G | Tolling Agreement (Exhibit B to the Reply) [To be filed before the hearing on this Disclosure Statement if the Bankruptcy Court has not ruled on the Independent Fiduciary Motion] |
| Exhibit H | Kerr County Hydrologic Assessment (Waterway Engineering, *Guadalupe River Hydrologic Assessment for the July 4, 2025 Flood Event* (July 24, 2025)) |